# EXHIBIT 2

CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM

SWIFTARC

# SWIFTARC BEAUTY FUND, LP

**$10MM Target Capital**
**Limited Partnership Interests**

**Minimum Investment for Class I Limited Partners: $250,000**

**Minimum Investment for Class II Limited Partners: $50,000**

**September 1, 2021**

**Investment Manager:**

**Swiftarc Ventures, LLC**

**General Partner:**

**Swiftarc Beauty Fund GP, LLC**

**The content of this document has not been approved by an Authorized Person within the meaning of the United Kingdom's Financial Services and Markets Act 2000. Reliance on this document for the purpose of engaging in any investment activity may expose a person to a significant risk of losing all of the property or other assets invested.**

DS
JMH

Joanne Marie Holiday

**CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM**

**SWIFTARC BEAUTY FUND, LP**
**$10,000,000**
*LIMITED PARTNERSHIP INTERESTS*

THIS CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM (THIS "***MEMORANDUM***") HAS BEEN PREPARED SOLELY FOR USE BY THE PROSPECTIVE INVESTORS OF SWIFTARC BEAUTY FUND, LP (THE "***PARTNERSHIP***" OR "***FUND***") AND SHALL BE MAINTAINED IN STRICT CONFIDENCE. EACH RECIPIENT HEREOF ACKNOWLEDGES AND AGREES THAT (I) THE CONTENTS OF THIS MEMORANDUM CONSTITUTE PROPRIETARY AND CONFIDENTIAL INFORMATION, (II) THAT SWIFTARC BEAUTY FUND GP, LLC (THE "***GENERAL PARTNER***"). SWIFTARC VENTURES, LLC (THE "***INVESTMENT MANAGER***") AND ITS AFFILIATES, INCLUDING WITHOUT LIMITATION THE GENERAL PARTNER AND THE FUND (COLLECTIVELY, "***SWIFTARC***") DERIVE INDEPENDENT ECONOMIC VALUE FROM SUCH CONFIDENTIAL INFORMATION NOT BEING GENERALLY KNOWN, AND (III) SUCH CONFIDENTIAL INFORMATION IS THE SUBJECT OF REASONABLE EFFORTS TO MAINTAIN ITS SECRECY. THE RECIPIENT FURTHER AGREES THAT THE CONTENTS OF THIS MEMORANDUM ARE A TRADE SECRET, THE DISCLOSURE OF WHICH IS LIKELY TO CAUSE SUBSTANTIAL AND IRREPARABLE COMPETITIVE HARM TO SWIFTARC. ANY REPRODUCTION OR DISTRIBUTION OF THIS MEMORANDUM, IN WHOLE OR IN PART, OR THE DISCLOSURE OF ITS CONTENTS, WITHOUT THE PRIOR WRITTEN CONSENT OF THE GENERAL PARTNER, IS PROHIBITED. THIS MEMORANDUM WILL BE RETURNED TO THE GENERAL PARTNER UPON REQUEST. THE EXISTENCE AND NATURE OF ALL CONVERSATIONS REGARDING THE FUND AND THIS OFFERING MUST BE KEPT CONFIDENTIAL.

THIS MEMORANDUM HAS BEEN PREPARED IN CONNECTION WITH A PRIVATE OFFERING TO ACCREDITED INVESTORS OF CLASS I AND CLASS II LIMITED PARTNERSHIP INTERESTS IN THE FUND (THE "***INTERESTS***"). EACH INVESTOR ACQUIRING CLASS I OR CLASS II LIMITED PARTNERSHIP INTERESTS WILL BE REQUIRED TO EXECUTE AN AMENDED AND RESTATED LIMITED PARTNERSHIP AGREEMENT (THE "***PARTNERSHIP AGREEMENT***") AND A SUBSCRIPTION AGREEMENT AND INVESTOR QUESTIONNAIRE (THE "***SUBSCRIPTION AGREEMENT***") TO EFFECT ITS INVESTMENT IN THE FUND. THIS MEMORANDUM CONTAINS A SUMMARY OF THE PARTNERSHIP AGREEMENT, THE SUBSCRIPTION AGREEMENT AND CERTAIN OTHER DOCUMENTS REFERRED TO HEREIN. HOWEVER, THE SUMMARIES IN THIS MEMORANDUM DO NOT PURPORT TO BE COMPLETE AND ARE SUBJECT TO, AND QUALIFIED IN THEIR ENTIRETY BY, REFERENCE TO THE ACTUAL TEXT OF THE RELEVANT DOCUMENT, COPIES OF WHICH WILL BE PROVIDED TO EACH PROSPECTIVE INVESTOR UPON REQUEST. EACH PROSPECTIVE INVESTOR SHOULD REVIEW THE PARTNERSHIP AGREEMENT, THE SUBSCRIPTION AGREEMENT AND SUCH OTHER DOCUMENTS FOR COMPLETE INFORMATION CONCERNING THE RIGHTS, PRIVILEGES AND OBLIGATIONS OF INVESTORS IN THE PARTNERSHIP. IF ANY OF THE TERMS, CONDITIONS OR OTHER PROVISIONS OF THE PARTNERSHIP AGREEMENT, THE SUBSCRIPTION AGREEMENT OR SUCH OTHER DOCUMENTS ARE INCONSISTENT WITH OR CONTRARY TO THE DESCRIPTIONS OR TERMS IN THIS MEMORANDUM, THE PARTNERSHIP AGREEMENT, THE SUBSCRIPTION AGREEMENT OR SUCH OTHER DOCUMENTS SHALL CONTROL. SWIFTARC RESERVES THE RIGHT TO MODIFY THE TERMS OF THE OFFERING AND THE INTERESTS DESCRIBED IN THIS MEMORANDUM, AND THE INTERESTS ARE OFFERED SUBJECT TO THE GENERAL PARTNER'S ABILITY TO REJECT ANY SUBSCRIPTION IN WHOLE OR IN PART.

THE INTERESTS HAVE NOT BEEN REGISTERED UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED (THE "***SECURITIES ACT***"), OR ANY STATE SECURITIES LAWS OR THE LAWS OF ANY FOREIGN JURISDICTION. THE INTERESTS WILL BE OFFERED AND SOLD UNDER THE EXEMPTION PROVIDED BY SECTION 4(A)(2) OF THE SECURITIES ACT AND REGULATION D PROMULGATED THEREUNDER AND OTHER EXEMPTIONS OF SIMILAR IMPORT IN THE LAWS OF THE STATES AND OTHER JURISDICTIONS WHERE THE OFFERING WILL BE MADE. THE FUND WILL NOT BE REGISTERED AS AN INVESTMENT COMPANY UNDER THE U.S. INVESTMENT COMPANY ACT OF 1940, AS AMENDED (THE "***INVESTMENT COMPANY ACT***"). CONSEQUENTLY, INVESTORS WILL NOT BE AFFORDED THE PROTECTIONS OF THE INVESTMENT COMPANY ACT.

THE INTERESTS DESCRIBED IN THIS MEMORANDUM ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE PARTNERSHIP AGREEMENT AND THE SECURITIES ACT AND APPLICABLE STATE SECURITIES LAWS, PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM. INVESTORS SHOULD BE AWARE THAT THEY WILL BE REQUIRED TO BEAR THE FINANCIAL RISKS OF THIS INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.

THE FUND'S INVESTMENTS WILL BE CHARACTERIZED BY A HIGH DEGREE OF RISK, VOLATILITY, AND ILLIQUIDITY. A PROSPECTIVE INVESTOR SHOULD THOROUGHLY REVIEW THE INFORMATION CONTAINED HEREIN AND THE TERMS OF THE FUND'S PARTNERSHIP AGREEMENT AND SUBSCRIPTION AGREEMENT, AND CAREFULLY CONSIDER WHETHER AN INVESTMENT IN THE FUND IS SUITABLE TO THE INVESTOR'S FINANCIAL SITUATION AND GOALS.

CERTAIN ECONOMIC AND MARKET INFORMATION CONTAINED HEREIN HAS BEEN OBTAINED FROM PUBLISHED SOURCES PREPARED BY OTHER PARTIES. WHILE SUCH SOURCES ARE BELIEVED TO BE RELIABLE, NEITHER THE FUND, THE GENERAL PARTNER, NOR THEIR RESPECTIVE AFFILIATES ASSUME ANY RESPONSIBILITY FOR THE ACCURACY OR COMPLETENESS OF SUCH INFORMATION. NEITHER DELIVERY OF THIS MEMORANDUM NOR ANY STATEMENT HEREIN SHOULD BE TAKEN TO IMPLY THAT ANY INFORMATION CONTAINED HEREIN IS CORRECT AS OF ANY TIME SUBSEQUENT TO THE DATE HEREOF.

NO PERSON HAS BEEN AUTHORIZED TO MAKE ANY STATEMENT CONCERNING THE FUND OR THE SALE OF THE INTERESTS DISCUSSED HEREIN OTHER THAN AS SET FORTH IN THIS MEMORANDUM, AND ANY SUCH STATEMENTS, IF MADE, MUST NOT BE RELIED UPON.

IN CONSIDERING THE PRIOR PERFORMANCE INFORMATION CONTAINED HEREIN, PROSPECTIVE INVESTORS SHOULD BEAR IN MIND THAT PAST PERFORMANCE IS NOT NECESSARILY INDICATIVE OF FUTURE RESULTS, AND THERE CAN BE NO ASSURANCE THAT THE FUND WILL ACHIEVE COMPARABLE RESULTS.

INVESTORS SHOULD MAKE THEIR OWN INVESTIGATIONS AND EVALUATIONS OF THE FUND, INCLUDING THE MERITS AND RISKS INVOLVED IN AN INVESTMENT THEREIN. PRIOR TO ANY INVESTMENT, THE GENERAL PARTNER WILL GIVE INVESTORS THE OPPORTUNITY TO ASK QUESTIONS OF AND RECEIVE ANSWERS AND ADDITIONAL INFORMATION FROM IT CONCERNING THE TERMS AND CONDITIONS OF THIS OFFERING AND OTHER RELEVANT MATTERS. INVESTORS SHOULD INFORM THEMSELVES AS TO THE LEGAL REQUIREMENTS APPLICABLE TO THEM IN RESPECT OF THE ACQUISITION, HOLDING AND DISPOSITION OF THE INTERESTS, AND AS TO THE INCOME AND OTHER TAX CONSEQUENCES TO THEM OF SUCH ACQUISITION, HOLDING AND DISPOSITION.

THIS MEMORANDUM DOES NOT CONSTITUTE AN OFFER TO SELL, OR A SOLICITATION OF AN OFFER TO BUY, AN INTEREST IN ANY JURISDICTION IN WHICH IT IS UNLAWFUL TO MAKE SUCH AN OFFER OR SOLICITATION. NEITHER THE U.S. SECURITIES AND EXCHANGE COMMISSION NOR ANY OTHER FEDERAL OR STATE AGENCY HAS APPROVED AN INVESTMENT IN THE FUND. FURTHERMORE, THE FOREGOING AUTHORITIES HAVE NOT CONFIRMED THE ACCURACY OR DETERMINED THE ADEQUACY OF THIS MEMORANDUM. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

INVESTMENTS WILL BE DENOMINATED IN UNITED STATES DOLLARS ($) AND, THEREFORE, WILL BE SUBJECT TO ANY FLUCTUATION IN THE RATE OF EXCHANGE BETWEEN UNITED STATES DOLLARS ($), THE CURRENCY OF YOUR OWN JURISDICTION AND THE CURRENCY OF THE JURISDICTION IN WHICH ANY PARTNERSHIP PORTFOLIO COMPANY OPERATES OR GENERATES INVESTMENT PROCEEDS, AS APPLICABLE. SUCH FLUCTUATIONS MAY HAVE AN ADVERSE EFFECT ON THE VALUE, PRICE, OR INCOME OF YOUR INVESTMENT.

PROSPECTIVE INVESTORS ARE NOT TO CONSTRUE THIS MEMORANDUM AS INVESTMENT, LEGAL OR TAX ADVICE, AND THIS MEMORANDUM IS NOT INTENDED TO PROVIDE THE SOLE BASIS FOR ANY EVALUATION OF AN INVESTMENT IN AN INTEREST. PRIOR TO ACQUIRING AN INTEREST, A PROSPECTIVE INVESTOR SHOULD CONSULT WITH ITS OWN LEGAL, INVESTMENT, TAX, ACCOUNTING, AND OTHER ADVISORS TO DETERMINE THE POTENTIAL BENEFITS, BURDENS, AND OTHER CONSEQUENCES OF SUCH INVESTMENT.

**FORWARD-LOOKING STATEMENTS:** CERTAIN STATEMENTS IN THIS MEMORANDUM CONSTITUTE FORWARD-LOOKING STATEMENTS. WHEN USED IN THIS MEMORANDUM, THE WORDS “MAY,” “WILL,” “SHOULD,” “PROJECT,” “ANTICIPATE,” “BELIEVE,” “ESTIMATE,” “INTEND,” “EXPECT,” “CONTINUE” AND SIMILAR EXPRESSIONS OR THE NEGATIVES THEREOF ARE GENERALLY INTENDED TO IDENTIFY FORWARD-LOOKING STATEMENTS. SUCH FORWARD-LOOKING STATEMENTS, INCLUDING THE INTENDED ACTIONS AND PERFORMANCE OBJECTIVES OF THE GENERAL PARTNER, THE PARTNERSHIP OR ANY PORTFOLIO COMPANY REFERENCED HEREIN INVOLVE KNOWN AND UNKNOWN RISKS, UNCERTAINTIES AND OTHER IMPORTANT FACTORS THAT COULD CAUSE THE ACTUAL RESULTS, PERFORMANCE OR ACHIEVEMENTS OF THE GENERAL PARTNER, THE PARTNERSHIP OR ANY PORTFOLIO COMPANY TO DIFFER MATERIALLY FROM ANY FUTURE RESULTS, PERFORMANCE OR ACHIEVEMENTS EXPRESSED OR IMPLIED BY SUCH FORWARD-LOOKING STATEMENTS. NO REPRESENTATION OR WARRANTY IS MADE AS TO FUTURE PERFORMANCE OR SUCH FORWARD-LOOKING STATEMENTS. ALL FORWARD-LOOKING STATEMENTS IN THIS MEMORANDUM SPEAK ONLY AS OF THE DATE HEREOF. THE PARTNERSHIP AND THE GENERAL PARTNER EXPRESSLY DISCLAIM ANY OBLIGATION OR UNDERTAKING TO DISSEMINATE ANY UPDATES OR REVISIONS TO ANY FORWARD-LOOKING STATEMENT CONTAINED HEREIN TO REFLECT ANY CHANGE IN ITS EXPECTATION WITH REGARD THERETO OR ANY CHANGE IN EVENTS, CONDITIONS, OR CIRCUMSTANCES ON WHICH ANY SUCH STATEMENT IS BASED.

**NOTICE TO FOREIGN INVESTORS:** PROSPECTIVE FOREIGN INVESTORS SHOULD CAREFULLY CONSIDER THE APPLICABLE LEGENDS CONTAINED IN APPENDIX A ATTACHED HERETO BEFORE DECIDING WHETHER OR NOT TO INVEST IN THE PARTNERSHIP. IT IS THE RESPONSIBILITY OF ANY PERSON OR ENTITY WISHING TO

PURCHASE AN INTEREST TO SATISFY HIMSELF, HERSELF, OR ITSELF AS TO THE FULL OBSERVANCE OF THE LAWS OF ANY RELEVANT TERRITORY OUTSIDE OF THE UNITED

STATES IN CONNECTION WITH ANY SUCH PURCHASE, INCLUDING OBTAINING ANY REQUIRED GOVERNMENTAL OR OTHER CONSENTS OR OBSERVING ANY OTHER APPLICABLE FORMALITIES.

**NOTICE TO FLORIDA RESIDENTS:** A PURCHASER (OTHER THAN AN INSTITUTIONAL INVESTOR DESCRIBED IN SECTION 517.061(7), FLA. STAT.) WHO ACCEPTS AN OFFER TO PURCHASE SECURITIES EXEMPTED FROM REGISTRATION BY SECTION 517.061(11), FLA. STAT., MAY VOID SUCH PURCHASE WITHIN A PERIOD OF THREE (3) DAYS AFTER (A) THE PURCHASER FIRST TENDERS CONSIDERATION TO THE ISSUER, ITS AGENT OR AN ESCROW AGENT OR (B) THE AVAILABILITY OF THAT PRIVILEGE IS COMMUNICATED TO THE PURCHASER, WHICHEVER LATER OCCURS, UNLESS SALES ARE MADE TO FEWER THAN FIVE (5) PURCHASERS IN FLORIDA (NOT COUNTING THOSE INSTITUTIONAL INVESTORS DESCRIBED IN SECTION 517.061(7)).

* * * * *

Any questions regarding this offering, and any requests for copies of the Memorandum, the Partnership Agreement and the Subscription Agreement should be directed to:

**SID JAWAHAR**
SWIFTARC BEAUTY FUND, LP
c/o Swiftarc Beauty Fund GP, LLC
801 Brickell Avenue, Office 709, Miami, FL, 33131
Sid@SwiftarcVentures.com

## TABLE OF CONTENTS

I. EXECUTIVE SUMMARY .......... 7
II. MANAGEMENT TEAM .......... 7
III. INVESTMENT STRATEGY AND PROCESS .......... 9
IV. INITIAL INVESTMENT .......... 10
V. SUMMARY OF PRINCIPAL TERMS .......... 12
VI. CERTAIN RISK FACTORS AND INVESTMENT CONSIDERATIONS .......... 23
VII. POTENTIAL CONFLICTS OF INTEREST .......... 31
VIII. CERTAIN ERISA, TAX AND OTHER REGULATORY MATTERS .......... 36

A. CERTAIN FEDERAL INCOME TAX CONSIDERATIONS .......... 36
B. CERTAIN SECURITIES LAW AND ANTI-MONEY LAUNDERING CONSIDERATIONS .......... 43
C. CERTAIN ERISA CONSIDERATIONS .......... 44

IX. ADDITIONAL INFORMATION .......... 48
APPENDIX A .......... 49

## I. EXECUTIVE SUMMARY

Swiftarc Beauty Fund GP, LLC, a Delaware limited liability company (the "***General Partner***"), is organizing Swiftarc Beauty Fund, LP, a Delaware limited partnership (the "***Fund***" or the "***Partnership***") to pursue early-stage investment opportunities in the fast-evolving and compelling beauty and wellness industries. The Fund's investment manager is Swiftarc Ventures, LLC, a Texas limited liability company (the "***Investment Manager***" together with its affiliates, including without limitation the Fund and the General Partner, "***Swiftarc***").

The Fund is a sector fund dedicated to investing and partnering with management in beauty and wellness companies positioned for solid growth and equity appreciation. The Fund will focus on supporting insightful and driven founders leading the next wave of beauty and wellness companies, which are reinventing and addressing the evolving needs of both more demanding and traditionally underserved consumers. The Fund will initially focus on opportunities aligned with the following categories: underserved beauty and wellness consumer segments, clean and sustainable beauty and wellness, technology-enabled and community-driven beauty, and inclusive beauty and wellness.

The Fund and its management team are designed to support the entrepreneurial journey of a founding team or an organic product idea, from the concept stage through to becoming a thriving product-focused company. The main purpose of this approach is to facilitate a multifunctional relationship between the Fund and the target company. The management team believes that a concentrated investment strategy with smaller impact-focused capital will allow the Fund to challenge and succeed against antiquated larger competitors. The Fund's management team has a deep network of industry relationships and nuanced sector knowledge, which translates into the ability to enhance value within our portfolio companies.

## II. MANAGEMENT TEAM

The Fund will be managed by a seasoned team of successful investors who collectively possess decades of investment experience and significant senior operating experience. The management team has strong anchor networks in Texas, California and New York and stretch across the nation in additional hubs such as Florida, Ohio, Colorado, Tennessee, and Massachusetts. The management team has a proven track record of creating significant value across the global beauty industries. The principal investment personnel will enlist a specially created "Beauty Council" and venture partners to assist the management team in matters of deal sourcing, company diligence and ongoing operational support for the Fund's portfolio companies. These Beauty Council members and other partners bring deep industry expertise and market intelligence to all activities of the Fund.

### General Partners

**SID JAWAHAR,** ***Founder & Managing General Partner***

Sid founded Swiftarc Ventures along with his partners to offer exposure to promising early-stage and fast-growing consumer companies. Sid also serves as the Founder & Managing Partner of Swiftarc and its emerging markets hedge fund, Swiftarc Capital, LLC ("***Swiftarc Capital***"). Swiftarc Capital's portfolio consists of fast-growing consumer businesses that are listed in local markets in the following consumer staple categories: food retail, fast food, household products, fast moving goods, and food and beverage products. He also serves as the Executive Chairman of Esperos Inc, a socially conscious manufacturer of handbags and accessories that promotes women's education around the world. He started his career at Morgan Stanley and spent time in the firm's Hong Kong, Singapore and New York offices focusing on deal execution across various products and geographies. Over the years, Sid has advised, invested in, and chaired several consumer and consumer technology companies.

Sid is focused on several key philanthropic areas which range from developing educational and after school programs in challenging neighborhoods to helping integrate art and science learning in inner cities. The scope of programs currently includes outdoor learning initiatives, intensive summer programs and promoting the arts and sciences in low-income communities in several cities across the country.

**FRANK KRASOVEC, *Co-Founder, General Partner & Chairman***

Frank is a Co-Founder, General Partner and Executive Chairman of Swiftarc Capital and his advisory firm, Norwood Investments. Mr. Krasovec has co-founded, actively invested, and helped operationally scale 12 companies with successful monetizations including 7 initial public offerings over his career. He was also a co-founder in two successful venture firms in the early to mid-1980s that went on to become Austin Ventures and Kirtland Capital. Currently, Frank serves as Chairman, Co-Founder and primary sponsor of Dash Brands, a major quick service restaurant platform in China, Hong Kong, and Macau that has distribution rights to Domino's Pizza across all of China.

**ZOHAR ZIV, *Co-Founder & General Partner***

Zohar is a Co-Founder and General Partner of Swiftarc Capital, is an active angel investor and has over 25 years of executive management experience and a successful track record in growing companies across various environments, including large to small size and public and private companies, rapid growth, and managed over 25 M&A transactions. He served as COO of a $1.8 billion footwear brand, CFO of public and private companies, co- founder and primary sponsor of Dash Brands in China, and a director and advisor to two private footwear, facial recognition and digital media firms.

**FABIAN URQUIJO, *President***

Fabian has broad experience in leading and managing businesses at different stages of their life cycle, ranging from a few million dollars to close to a billion dollar in revenue. His expertise lies in identifying winning strategies and marshaling resources to implement planning in areas including consumer segmentation, concept and communication development, channel strategy, innovation, and talent/organizational development. Immediately prior to Swiftarc, Fabian served as Global Chief Marketing Officer of Revlon for the Professional division and Senior Vice President of Marketing for Portfolio Brands division. At Revlon, Fabian led several business lines including: Male Grooming (Brand: American Crew), Professional Color Care (Brand: Revlon Professional), Professional & Consumer Nail Color & Care (Brands: CND, Cutex, SinfulColors, Pure Ice), Color Cosmetics (Brand: Almay), and Personal Care (Brand: Mitchum). Prior to Revlon, Fabian was with the Procter & Gamble Company for 18 years. His tenure was spent across several geographies (Argentina, Venezuela, United States, Panama) and business lines (Hair Care, Home Care, Health Care, Oral Care, and Fabric Care). Most recently prior to joining Revlon, Fabian was the Senior Marketing Director for the Laundry division at P&G, where he led the Ariel brand across Latin America. Mr. Urquijo is originally from Argentina and received his bachelor's degree in Business Management (Summa Cum Laude) from the Argentinean Catholic University.

**LESLIE WOLFSON, *Engagement Director***

Leslie has over 30 years of expertise building brands and various media companies across the United States, Latin America, and the Caribbean. She became the youngest person to run a division of Jones Apparel Group, the global womenswear brand. She also built the annual sales of Ocean Drive Magazine from $800,000 to over $20 million in 11 years, managing multiple luxury publications including Miami Magazine and Manhattan Magazine. Leslie's extensive network also comprises successful and powerful women executives, founders, and investors.

## III. INVESTMENT STRATEGY AND PROCESS

***Investment Strategy***

The Fund plans to implement a concentrated investment strategy, yet no specific company will comprise more than 15% of the Funds capital. Swiftarc believes that one of the Fund's key differentiators is the management team's unique combination of operating and investing experience that is, in its opinion, both valuable in attracting high quality teams and identifying high quality investment opportunities. The Fund will focus on strong and cohesive founding teams, believing that successful seed-stage investments need to focus on people, product, and pipeline. Further, the Fund will provide an opportunity to take advantage of the opportunities in the beauty sector afforded by the current environment, which is in constant transformation towards cleaner formulation and more transparent ingredients

The Fund will seek to leverage strategic operators in Swiftarc's network to source and acquire deals. The management team's entrepreneurial, operating and investing experience has provided the team with a wide network of entrepreneurs that the team anticipates will help source investment opportunities. This network will also provide strong operational and resource support to the Fund's portfolio companies, identifying and connecting key resources and experts within the Swiftarc ecosystem.

***Industry Focus***

The Fund will seek to invest in early-stage financings of beauty and wellness companies. The Fund intends to make investments (each, a "***Portfolio Investment***") in innovative women or minority-owned, founded, or led companies that are making major economic and social disruptions in the beauty sector.

Beauty is a large and fast-growing category and is in state of a constant reinvention. The U.S. beauty industry continues to get stronger, generating approximately $89.5 billion in revenue in 2018, with the global cosmetics-products market expected to reach $805.61 billion by 2023, up from $532.43 billion in 2017.[1] Given its dynamic nature and economic incentives, there has been a significant amount of M&A activity in the beauty category in recent years, dominated by later, growth-stage investments and private equity firms.[2] Therefore, early-stage beauty investments continue to be relatively underserved.

While the beauty and wellness industry primarily serves female consumers, female-founded and led companies in this space continue to be significantly underrepresented in the venture capital world; only around 2.3% of overall venture funding goes to women-led startups.[3] A key goal of the Fund is to lead in changing this inequitable reality, with a focus on Portfolio Investment that are owned and led by women.

---

[1] *See* "Cosmetics Industry in the U.S. - Statistics & Facts" by M. Rider, STATISTIA.COM, January 6, 2021, available at https://www.statista.com/topics/1008/cosmetics-industry/; see also "The Quiet, Quick Rise Of Indie Beauty Brands" by Pritika Gupta, FORBES, March 4, 2021, available at https://www.forbes.com/sites/columbiabusinessschool/2021/03/04/the-quiet-quick-rise-of-indie-beauty-brands/?sh=3161034e32c1.

[2] *See* "Beauty's M&A Boom to Continue in 2020" by Jessica Schiffer, VOGUE BUSINESS, December 2, 2019, available at https://www.voguebusiness.com/beauty/mergers-and-acquisitions-kylie-cosmetics-coty-estee-lauder-milk-makeup.

[3] *See* "Women-Led Startups Received Just 2.3% of VC Funding in 2020" by Ashley Bittner and Brigette Lau, HARVARD BUSINESS REVIEW, February 25, 2021, available at https://hbr.org/2021/02/women-led-startups-received-just-2-3-of-vc-funding-in-2020.

The expansion of marketing through digital channels has resulted in the ability to attract more consumers willing to pay higher prices for higher quality, with younger consumers increasingly making purchasing decisions after reading online reviews.

The Fund will focus its investments on companies that: (i) have network expertise; (ii) are challenging the status quo in underserved or underfunded consumer areas of the Fund's chosen industry focuses (clean and sustainable beauty and wellness, technology-enabled and community-driven beauty, and inclusive beauty and wellness); and (iii) are digitally-native, post-revenue brands with omnichannel aspirations within either the personal care, skincare, color cosmetics, haircare segments, or overall wellness sectors.

***Investment Stage***

The Fund intends to invest opportunistically in what it believes to be high-quality, high-potential early-stage beauty and wellness companies. While the Fund will seek to lead investments and take board seats with Portfolio Investments, the Fund will also strive to be nimble and be able to act as both a co-lead or participating investor in venture financing rounds.

***Geographic Focus***

The General Partner intends to invest the Fund's committed capital in companies that are based in North America, but over time may explore global investment opportunities. This strategy is driven by the strength of the management team's proprietary people network and the resulting access to differentiated deal sourcing in this geography.

***Evaluation Process***

Mr. Jawahar, Mr. Urquijo, Ms. Wolfson, Mr. Ziv, and Mr. Krasovec, with additional expertise supported by the Beauty Council and the Fund's venture partners, are the central decisionmakers in the investment process for the Fund. Their responsibilities include but are not limited to: (i) participation in regular meetings and pipeline discussions and (ii) performing intensive and thorough due diligence, investigation, and analysis of prospective investments.

When evaluating prospective investments, the team will consider the merits and risks of each investment opportunity. Due diligence items include, but are not limited to, analysis of the founder and management team, market trends and size, competitive differentiation, technology quality, business model, and financial projections.

**IV. INITIAL INVESTMENT**

On August 11, 2021, the Fund executed a Term Sheet (the "***Pause Term Sheet***") for Series "Seed" Preferred Stock financing of The Pause Group, Inc., a Delaware corporation (the "***Pause***"). The Fund will use its best efforts following the Initial Closing to consummate the transactions set forth in the Pause Term Sheet, pursuant to which the Fund will act as a co-lead investor together with Grace Beauty Capital LLC, a Delaware limited liability company ("***Grace Beauty***"). Grace Beauty also intends to invest $1,250,000 (the "***GB Initial Investment***") in the Fund's Initial Closing as an Investor and to become a Limited Partner in the Fund.

The Pause Term Sheet contemplates the creation and issuance of up to 14,133,592 shares of a new class of capital stock designated as Series "Seed" Preferred Stock ("***Series Seed Preferred Stock***"), representing up to fifty-one percent (51%) of the total outstanding capital stock of Pause on a post-money, fully diluted basis, with the ability to allow for oversubscription of up to $1,000,000, at a price per share of $0.353767.

The Fund intends to invest $750,000 for a 7.5% equity stake in Pause, or 2,120,039 shares of Series Seed Preferred Stock. In addition to the other rights and obligations as set forth in the Pause Term Sheet, the Fund shall be entitled to appoint one director to the 5-member board of directors of Pause, until such time as the Fund no longer owns an equity interest in the company or 3 years following the closing of the Fund's initial investment in Pause, whichever is earlier.

In connection with the Initial Closing of the Fund, the Fund has agreed to execute a side letter agreement with Grace Beauty, pursuant to which the Fund will agree to grant certain redemption rights to Grace Beauty with respect to its limited partnership interests in the Partnership. In the event the Fund does not accept subscriptions for at least $7 million in Capital Contributions, in addition to the GB Initial Investment, within 180 days of the Initial Closing (the "***Fundraising Target***"), Grace Beauty shall have the right to elect that the Fund to redeem $500,000 of its Interests in the Fund, in exchange for a cash payment equal to such amount. In the event the Fundraising Target is achieved, however, the side letter agreement provides that the Fund shall also have the right to elect to purchase an additional 2.5% equity stake in Pause for an investment of $250,000, at a $0.353767 price per share of Series Seed Preferred Stock.

## V. SUMMARY OF PRINCIPAL TERMS

*The following information is presented as a summary of certain of the Partnership's principal terms and is qualified in its entirety by reference to the Partnership Agreement, which will be circulated to investors prior to closing. To the extent that this summary conflicts with the Partnership Agreement, the Partnership Agreement will control.*

**THE FUND**

Swiftarc Beauty Fund, LP, a Delaware limited partnership (the "***Fund***").

**GENERAL PARTNER**

The general partner of the Fund will be Swiftarc Beauty Fund GP, LLC, a Delaware limited liability company (the "***General Partner***"). The General Partner will delegate the Fund's management and administration functions to service providers or the Investment Manager (as defined below), as appropriate.

**INVESTMENT MANAGER**

The General Partner has delegated the Fund's day-to-day investment management and certain administrative and advisory activities to Swiftarc Ventures, LLC, a Texas limited liability company (the "***Investment Manager***"). The Investment Manager will make investment decisions pursuant to an agreement among the Fund, the General Partner, and the Investment Manager (the "***Investment Management Agreement***"). The General Partner will remain responsible for the management and control of the Fund's business.

**THE OFFERING**

The Fund is offering Class I and Class II limited partnership interests ("***Interests***") only to a limited number of persons that are (i) "accredited investors," as that term is defined in Regulation D promulgated under the U.S. Securities Act of 1933, as amended, (ii) "qualified clients," as that term is defined under the U.S. Investment Advisers Act of 1940, as amended, and the rules and regulations promulgated thereunder, and (iii) unless waived in the discretion of the General Partner, "qualified purchasers," as that term is defined under the U.S. Investment Company Act of 1940, as amended, and the rules and regulations promulgated thereunder. (Investors who acquire Class I limited partnership interests are hereinafter referred to as the "***Class I Limited Partners***"; investors who acquire Class II limited partnership interests are hereinafter referred to as the "***Class II Limited Partners***"; Class I Limited Partners and Class II Limited Partners are referred to herein collectively as the "***Limited Partners***" and together with the General Partner, are the "***Partners***"). The General Partner reserves the right to impose additional requirements for subscription by particular types of investors and may decline to accept any prospective investor's subscription.

The Fund may enter into arrangements with persons or entities (including those related to the General Partner) who introduce investors to the Fund or provide similar services under which it agrees to make payments or allocate profits to those persons or entities, but will do so only to the extent the General Partner and/or the Investment Manager agrees to reductions in or reallocations of a

portion of the Management Fee and/or the carried interest to which they would otherwise be entitled.

**FUND SIZE**

The Fund is seeking capital contributions ("***Capital Contributions***") from eligible investors in the aggregate amount of $10,000,000, with the ability to allow for oversubscription of up to $5,000,000 (the "***Oversubscription Right***"). The General Partner may hold an initial closing of the Fund (the "***Initial Closing***") upon the acceptance of subscriptions from Partners representing Capital Contributions of at least $1,250,000.

**SUBSEQUENT CLOSINGS**

Following the Initial Closing, the Fund may admit additional Limited Partners or accept increased Capital Contributions from existing Limited Partners at one or more additional closings ("***Subsequent Closings***") to be held within 18 months after the Initial Closing, the last closing held within such 18-month period (the "***Final Closing***"); *provided, however*, the General Partner may extend this period to 24 months in its sole discretion, if it believes such extension is necessary given the circumstances.

**INVESTMENT OBJECTIVES**

The Fund's primary objective will be to generate significant capital appreciation primarily through equity and equity-related investments (each, a "***Portfolio Investment***" and collectively, "***Portfolio Investments***") in early-stage financings of beauty and wellness companies (each, a "***Portfolio Company***" and collectively, "***Portfolio Companies***").

**MINIMUM CONTRIBUTION**

The minimum Capital Contribution of each Class I Limited Partner to the Fund will be $250,000; the minimum Capital Contribution of each Class II Limited Partner to the Fund will be $50,000. Notwithstanding the foregoing, the General Partner may accept a lesser Capital Contribution in its sole and absolute discretion.

**GENERAL PARTNER CONTRIBUTION**

The General Partner will contribute to the Fund an aggregate of at least five percent (5%) of the Fund's aggregate Capital Contributions, but not to exceed $500,000.

**TERM**

The Fund's term shall continue until the fifth (5th) anniversary of the Initial Closing, *provided* that the General Partner may extend the Fund's term for up to two (2) additional two (2) year periods in its sole and absolute discretion.

**INVESTMENT PERIOD**

The Fund will have an investment period beginning on the Initial Closing and ending on the earliest to occur of: (a) the second (2nd) anniversary of the Initial Closing and (b) the date on which the aggregate Capital Contributions of the Partners have been used committed or reserved for a specific purpose (the "***Investment Period***"); provided, that the General Partner may extend the Investment Period to the third (3rd) anniversary of the Initial Closing, in its sole discretion, if the General Partner believes such an extension is necessary or desirable. Following the expiration of the

Investment Period, no Portfolio Investment may be made by the Fund without the consent of the Advisory Committee.

**CAPITAL CONTRIBUTIONS**

Each Limited Partner shall make its Capital Contribution upon acceptance of such Limited Partner's Subscription Agreement by the General Partner at the applicable closing. Each Limited Partner may also be requested to make certain additional capital contributions to the Partnership following the end of the Investment Period if the General Partner determines such capital contributions are necessary to cover the Investment Expenses in a given year; provided, that, in no event, shall the amount requested from a Limited Partner in a given year exceed three percent (3.0%) of such Limited Partner's Capital Contributions as of the beginning of such year.

**DISTRIBUTIONS**

Distributions in respect of proceeds from a Portfolio Investment will be apportioned among the Partners participating in such Portfolio Investment in proportion to their relative Capital Contributions with respect to such Portfolio Investment. The amount apportioned to the General Partner in respect of its Capital Contributions will be distributed to the General Partner, and the amount apportioned to each Limited Partner, will be distributed as follows:

(a) first, 100% to such Limited Partner until such Limited Partner has received, on a cumulative basis, taking into account all prior distributions made pursuant to this clause (a), an aggregate amount equal to its Capital Contributions with respect to the Portfolio Investment; and

(b) thereafter, (i) with respect to each Class I Limited Partner, such Class I Limited Partner's pro rata share of the distributions made pursuant to this clause (b) at the Class I Distribution Rate, and (ii) with respect to each Class II Limited Partner, such Class II Limited Partner's pro rata share of the distributions made pursuant to this clause (b) at the Class II Distribution Rate.

As used herein, the term "***Class I Distribution Rate***" means 90% to the Class I Limited Partners and 10% to the General Partner; and the term "***Class II Distribution Rate***" means 80% to the Class II Limited Partners and 20% to the General Partner.

Distributions that the General Partner receives pursuant to clause (b) above are referred to herein as "***Carried Interest Distributions***."

A distribution relating to a partial disposition of a Portfolio Investment will be subject to the above formula, with the Carried Interest Distributions based *pro rata* on the original cost of, and the cumulative distributions made with respect to, the disposed portion of such investment.

Notwithstanding the foregoing distribution provisions, the General Partner may receive tax distributions to satisfy tax liabilities arising from allocations attributable to its Carried Interest Distributions.

The General Partner intends to promptly distribute all cash received by the Fund, less cash reserved for future expenses and any required tax withholdings.

**CLAWBACK**

The General Partner will be required to restore funds to the Fund to the extent that it has received (or would be deemed to have been received if each Portfolio Investment were realized at fair market value as of such date) Carried Interest Distributions in excess of amounts otherwise distributable to the General Partner pursuant to the formula set forth in the "Distributions" section above, applied on an aggregate basis covering all transactions of the Fund (the "***Clawback***") upon termination of the Fund. In no event will the General Partner be required to restore more than the cumulative distributions received by the General Partner as Carried Interest Distributions determined on an after-tax basis.

**LIMITED PARTNER GIVEBACK**

The General Partner may require each Limited Partner to return distributions made to such Limited Partner for the purpose of meeting such Limited Partner's *pro rata* share of Investment Expenses (as defined below), including indemnification obligations. No Limited Partner will be required to return all or a portion of a distribution to the extent such return, combined with all prior returns of distributions, would exceed the lesser of twenty percent (20%) of such Limited Partner's Capital Contributions and forty percent (40%) of the aggregate distributions received by such Limited Partner from the Fund. The obligation to return a distribution will survive the termination of the Fund and will cease upon the earliest to occur of (i) the second (2nd) anniversary of the date of termination of the Fund or (ii) the second (2nd) anniversary of the date of such distribution, unless, in each case, notice of a potential claim is given to each Limited Partner prior to such date (in which case such obligation will survive with respect to such claim until the date such claim is ultimately resolved and satisfied).

**ALLOCATION OF INCOME, EXPENSES, GAINS AND LOSSES**

Income, expenses, gains, and losses of the Fund generally will be allocated among the Partners in a manner that reflects the economic interests of the Partners and is consistent with the requirements of the Internal Revenue Code of 1986, as amended (the "***Code***").

**MANAGEMENT FEE**

The Fund will pay an annual management fee, in quarterly installments in advance (the "***Management Fee***"), to the Investment Manager (i) in respect of each Class I Limited Partner in an amount equal to one percent (1%) *per annum* of the Capital Contributions of such Limited Partner during the life of the Fund and (ii) in respect of each Class II Limited Partner in an amount equal to two percent

(2%) *per annum* of the Capital Contributions of such Limited Partner during the life of the Fund.

**OTHER FEES**

Any directors' fees received by the Investment Manager or its affiliates, the General Partner, or the individual members of the General Partner or the Investment Manager from a Portfolio Company will first be used to pay unreimbursed related expenses, and one hundred percent (100%) of each Limited Partner's *pro rata* portion of the Fund's allocable share of any remaining directors' fees will be applied to reduce the Management Fee in respect of such Limited Partner.

The Investment Manager and its affiliates may charge transaction fees (including, without limitation, set-up, acquisition, and commitment fees) in connection with a Portfolio Investment or monitoring fees, payable by a Portfolio Company. Except as described in the following paragraph, the Investment Manager will apply one hundred percent (100%) of each Limited Partner's *pro rata* portion of the Fund's allocable share of any such transaction fees, net of applicable expenses, to reduce the Management Fee in respect of such Limited Partner.

The General Partner, the Investment Manager or any of their respective affiliates may perform certain functions in-house in lieu of hiring an unaffiliated third-party service provider to provide these services if they believe they can provide such services more effectively and at a cost that is comparable to prevailing market rates for such services, and on such terms reasonably expected by the General Partner, the Investment Manager or any of their respective affiliates to be available in an arm's-length transaction with an un-affiliated third party (such services, "***Affiliate Services***"). Any such fees will be treated as an Operating Expense of the Fund, will be in addition to the Management Fee and will not be subject to offset.

**ORGANIZATIONAL EXPENSES**

The Fund will bear all legal, organizational, and offering expenses, including the out-of-pocket expenses of the General Partner and its agents actually incurred in the formation of the Fund and the General Partner ("***Organizational Expenses***"), not to exceed $250,000.

The Investment Manager will bear full economic responsibility for all fees payable to any placement agent in connection with its role as placement agent for, and financial advisor to, the Fund through an offset against the Management Fee. The Limited Partners will not economically bear any such fees.

**OPERATING EXPENSES**

The Fund will bear its *pro rata* share of all third-party costs and expenses of maintaining the operations of the Fund and appraising and valuing, acquiring, maintaining, financing, hedging and disposing of Portfolio Investments ("***Operating Expenses***" and together with the Management Fee and Organizational Expenses, the "***Investment Expenses***"), including without limitation: broken deal

expenses (to the extent not paid for or reimbursed by Portfolio Investments), limitation, taxes, fees and other governmental charges levied against the Fund; insurance; administrative and research fees; expenses of custodians, outside advisors, counsel, accountants, auditors, administrators and other consultants and professionals; expenses and costs incurred in connection with the maintenance of the Fund's books of account and the preparation of audited or unaudited financial statements; expenses associated with forming and operating holding vehicles related to a Portfolio Investment; technological expenses; interest on and fees, costs and expenses arising out of all financings entered into by the Fund (including, without limitation, those of lenders, investment banks, and other financing sources); brokerage commissions; appraisal fees; investment costs; custodial expenses; litigation expenses (including the amount of any judgments or settlements paid in connection therewith); winding up and liquidation expenses; and any extraordinary expenses to the extent not reimbursed or paid by insurance, but specifically excluding the Management Fee and Organizational Expenses.

**CO-INVESTMENT OPPORTUNITIES**

Where possible and appropriate, the General Partner may, but will be under no obligation, to provide co-investment opportunities to certain Limited Partners before making such opportunities available to third parties.

**OTHER FUNDS**

The General Partner and Investment Manager generally will not commence the operation of another equity investment fund with objectives, strategy and scope substantially similar to those of the Fund until the earlier of: (i) the end of the Investment Period; and (ii) such time as at least seventy-five percent (75%) of the Capital Contributions have been invested, committed or allocated for investment, used for Fund Expenses or Organizational Expenses, or reserved for Follow-on Investments or reasonably anticipated expenses of the Fund.

**ADVISORY COMMITTEE**

The General Partner will establish up to a five (5)-member Advisory Committee consisting solely of representatives of the Limited Partners (the "***Advisory Committee***"). Limited Partners with Capital Contributions in excess of $1,000,000 will be eligible for selection for the Advisory Council. Notwithstanding the foregoing, the General Partner may select Limited Partners with a lesser Capital Contributions for service on the Advisory Committee in its sole and absolute discretion. The General Partner shall strategically select members to the Advisory Committee based on interest, industry background, and network. The duties of the Advisory Committee will include such advice and counsel as is requested by the General Partner in connection with the Fund's investments and other Fund matters and attendance at the Advisory Committee's meetings. Advisory Committee members may be offered the opportunity to make co-investments alongside the Fund, in the General Partner's discretion.

| | |
|---|---|
| **DEFAULT PROVISIONS** | The Partnership Agreement will include customary default provisions to address situations in which a Limited Partner fails to make its Capital Contribution as set forth in such Limited Partner's Subscription Agreement, or otherwise make a payment when due. |
| **PARALLEL INVESTMENT VEHICLES** | The General Partner may, in its sole and absolute discretion, organize additional partnerships or other vehicles (each, a "***Parallel Investment Vehicle***") to facilitate, from a legal, tax or regulatory standpoint, investments by certain foreign, tax-exempt or other classes of investors, the structure and terms of which may differ from that of the Fund, but which will invest proportionately in all transactions on effectively the same terms and conditions as the Fund. For purposes hereof, all references to the Fund include any such Parallel Investment Vehicles. |
| **ALTERNATIVE INVESTMENT VEHICLES; FEEDER VEHICLES** | If at any time the General Partner determines that for legal, tax, regulatory or other similar considerations, it is in the best interests of the Fund or one or more Partners that certain Partners participate in a potential Portfolio Investment through an alternative investment structure, the General Partner may affect the making of such Portfolio Investment outside of the Fund by requiring certain or all Partners to make capital contributions with respect to such Portfolio Investment of a limited partnership or other vehicle that would provide for the limited liability of the Limited Partners investing therein (each, an "***Alternative Investment Vehicle***"). The governing documents of any such Alternative Investment Vehicle will contain terms and conditions generally comparable to those of the Fund and will be managed by the General Partner or an affiliate thereof.<br><br>The General Partner may, in its sole and absolute discretion, require any Limited Partner, for legal, tax, regulatory or other similar considerations, (or offer such Limited Partner the right) to hold its Interest in the Fund or its interest in any Alternative Investment Vehicle with respect to one or more Portfolio Investments indirectly through one or more vehicles that would hold such interest (each, a "***Feeder Vehicle***"). |
| **REPORTS** | The Limited Partners shall receive (i) annual audited financial statements and annual report (including an overview of the portfolio), (ii) quarterly valuations of the portfolio, (iii) quarterly summaries of new investments and dispositions made during the period, and (iv) Schedule K-1's and any other tax information reasonably requested by a Limited Partner. |
| **INDEMNIFICATION AND EXCULPATION** | To the fullest extent permitted by applicable law, none of the General Partner, the Investment Manager or any of their respective affiliates or any such entity's (including any such affiliate's) directors, officers, partners, members, shareholders, employees, consultants, agents or representatives (each, a "***Covered Person***") will be liable to the Fund or its investors (as the case may be) for any |

losses, claims, damages, liabilities or expenses (collectively, "***Indemnified Losses***") arising out of, related to, or in connection with any act or omission of such Covered Person, except for any Indemnified Losses arising out of, related to, or in connection with (i) any act or omission that is finally judicially determined to have been primarily attributable to such Covered Person's fraud, gross negligence, bad faith or willful misconduct or (ii) a material breach of the Partnership Agreement. Nothing in the Partnership Agreement, the Investment Management Agreement, this Memorandum or otherwise constitutes a waiver or limitation of any Limited Partner's rights under the U.S. Federal or state securities laws.

In addition, the Partnership Agreement will provide that to the fullest extent permitted by law, the General Partner shall incur no liability and shall be fully indemnified out of the assets of the Fund if it takes, or refrains from taking, any action under the Partnership Agreement pursuant to the advice or recommendation of legal counsel, accountants, appraisers, management consultants, investment bankers and other consultants and advisers selected and engaged by it on behalf of the Fund (including the Investment Manager). The obligations and liabilities assumed by the General Partner for the account of the Fund shall be limited in any case to the assets of the Fund and no Limited Partner or any other person shall be entitled to seek the satisfaction of any such obligation from the General Partner to the extent that the assets of the Fund are insufficient to satisfy such obligation or from the directors, officers, employees, or agents of the General Partner.

**SIDE LETTERS**

The General Partner, on behalf of the Fund, expects from time to time to enter into letter agreements or other similar agreements (collectively, "***Side Letters***") with one or more Limited Partner (including Limited Partners who may be employees, members, officers, partners, principals, directors, agents and certain third party strategic investors who are also holders of equity or equity-linked securities of the General Partner or its affiliates), which provide such Limited Partners with additional or different rights than such Limited Partners have pursuant to the Partnership Agreement. As a result of such Side Letters, certain Limited Partners will receive additional rights (which may include expanded informational rights or preferential economic terms) which other Limited Partners will not receive. The General Partner may not be required to notify all Limited Partners of any such Side Letters or any of the rights or terms or provisions thereof and may not be required to offer such additional or different rights or terms to all Limited Partners.

**REQUESTS FOR ADDITIONAL INFORMATION**

Each Limited Partner will be required to comply promptly with reasonable requests for information made by the General Partner in connection with the operation of the Fund, including in order to comply with any actual or anticipated requests by any U.S. federal,

state or local or non-U.S. regulatory authority, agency, committee, court, exchange or self-regulatory organization (e.g., obtaining approvals necessary for the making, holding or disposition of any investment) and to assist the General Partner in complying with tax, regulatory and other requirements.

**TRANSFER OF INTERESTS**

Generally, a Limited Partner may not sell, assign, or transfer any interest in the Fund without the prior written consent of the General Partner, which generally may be withheld in the General Partner's sole discretion. In addition, generally, a Limited Partner may not withdraw any amount from the Fund, except as otherwise agreed with such Limited Partner and other than with respect to certain regulated Limited Partners in certain circumstances as set forth in the Partnership Agreement. A Limited Partner may be required to withdraw from the Fund in certain circumstances as set forth in the Partnership Agreement, including to avoid subjecting the Fund or any other Partner to any regulatory or tax obligation to which it would not otherwise be subject.

**EXCUSED PARTICIPATION**

A Partner may be excused in certain circumstances from participating in one or more particular investments as set forth in the Partnership Agreement.

**TAX CONSIDERATIONS**

The Fund expects to be treated as a partnership and not as an association taxable as a corporation for U.S. Federal income tax purposes. For a discussion of certain U.S. Federal income tax considerations relating to an investment in the Fund, see Section VIII, "Certain ERISA, Tax and Other Regulatory Matters" below. Each prospective Limited Partner should consult with its own tax advisor regarding the U.S. Federal, state, local and foreign income, and other tax consequences applicable to an investment in the Fund.

**UBTI; ECI**

The Fund will use its reasonable best efforts not to invest more than (i) twenty-five percent (25%) of the Fund's aggregate Capital Contributions in a manner that the General Partner reasonably believes would cause a tax-exempt partner to have "unrelated business taxable income" ("***UBTI***") within the meaning of Section 512 of the Code, or (ii) twenty-five percent (25%) of the Fund's aggregate Capital Contributions in a manner that the General Partner reasonably believes would cause a non-U.S. partner to have income "effectively connected with the conduct of a trade or business within the United States," as defined in Section 864(c) of the Code, in each case as a result of investments in flow-through entities that are conducting active businesses. The Fund may, however, generate debt financed UBTI under Section 514 of the Code as a result of the Fund's borrowing activity, but with respect to investments that are not made in reliance on the aforementioned 25% "basket", generally is prohibited from borrowing money (other than to bridge a capital call) if the General Partner believes it would result in such debt-financed UBTI.

**ERISA CONSIDERATIONS**

Investors subject to the Employee Retirement Income Security Act of 1974, as amended ("***ERISA***"), should consult their own advisors as to the application of ERISA to an investment in the Fund. The General Partner will use its reasonable efforts so that the Fund's assets should not constitute "plan assets" under ERISA. The Fund may require certain representations or assurances from Limited Partners that are subject to ERISA, and the General Partner shall be entitled to rely on such representations and assurances without further inquiry.

**RISKS AND CERTAIN POTENTIAL CONFLICTS OF INTEREST**

Investment in the Fund involves significant risks and there can be no assurance that the Fund's investment objectives will be achieved. There may occur potential or actual conflicts of interest involving the General Partner and its affiliates (including portfolio companies of other investment funds managed by affiliates of the General Partner), on the one hand, and the Fund and its Portfolio Companies, on the other hand. For a discussion of risks and certain potential conflicts of interest, see Section VI, "Certain Risk Factors and Investment Considerations" and Section VII, "Potential Conflicts of Interest" below.

**INVESTMENT CONSIDERATIONS**

Each prospective investor should consult its own advisers as to legal, business, tax, accounting, ERISA and other related matters concerning an investment in the Fund. Each prospective non-U.S. investor should consult its own tax and other advisers in determining the possible tax, exchange control, or other consequences to such investor under the laws of the jurisdictions of which it is a citizen, resident, or domiciliary; in which it conducts business; or in which it otherwise may be subject to tax, of the purchase and ownership of limited partner interests in the Fund.

For further discussion of certain investment considerations, see Section VI, "Certain Risk Factors and Investment Considerations" below.

**LEGAL COUNSEL**

DuBois Bryant & Campbell, LLP has been retained to act as counsel to the Fund.

## VI. CERTAIN RISK FACTORS AND INVESTMENT CONSIDERATIONS

*Potential Limited Partners should be aware that an investment in the Fund involves a high degree of risk and, therefore, should be undertaken only by investors capable of evaluating the risks of the Fund and bearing the risks it represents. There can be no assurance that the Fund's investment objectives will be achieved, or that an investor will receive a return of its capital, and therefore, an investor should only invest in the Fund if such investor is able to withstand a total loss of its investment. The following considerations, among others, should be carefully evaluated before making an investment in the Fund. The following risks do not purport to be a complete explanation of all of the risks involved in acquiring an Interest. Potential investors are urged to read this entire Memorandum and the Partnership Agreement before making a determination whether to invest in the Fund. Prospective investors should also consult their own financial, tax and legal advisors regarding the suitability of an investment in the Fund prior to subscribing for an investment in the Fund.*

**OVERALL RISKS**. Prospective investors are not to construe any communication from the Fund, the General Partner, the Investment Manager, of their respective managers, members, partners or any other person or entity identified herein or any of their respective employees, affiliates or representatives as providing assurances, whether express or implied, that the investment objectives or strategy of the Fund will be realized, that any benefits or advantages to prospective investors of an investment in the Fund suggested, implied or advocated will be available or accomplished, or that any historical performance record of any of the entities or persons mentioned herein will be repeated with respect to the Fund or will confer any benefits on the Fund or prospective investors.

**RISK INHERENT IN VENTURE CAPITAL INVESTMENTS**. The types of investments that the Fund anticipates making involve a high degree of risk. In general, financial and operating risks confronting portfolio companies can be significant. While targeted returns should reflect the perceived level of risk in any investment situation, there can be no assurance that the Fund will be adequately compensated for risks taken. A loss of an investor's entire investment is possible. The timing of profit realization is highly uncertain. Losses are likely to occur early in the Fund's life, while successes often require a long maturation.

Seed-stage companies often experience unexpected problems in the areas of product development, marketing, financing, and general management, which, in some cases, cannot be adequately solved. Such companies may face intense competition, including from companies with greater financial resources, more extensive development, marketing and service capabilities and a larger number of qualified managerial and technical personnel. In addition, such companies may require substantial amounts of financing, which may not be available through institutional private placements or the public markets. The percentage of companies that survive and prosper can be small.

**INVESTMENTS IN UNSEASONED COMPANIES**. The Fund may invest its assets in privately held companies with limited histories of profit and stability. These companies may require considerable additional capital to develop technologies and markets, acquire customers and achieve or maintain a competitive position. This capital may not be available at all, or on acceptable terms. Such companies may face intense competition, including competition from established companies with much greater financial and technical resources, more extensive development, manufacturing, marketing and service capabilities, and a greater number of qualified managerial and technical personnel. Although the Fund may be represented by a representative of the General Partner on a Portfolio Company's board of directors, each Portfolio Company will be managed on a day-to-day basis by its own management team (who generally will not be affiliated with the Fund or the General Partner). Portfolio Companies may have substantial variations in operating results from period to period and experience failures or substantial declines in value at any stage.

**FOREIGN INVESTMENTS**. The Fund may invest in companies that are based outside of the United States or the operations of which are primarily outside of the United States. Any investment in a foreign country involves risks not found in the domestic securities market, including the following: the risk of economic and financial instability in the foreign country, which in some cases may include a collapse in credit markets, stock prices, currencies and/or consumer spending; the risk of adverse social and political developments, including nationalization, confiscation without fair compensation, political and social instability and war; the risk that the foreign country may impose restrictions on the repatriation of investment income or capital or on the ability of foreign persons to invest in certain types of companies, assets or securities; risks related to the possible lack of availability of sufficient financial information as a result of accounting, auditing, and financial disclosure standards that differ, in some cases significantly, from those in the United States; risks related to foreign laws and legal systems, which are likely to differ from those of the United States, including in particular the laws with respect to the rights of investors which may not be as comprehensive or well developed as those in the United States and the procedures for the judicial or other enforcement of such rights which may not be as effective as in the United States; risks related to the fact that some investments may be denominated in foreign currencies and, therefore, will be subject to fluctuations in exchange rates; and risks related to applicable tax laws and regulations and tax treaties, which are likely to vary from country to country and may be less well developed than those in the United States, possibly resulting in retroactive taxation so that the Fund could become subject to an unanticipated local tax liability. The profits or losses of the Fund on any investment, as measured in U.S. dollars, will be affected by fluctuations in currency exchange rates and exchange control regulations as well as by the success of the investment itself. In addition, the Fund may incur costs in connection with conversions between various currencies. The Fund does not presently intend to seek to reduce currency risks through "hedging" or other methods.

**NO ASSURANCE OF RETURNS**. An investment in the Fund is highly speculative, involves a high degree of risk and could result in the loss of part or all of the Investor's investment in the Fund. There can be no assurance that the Investor will receive distributions from the Fund in an amount equal to its investment in the Fund. The timing of profit realization, if any, is highly uncertain.

**RELIANCE ON THE GENERAL PARTNER**. The General Partner will have sole discretion over the investment of the capital contributed to the Fund as well as the ultimate realization of any profits. The Investor will not receive the detailed financial information issued by Portfolio Companies that will be available to the Fund. Accordingly, the Investor will not have the opportunity to evaluate the relevant economic, financial and other information that will be utilized by the General Partner in its selection of investments. As such, the pool of funds in the Fund represents a blind pool of funds. The Limited Partners will not make decisions with respect to the management, disposition or other realization of any investment made by the Fund, or other decisions regarding the Fund's business and affairs. The Investor will be relying on the General Partner to identify, structure, and implement investments consistent with the Fund's investment objectives and policies and to conduct the business of the Fund as contemplated by the Partnership Agreement. The loss of the Sid Jawahar (the "***Managing General Partner***") would likely have a significant adverse impact on the business of the Fund. No assurances can be given that the Managing General Partner will continue to be affiliated with the Fund throughout its term. Notwithstanding any prior experience that the Managing General Partner may have in making investments of the type expected to be made by the Fund, any such experience necessarily was obtained under different market conditions and with different technologies at the forefront

**RELIANCE ON PORTFOLIO COMPANY MANAGEMENT.** Although the General Partner may seek representation on the board of directors of each of the Portfolio Companies, the Fund will not have an active role in the day-to-day management of the companies in which it invests. To the extent that the senior management of a Portfolio Company performs poorly, or if a key manager terminates employment, the Fund's investment in such company could be adversely affected.

**LACK OF INFORMATION FOR MONITORING AND VALUING THE FUND'S ASSETS.** Generally, there will be no readily available market for a substantial number of the Fund's investments and hence, most of the Fund's investments will be difficult to value. Despite the General Partner's efforts to acquire sufficient information to monitor certain of the Fund's investments and make well-informed valuation and pricing determinations, the General Partner may only be able to obtain limited information at certain times and, in some cases, may not be able to obtain information beyond the information that is publicly available. It is possible that the General Partner may not be aware on a timely basis of material adverse changes that have occurred with respect to certain of its investments. The value of the Fund's assets could be significantly negatively affected by any such event. Further, the General Partner will have to make valuation determinations without the benefit of an adequate amount of relevant information. The Investor should be aware that as a result of these difficulties, as well as other uncertainties, any valuation made by the General Partner may not represent the fair market value of the securities acquired by the Fund.

**COMPETITIVE MARKETPLACE**. The marketplace for venture capital investing has become increasingly competitive. Participation by financial intermediaries has increased, substantial amounts of funds have been dedicated to making investments in the private sector and the competition for investment opportunities is at high levels. Some of the Fund's potential competitors may have greater financial and personnel resources than the General Partner. There can be no assurances that the General Partner will locate an adequate number of attractive investment opportunities.

**AVAILABILITY OF ATTRACTIVE INVESTMENT CANDIDATES**. The ultimate success of the Fund will hinge on its ability to locate attractive investment candidates. There can be no assurances that attractive candidates will be found in sufficient quantity to allow all of the capital contributions to be deployed within the investment period.

**CHANGING ECONOMIC CONDITIONS.** The success of any investment activity is determined to some degree by general economic conditions, and the General Partner's investment strategy could be significantly impacted by changing external economic conditions in the United States and global economics, as well as global pandemics such as the outbreak of novel coronavirus, later named COVID-19, that started in late 2019. The availability, unavailability, or hindered operation of external credit markets, equity markets and other economic systems which the Fund may depend upon to achieve its objectives may have a significant negative impact on the Fund's operations and profitability. The stability and sustainability of growth in global economies may be impacted by terrorism or acts of war. There can be no assurance that such markets and economic systems will be available or will be available as anticipated or needed for the Fund to operate successfully. Changing economic conditions could potentially adversely impact the valuation of the Fund's Portfolio Companies.

The extent to which COVID-19 impacts our investment strategy or the operations and performance of our Portfolio Companies will depend on future developments, which are highly uncertain and cannot be predicted with confidence, including the duration of the outbreak, new information which may emerge concerning the severity of the novel coronavirus and the actions to contain the pandemic or treat its impact, among others. In particular, the continued spread of COVID-19 globally could adversely impact supply chain, sales and marketing and other operations of our Portfolio Companies.

**MINORITY INVESTMENTS**. A significant portion of the Fund's investments may represent minority stakes in privately held companies. In addition, during the process of exiting investments, the Fund is likely to hold minority equity stakes if portfolio holdings are taken public. As is the case with minority holdings in general, such minority stakes that the Fund may hold will have neither the control characteristics of majority stakes nor the valuation premiums accorded majority or controlling stakes. The Fund may also invest in companies for which the Fund has no right to appoint a director or otherwise exert significant influence. In such cases, the Fund will be reliant on the existing management and board of directors of

such companies, which may include representatives of other financial investors with whom the Fund is not affiliated and whose interests may conflict with the interests of the Fund.

Although it is expected that appropriate rights generally will be sought to protect the Fund's interests, to the extent possible, there can be no assurance that such minority shareholder rights will be available. The General Partner expects to make investments in companies that have incurred or are permitted to incur indebtedness, or that may issue equity securities that rank senior to the Fund's investment. By their terms, such instruments may provide that their holders are entitled to receive payments of dividends, interest or principal on or before the dates on which payments are to be made in respect of the Fund's investment. In the event of insolvency, liquidation, dissolution, reorganization or bankruptcy of a company in which an investment is made, creditors or holders of securities ranking senior to the Fund's investment in such Portfolio Company typically would be entitled to receive payment in full before distributions could be made in respect of the Fund's investment. After repaying creditors and senior security holders, the company's remaining assets may not be sufficient for repayment of amounts owed in respect of the Fund's investment. To the extent that any assets remain, holders of claims that rank equally with the Fund's investment would be entitled to share on an equal and ratable basis in distributions that are made out of those assets.

**PROJECTIONS.** Projected operating results of a Portfolio Company in which the Fund invests normally will be based primarily on financial projections prepared by each Portfolio Company's management team. In all cases, projections are only estimates of future results that are based upon assumptions made at the time the projections are developed. There can be no assurance that the results set forth in the projections will be attained, and actual results may be significantly different from the projections. Also, general economic factors, which are not predictable, can have a material effect on the reliability of projections.

**NO ASSURANCE OF ADDITIONAL CAPITAL FOR INVESTMENTS**. After the Fund has financed a company, continued development and marketing of products may require that additional financing be provided. No assurance can be made that such additional financing will be available, and no assurance can be made as to the terms upon which such financing may be obtained.

**RESERVES**. As is customary in the industry, the General Partner may establish reserves for follow-on investments by the Fund in portfolio companies, operating expenses, Fund liabilities, and other matters. Estimating the appropriate amount of such reserves is difficult, especially for follow-on investment opportunities, which are directly tied to the success and capital needs of portfolio companies. Inadequate or excessive reserves could impair the investment returns to the investors. If reserves are inadequate, the Fund may be unable to take advantage of attractive follow-on or other investment opportunities or to protect its existing investments from dilutive or other punitive terms associated with "pay-to-play" or similar provisions. If reserves are excessive, the Fund may decline attractive investment opportunities or hold unnecessary amounts of capital in money market or similar low-yield accounts.

**REPAYMENT OF CERTAIN DISTRIBUTIONS.** In the event that the Fund is unable otherwise to meet its obligations, the Investor may be required to repay to the Fund or to pay to creditors of the Fund distributions previously received by them.

**FUTURE AND PAST PERFORMANCE.** The performance of any prior fund or any personal investments affiliated with the Managing General Partner is not necessarily indicative of the Fund's future results. While the General Partner intends for the Fund to make investments that have estimated returns commensurate with the risks undertaken, there can be no assurance that targeted results will be achieved. Loss of principal is possible on any given investment.

**BRIDGE FINANCING**. The Fund may lend to portfolio companies on a short-term, unsecured basis in anticipation of a future issuance of equity or long-term debt. Such bridge loans would typically be

convertible into a more permanent, long-term security; however, for reasons not always in the Fund's control, such long-term securities may not issue and such bridge loans may remain outstanding. In such event, the interest rate on such loans may not adequately reflect the risk associated with the unsecured position taken by the Fund.

**LIMITATIONS ON ABILITY TO EXIT INVESTMENTS**. The General Partner expects to exit from its investments in two principal ways: (i) private sales (including acquisitions of its portfolio companies) and (ii) initial and secondary public offerings. At any particular time, one or both of these avenues may not be open to the Fund, or timing with respect to these exit mechanisms may be inopportune. As such, the ability to exit from and liquidate portfolio holdings may be constrained at any particular time.

**POTENTIAL LIABILITIES**. In connection with its investments, the Fund may negotiate the right to appoint one of the principals of the General Partner as a member of the portfolio company's board of directors. Such membership on the board of directors of a company can result in the Fund or the individual director being named as a defendant in litigation. The Fund may also participate in portfolio company financings at valuations lower than the valuations in preceding rounds of financing. Disputes arising out of such down-round financings may result in the Fund, the General Partner, or its members being named as defendants. Typically, portfolio companies will have insurance to protect directors and officers, but this insurance may be inadequate. The Fund will also indemnify the General Partner and its principals, among others, for liabilities incurred in connection with operations of the Fund, including liabilities arising from such suits. Such indemnification obligations and other liabilities could be substantial.

**INVESTMENTS LONGER THAN TERM.** The Fund may make investments that may not be advantageously disposed of prior to the date that the Fund will be dissolved, either by expiration of the Fund's term or otherwise. After the expiration of the Fund's term and during the Fund's dissolution the General Partner may decide to not sell or otherwise dispose of securities for an extended period of time in an effort to maximize the value of such the securities or other assets held by the Fund. The Limited Partners acknowledge and agree that the General Partner shall not be required to sell or distribute assets simply because the term of the Fund has expired.

**CONTINGENT LIABILITIES ON DISPOSITION OF INVESTMENTS**. In connection with the disposition of an investment in a portfolio company, the Fund may be required to make representations about the business and financial affairs of such company typical of those made in connection with the sale of a business. The Fund may be required to indemnify the purchasers of such investment to the extent that any such representations are inaccurate. These arrangements may result in the incurrence of contingent liabilities for which the General Partner may establish reserves and escrows. In that regard, distributions may be delayed or withheld until such reserve is no longer needed or the escrow period expires.

**THIRD-PARTY INVOLVEMENT.** The Fund may co-invest with third parties through partnerships, joint ventures or other structures. Such investments may involve risks not present in investments where a third party is not involved, including the possibility that a third-party co-venturer or partner may at any time have economic or business interests or goals that are inconsistent with those of the Fund, might become bankrupt or may be in a position to take action contrary to the investment objectives of the Fund. In addition, the Fund may in certain circumstances be liable for actions of its third-party co-venturer or partner.

**ABSENCE OF LIQUIDITY AND PUBLIC MARKETS**. The Fund's investments will generally be private, illiquid holdings. As such, there will be no public markets for the securities held by the Fund and no readily available liquidity mechanism at any particular time for any of the investments held by the Fund. In addition, the realization of value from any investments will not be possible or known with any certainty until the General Partner elects, in its sole discretion, to sell the Fund's investments and subsequently distribute the proceeds to its investors or to distribute securities to investors in lieu of cash. Limited

Partners will bear the economic risks of their investment for the term of the Fund. Prospective investors will be required to represent and agree that they are purchasing the limited partnership interests for their own account for investment only and not with a view to the resale or distribution thereof.

**CERTAIN LIMITATIONS ON ABILITY OF LIMITED PARTNERS TO TRANSFER THEIR INTERESTS IN THE FUND**. The transferability of interests in the Fund will be restricted by the Partnership Agreement and by United States federal and state securities laws. In general, Limited Partners will not be able to sell or transfer their limited partnership interests to third parties without the consent of the General Partner.

**LIMITED PORTFOLIO DIVERSIFICATION**. As is typical of venture capital firms, the portfolio holdings of the Fund will not be broadly diversified. A downturn of the economy or in the business of any one company could impact the aggregate returns delivered to investors by the Fund.

**INVESTMENT ADVISORS ACT OF 1940 AND INVESTMENT COMPANY ACT OF 1940 PROPOSED LEGISLATION**. The Fund is not and does not expect to be registered as an "investment company" under the United States Investment Company Act of 1940, as amended (the "***Investment Company Act***"), pursuant to an exemption set forth in Sections 3(c)(1) and/or 3(c)(7) of the Investment Company Act. There is no assurance that such exemptions will continue to be available to the Fund. Due to the burdens of compliance with the Investment Company Act, the performance of the Fund's investment portfolio could be materially adversely affected, and risks involved in financing portfolio companies could substantially increase, if the Fund becomes subject to registration under the Investment Company Act. Neither the Fund nor its counsel can assure investors that, under certain conditions, changed circumstances, or changes in the law, the Fund may not become subject to the Investment Company Act or other burdensome regulation. In addition, neither the General Partner nor its affiliates are registered, and do not expect to register, as an "investment adviser" under the United States Investment Advisers Act of 1940, as amended (the "***Advisers Act***"). However, as a consequence of the provisions of the Dodd-Frank Wall Street Reform and Consumer Protection Act (the "***Reform Act***"), the General Partner and/or its affiliated management company may be required to become registered under the Advisers Act as an investment adviser. In such event, the General Partner and/or its affiliated management company could become subject to additional regulatory and compliance requirements associated with such legislation. Any such additional requirements, or any different requirements, may be costly and/or burdensome to the General Partner and/or its affiliated management company and could result in the imposition of restrictions and limitations on the operations of the Fund and/or the disclosure of information to United States regulatory authorities regarding the operations of the Fund (regardless of whether the General Partner and/or its affiliated management company are required to be registered as an investment adviser). In addition, the Fund does not plan to register the offering of the Interests to the Limited Partners under the Securities Act. As a result, Limited Partners will not be afforded the protections of such Acts with respect to their investment in the Fund.

**REDEMPTION RIGHT GRANTED TO CERTAIN LIMITED PARTNER**. As described in Section IV, "Initial Investment" above, the Fund intends to enter into a side letter agreement with Grace Beauty in connection with the GB Initial Investment, which shall grant Grace Beauty the right to force the redemption of $500,000 of its limited partnership interests in the Fund in the event the Fund does not accept subscriptions for at least $7 million in Capital Contributions, in addition to the GB Initial Investment, within 180 days of the Initial Closing. The General Partner does not contemplate offering similar redemption rights to other Limited Partners in the Fund.

**LEGAL, TAX AND REGULATORY RISKS**. Legal, tax and regulatory changes could occur during the term of the Fund that may adversely affect the Fund.

**FAILURE TO MAKE CAPITAL CONTRIBUTIONS**. If a Limited Partner fails to pay when due its capital contributions to the Fund, and the contributions made by non-defaulting Limited Partners and borrowings

by the Fund are inadequate to cover the defaulted capital contribution, the Fund may be unable to pay its obligations when due. As a result, the Fund may be subjected to significant penalties that could materially and adversely affect the returns to the Limited Partners (including non-defaulting Limited Partners). If a Limited Partner defaults, it may be subject to various remedies as provided in the Partnership Agreement.

**INDEMNIFICATION**. The Fund will be required to indemnify the General Partner and its managers, members, and affiliates for liabilities incurred in connection with the affairs of the Fund. Such liabilities may be material and have an adverse effect on the returns to the Limited Partners. If the assets of the Fund are insufficient, the General Partner may require the return of distributions.

**LACK OF LIMITED PARTNER CONTROL**. Subject to the implementation of the investment limitations described herein, the General Partner has complete discretion in managing the Fund's portfolio. The Limited Partners will not make decisions with respect to the management, disposition or other realization of any investment made by the Fund, or other decisions regarding the Fund's business and affairs.

**LIMITED OPERATING HISTORY.** The Fund is a newly formed entity and has no operating history. The Fund's investment program should be evaluated on the basis that there can be no assurance that the General Partner's assessment of the prospects of investments will prove accurate or that the Fund will achieve its investment objective. Past performance of the Managing General Partner of the General Partner is not necessarily indicative of future results.

**RISK OF DILUTION.** Limited Partners subscribing for interests at subsequent closings will participate in existing investments of the Fund, diluting the interest of existing Limited Partners therein. Although such Limited Partners will contribute their pro rata share of prior capital contributions previously drawn down by the Fund, there can be no assurance that such payment will reflect the fair value of the Fund's existing investments at the time such additional Limited Partners subscribe for such interests.

**ELECTRONIC COMMUNICATION.** The General Partner may provide statements, reports and other communications relating to the Fund and/or the Limited Partners' interests in the Fund in electronic form, such as email or via a password-protected website ("***Electronic Communications***"). Electronic Communications may be modified, corrupted or contain viruses or malicious code, and may not be compatible with a Limited Partner's electronic system. In addition, reliance on Electronic Communications involves the risk of inaccessibility, power outages or slowdowns for a variety of reasons. These periods of inaccessibility may delay or prevent receipt of reports or other information by the Limited Partners.

**CYBERSECURITY RISK.** External cybersecurity breaches, including unauthorized access to systems, networks or devices (such as through "hacking" activity); infection from computer viruses or other malicious software code; and attacks that shut down, disable, slow or otherwise disrupt operations, business processes or website access or functionality, may occur. In addition, internal incidents can occur, such as the inadvertent release of confidential information (possibly resulting in the violation of applicable privacy laws). A cybersecurity breach could result in the loss or theft of customer data or funds, the inability to access electronic systems ("denial of services"), loss or theft of proprietary information or corporate data, physical damage to a computer or network system or costs associated with system repairs. Such incidents could cause the Fund, the General Partner, the Investment Manager or other service providers to incur regulatory penalties, reputational damage, additional compliance costs or financial loss. In addition, such incidents could affect the Fund's Portfolio Companies, and thereby adversely affect the Fund's returns.

**CONFIDENTIAL INFORMATION.** The Partnership Agreement will contain confidentiality provisions intended to protect proprietary and other information relating to the Fund and the Fund's Portfolio Companies. To the extent that such information is publicly disclosed, competitors of the Fund and/or competitors of its Portfolio Companies, and others, may benefit from such information, thereby adversely

affecting the Fund, its Portfolio Companies, the General Partner and the economic interests of Limited Partners.

***THE FOREGOING RISKS DO NOT PURPORT TO BE A COMPLETE EXPLANATION OF ALL THE RISKS INVOLVED IN ACQUIRING AN INTEREST IN THE FUND. POTENTIAL INVESTORS ARE URGED TO READ THIS ENTIRE MEMORANDUM AND THE PARTNERSHIP AGREEMENT, AND CONSULT WITH THEIR INDEPENDENT ADVISORS BEFORE MAKING A DETERMINATION WHETHER TO INVEST IN THE FUND. IN ADDITION, POTENTIAL INVESTORS SHOULD BE AWARE THAT, AS THE FUND'S PORTFOLIO DEVELOPS AND CHANGES OVER TIME, THE FUND MAY BE SUBJECT TO ADDITIONAL AND DIFFERENT RISKS.***

## VII. POTENTIAL CONFLICTS OF INTEREST

*The following discussion enumerates certain potential conflicts of interest that should be carefully evaluated before making an investment in the Fund. The following is not intended as an exhaustive list of the potential conflicts. Instances may arise where the interest of the General Partner, the Investment Manager and their respective members and/or affiliates may potentially or actually conflict with the interests of the Fund and the Limited Partners. For example, the existence of the General Partner's carried interest may create an incentive for the General Partner to make more speculative investments on behalf of the Fund than it would otherwise make in the absence of such performance-based arrangements. Conflicts may arise in the allocation of investment opportunities and the members of the General Partner's time among the Fund, and parallel or co-investment entities, on the one hand, and any future funds organized by Swiftarc in accordance with the Partnership Agreement, on the other hand. Further, conflicts of interest may arise as a result of the members of the Investment Manager or the General Partner and their respective affiliates having direct or indirect investments in Portfolio Companies of the Fund as well as other investments both public and private. While certain assurances are provided in the Partnership Agreement to address these potential conflicts, certain risks may remain. By acquiring an Interest, each Limited Partner will be deemed to have acknowledged the existence of any such actual or potential conflicts of interest and to have waived any claim with respect to any liability arising from the existence of any such conflicts of interest.*

**INVESTMENT OPPORTUNITIES AND TIME COMMITMENTS**. Conflicts may arise in the allocation of investment opportunities and the Managing General Partner's time among the Fund and parallel or co-investment entities, on the one hand and any other funds permitted to be organized in accordance with the Partnership Agreement, on the other hand. Further, conflicts of interest may arise as a result of the Managing General Partner having investments in Portfolio Companies and the Fund as well as other investments both public and private.

To the extent permitted by the Partnership Agreement and applicable law, the General Partner, the Investment Manager and/or their respective members, partners, employees and affiliates may: (a) make investments separate and apart from, or alongside, the Fund; (b) be permitted to manage other investment funds and similar vehicles during the Fund's life, any of which may compete with the Fund for investment opportunities, management time and attention, or otherwise; and (c) provide services to, or otherwise engage in transactions with, the Fund. Provisions contained within the Partnership Agreement that authorize such actions may override common law and statutory fiduciary duties that may apply in the absence of such provisions. Moreover, as a practical matter, it may be difficult for Limited Partners to subject the behavior of the General Partner, the Investment Manager and/or their respective managers, members, employees and affiliates to close scrutiny.

While it is the general intention of the General Partner and the Investment Manager that investment opportunities will be apportioned among the Fund and other investment funds affiliated with the General Partner and the Investment Manager, if any, on a fair and reasonable basis, decisions as to the allocation of investment opportunities present numerous conflicts of interest, and there can be no assurance that the Fund will be offered any specific investment opportunities that come to the attention of the General Partner and the Investment Manager or that the Fund will be permitted to invest the full amount it desires to invest in any opportunity made available to it. In addition, the Fund's ability to acquire investments or take certain actions with respect to investments may be limited due to the General Partner's and/or the Investment Manager's duties to other investment funds advised or managed by the General Partner and/or Investment Manager or an affiliate thereof or under applicable law (including the Advisers Act, the Company Act and/or ERISA) or by the General Partner's and/or Investment Manager's intention to avoid

certain potential conflicts of interest. Similarly, the General Partner and the Investment Manager may be required to take certain actions due to such duties and potential conflicts.

The appropriate allocation among the Fund and other affiliated investment funds of expenses and fees generated in the course of evaluating and making investments often may not be clear and will involve a level of discretion, especially where more than one fund participates in an investment. In addition, conflicts of interest may arise if the Fund invests in a company in which another affiliated investment fund also has invested (including, without limitation, relating to decisions concerning restructurings, recapitalizations, follow-on investments and other courses of action, as well as the terms thereof).

**CARRIED INTEREST**. The General Partner is entitled to receive distributions and allocations of cash and items of income, gain, loss and deduction that, relative to its capital contributions to the Fund, are proportionately greater than the corresponding distributions and allocations to the Limited Partners. This incentive compensation arrangement is commonly referred to as "carried interest". The existence of the General Partner's carried interest may create an incentive for the General Partner to make more speculative investments on behalf of the Fund than it would otherwise make in the absence of such performance-based arrangements.

**DIVERSE INVESTORS**. The Limited Partners will be a diverse group that may have conflicting investment, tax and other interests with respect to their investments in the Fund. The conflicting interests of individual Limited Partners may relate to, or arise from, among other things, the nature of investments made by the Fund, the structuring or the acquisition of investments and the timing of disposition of investments. As a consequence, conflicts of interest may arise in connection with decisions made by the General Partner with respect to the nature or structuring of investments that may be more beneficial for some Limited Partners than for others, particularly with respect to investors' individual tax situations. In selecting and structuring investments appropriate for the Fund, the General Partner will consider the investment and tax objective of the Fund and the Partners as a whole, not the investment, tax or other objective of any Limited Partner individually. Further, conflicts of interest may arise as a result of the Fund's partners having investments in Portfolio Companies of the Fund, as well as other investments both public and private.

**CO-INVESTMENT OPPORTUNITIES.** The General Partner may, in its discretion, offer co-investment opportunities to certain Limited Partners and to certain third-parties (on terms determined by the General Partner) and, to the extent such co-investment opportunities are offered, they may present inherent conflicts of interest between the interests of the Fund and the co-investors. These types of co-investments also may result in conflicts regarding decisions relating to a specific Portfolio Company, including with respect to timing or strategic objectives.

The General Partner currently expects to offer co-investment opportunities to Limited Partners or third party investors when the size of a prospective portfolio investment for the Fund is greater than the maximum amount appropriate for the Fund, as determined by the General Partner in its sole discretion. In determining allocations of co-investment opportunities, the General Partner may take into account any facts or circumstances it deems appropriate in its sole discretion, including, without limitation: (a) the size of the prospective co-investor's investment in the Fund and any other funds advised or managed by the Investment Manager or an affiliate thereof, if any; (b) the prospective co-investor's provision of services to the Fund; (c) the prospective co-investor's potential benefit to the Fund's activities or to one or more of its investments; (d) whether and to what extent the prospective co-investor has expressed an interest in co-investment opportunities; (e) the General Partner's evaluation of the financial resources, sophistication, experience and expertise of the potential co-investor with respect to the execution of co-investment transactions generally, and with respect to the geographic location or business activities of the applicable investment; (f) perception of past experiences and relationships with each prospective co-investor; (g) whether or not such person has co-invested previously and the ability of any such co-investor to respond promptly and

appropriately to potential investment opportunities; (h) perception of the legal, regulatory, reporting, public relations, competitive, confidentiality or other issues that may arise with respect to any prospective co-investor; and (i) any strategic value or other benefit resulting from offering such co-investment opportunity to a prospective co-investor. Nothing in this Memorandum constitutes a guarantee, prediction or projection of the availability of co-investment opportunities.

The General Partner may grant certain Limited Partners priority rights to participate in co-investment opportunities. The existence of such priority co-investment rights may result in other Limited Partners receiving fewer or no co-investment opportunities. In addition, any allocations of co-investment opportunities as between Limited Partners may not correspond to their pro rata interests in the Fund.

The Investment Manager and/or one of its Affiliates may charge management fees and/or carried interest in connection with co-investment opportunities offered to Limited Partners or third party parties, and neither the Fund nor the Limited Partners will be entitled to any portion of such amounts. In addition, none of the co-investors, the Fund or the Limited Partners will be entitled to receive any portion of any consulting, advisory, directors', investment banking, monitoring, transaction, closing or break-up fees received by the General Partner, the Investment Manager or the Managing General Partner, net of expenses, from any Portfolio Company of the Fund that are attributable to any co-investment, and the Management Fee will not be offset by such amounts. Distributions of income and proceeds related to each co-investment will be made separately from, and not aggregated with, distributions of income and proceeds related to the corresponding investment by the Fund.

Co-investments may result in conflicts between the Fund and other co-investors (for example, over the price and other terms of such investment, exit strategies and related matters, including the exercise of remedies of their respective investments). Furthermore, to the extent that the Fund holds interests that are different (or more senior) than those held by such other co-investors, the General Partner may be presented with decisions involving circumstances where the interests of such co-investors are in conflict with those of the Fund. Co-investors may not bear their proportionate share of investment-related expenses (including "broken-deal" expenses) because such co-investors may not be identified and/or may not agree to invest until relatively late in the investment process, or for other reasons.

**MANAGEMENT FEE.** The Management Fee is required to be paid to the Investment Manager even if the Fund experiences net losses in a particular year or over the life of the Fund.

**PORTFOLIO COMPANY REMUNERATION.** The receipt of consulting, advisory, directors', investment banking, monitoring, transaction, closing or break-up fees by the General Partner and the Investment Manager from any Portfolio Company (net of unreimbursed expenses of the General Partner and the Investment Manager) ("***Portfolio Company Remuneration***") may create a conflict of interest because the amounts of such Portfolio Company Remuneration may be substantial, and the rights of the Fund and the Limited Partners to these fees is limited to the offset arrangement described in the Partnership Agreement. Determining whether such Portfolio Company Remuneration will be paid periodically, prepaid or deferred and paid in arrears may also create a conflict of interest. When Portfolio Company Remuneration is earned with respect to any Portfolio Company in which the Fund co-invests with third parties, including other funds advised or managed by the Investment Manager or an affiliate thereof, if any, the Investment Manager will determine and apply the Fund's allocable share of such Portfolio Company Remuneration as described in more detail in the Partnership Agreement; such allocations often may not be clear and will involve a level of discretion.

**POTENTIAL CONFLICTS IN CALCULATION OF CERTAIN FUND COSTS AND EXPENSES.** The Partnership Agreement provides that the General Partner (or the Investment Manager) will bear all normal operating expenses incurred by it in connection with the management of the Fund, except for those expenses borne

directly by the Fund (as described in more detail in the Partnership Agreement). A potential conflict of interest exists in the General Partner's determination whether certain costs or expenses that are incurred in connection with the operation of the Fund constitute expenses for which the Fund is responsible or whether such expenses should be borne by the Investment Manager, rather than by the Fund. The Fund will be reliant on the determinations of the General Partner and the Investment Manager in this regard. Additionally, the Fund will be reliant on determinations of the General Partner with regard to the allocation of any common fees or expenses as between the Fund and any other investment funds advised or managed by the General Partner, the Investment Manager and/or their Affiliates.

**THIRD-PARTY RELATIONSHIPS.** Like other venture capital firms, as part of the Investment Manager's business, the Investment Manager and its employees have developed many relationships with third parties, some of which could be viewed as significant, close or personal, that have the potential to raise conflicts of interest. Such third parties include, without limitation, investment bankers, consultants, custodians, private equity and venture capital investors, co-investors, current and former directors, officers and employees of current and former Portfolio Companies, and former directors, officers and employees of the Investment Manager, including those who have or may form funds that engage in investment activities similar to those of the Fund. Certain of such third parties may: introduce investment opportunities to the Investment Manager or the Managing General Partner; arrange for, or facilitate financing in, the purchase or recapitalization of potential portfolio companies; introduce Portfolio Companies to potential acquisition or merger candidates; introduce the Investment Manager to potential buyers of Portfolio Company securities; facilitate the disposition of Portfolio Company securities; provide investment banking, consulting or advisory services to the Investment Manager or Portfolio Companies; co-invest in Portfolio Companies; perform investment banking services for issuers of private securities held by Investment Manager personnel or their friends or family members; introduce or recommend private investment opportunities to Investment Manager personnel (including, without limitation, the Managing General Partner) or their friends or family members; or provide other significant business or investment services to the General Partner, the Investment Manager, the Fund, Portfolio Companies, Investment Manager personnel and friends or family of Investment Manager personnel. Related parties may receive direct commercial compensation from the Fund or Portfolio Companies for providing these services. Moreover, principals, employees or affiliates of the Investment Manager may have a financial or ownership interest in, or serve on the board of directors of, certain banks, service providers, stockholder representatives and/or other financial institutions or entities that provide services to the Fund or otherwise directly or indirectly participate or act in connection with certain transactions of the Fund. Accordingly, such individuals may have additional economic incentives that create a potential conflict of interest with respect to such Fund transactions.

**LIMITED PARTNER DUE DILIGENCE INFORMATION.** The General Partner will make available, prior to the closing of this offering, to each prospective investor the opportunity to ask questions of, and receive responses from, a representative of the General Partner concerning the terms and conditions of this offering and to obtain any additional information, if the General Partner possesses such information or can acquire it without unreasonable effort or expense, necessary to verify the accuracy of the information set forth herein. Due to the fact that different potential investors may ask different questions and request different information, the General Partner may provide certain information to one or more prospective investors that it does not provide to all of the prospective investors. None of the responses or additional information provided is or will be integrated into this Memorandum, and no prospective investor may rely on any such responses or information in making its decision to subscribe for Interests.

**MATERIAL NON-PUBLIC INFORMATION.** From time to time, the General Partner, the Investment Manager and/or their members, partners, directors, officers, employees and Affiliates may come into laws, this may limit the General Partner's or the Investment Manager's flexibility to buy or sell portfolio securities issued by such companies. The Fund's investment flexibility may be constrained as a consequence of the General Partner's or the Investment Manager's inability to use such information for investment purposes.

Alternatively, each of the General Partner, the Investment Manager and their respective Affiliates may decline to receive material non-public information that they are entitled to receive on behalf of other investment vehicles, in order to avoid investment restrictions for such investment vehicles, even though access to such information might have been advantageous to the Fund and/or such investment vehicles and other market participants are in possession of such information.

**SIDE LETTERS.** The Fund, the General Partner and the Investment Manager may enter into one or more "side letters" or similar agreements with certain investors pursuant to which such parties grant to such investors terms that have the effect of establishing rights under, or altering or supplementing the terms of, this Memorandum, the Partnership Agreement or other related agreements, including, without limitation, the circumstances under which involuntary withdrawals from the Fund may be required; preferable economic arrangements; the right to receive reports from the Fund on a more frequent basis or to receive reports that include information not provided to other investors; and "most favored nation" rights (i.e., the right to receive favorable rights or economic arrangements, including co-investment arrangements, that may be afforded to other investors). Subject to applicable law, such agreements generally will be disclosed only to those actual or potential investors that have separately negotiated with the General Partner for the right to review such agreements.

**COUNSEL TO THE FUND DOES NOT REPRESENT THE LIMITED PARTNERS.** The General Partner has retained DuBois Bryant & Campbell ("***Fund Counsel***") in connection with the formation of the Fund and may retain Fund Counsel as legal counsel in connection with the management and operation of the Fund, including, without limitation, the making and holding of investments. Fund Counsel will not represent any Limited Partner or prospective limited partner of the Fund, unless the General Partner and such Limited Partner or prospective limited partner otherwise agree and such Limited Partner or prospective limited partner separately engages Fund Counsel, in connection with the formation of the Fund, the offering of the Interests, the management and operation of the Fund or any dispute that may arise between any Limited Partner, on the one hand, and the Fund, the General Partner, the Investment Manager and/or their affiliates on the other hand (the "***Fund Legal Matters***"). Any Limited Partner or prospective limited partner that wishes to obtain legal advice on any Fund Legal Matter must retain its own independent counsel with respect thereto and pay all fees and expenses of such independent counsel. Each Limited Partner and prospective limited partner acknowledges that Fund Counsel may represent the Fund, the General Partner and/or the Investment Manager in connection with any and all Fund Legal Matters.

**NO INDEPENDENT ADVICE.** The terms of the agreements and arrangements under which the Fund is established and will be operated have been or will be established by the General Partner. Prospective investors are not to construe this Memorandum or the Partnership Agreement as investment, legal, tax, regulatory, financial, accounting or other advice, and this Memorandum and the Partnership Agreement are not intended to provide the sole basis for any evaluation of an investment in the Fund (or an indirect investment in its Portfolio Companies). Prior to acquiring a limited partner interest in the Fund (and an indirect interest in its Portfolio Companies), a prospective investor should consult with its own legal, investment, tax, accounting, and other advisors to determine the potential benefits, burdens and other consequences of such investment in the Fund (and such indirect investment in its Portfolio Companies).

***THE FOREGOING LIST OF POTENTIAL AND ACTUAL CONFLICTS OF INTEREST DOES NOT PURPORT TO BE A COMPLETE ENUMERATION OF THE CONFLICTS ATTENDANT TO AN INVESTMENT IN THE FUND. ADDITIONAL CONFLICTS MAY EXIST THAT ARE NOT PRESENTLY KNOWN TO THE GENERAL PARTNER, THE INVESTMENT MANAGER OR THEIR RESPECTIVE AFFILIATES, OR THAT ARE DEEMED IMMATERIAL. POTENTIAL INVESTORS ARE URGED TO READ THIS ENTIRE MEMORANDUM AND THE PARTNERSHIP AGREEMENT.***

## VIII. CERTAIN ERISA, TAX AND OTHER REGULATORY MATTERS

### A. CERTAIN FEDERAL INCOME TAX CONSIDERATIONS

*Set forth below is a discussion, in summary form, of certain United States federal income tax consequences relating to an investment in the Fund based upon the Internal Revenue Code of 1986, as amended (the "**Code**"), ruling with respect to the Code, U.S. Treasury regulations promulgated or proposed under the Code ("**Treasury Regulations**") and existing interpretations of the Code, all as in effect and available as of the date of this memorandum. This summary does not attempt to present all aspects of the federal income tax laws or any state, local or foreign laws that may affect an investment in the Fund. Except as otherwise explicitly set forth below, this summary in general relates to the United States federal income tax implications of owning an investment in the Fund by individuals who are citizens or residents of the United States. In particular, this summary does not discuss any tax consequences that may be applicable to foreign investors, financial institutions, insurance companies, tax-exempt entities and other investors of special status, and thus such investors must consult with their own professional tax advisors regarding a prospective investment in the Fund. No ruling has been or will be requested from the Internal Revenue Service (the "**IRS'**) and no assurance can be given that the IRS will agree with the tax consequences described in this summary. Tax laws and administrative rules may change, sometimes with retroactive effect. The following discussion assumes that each prospective Limited Partner will hold its interest in the Fund as a capital asset. Each prospective Limited Partner should consult with its own tax adviser in order to fully understand the federal, state, local, and foreign income tax consequences of an investment in the Fund.*

Except as otherwise indicated below, references in this discussion to Partners or Limited Partners refer to "U.S. persons," which include an individual who is a citizen of the United States or is treated as a resident of the United States for United States federal income tax purposes, a corporation (or any other entity treated as a corporation for United States federal income tax purposes) created or organized in or under the laws of the United States, any state thereof or the District of Columbia, an estate the income of which is subject to United States federal income taxation regardless of its source, or a trust that (i) is subject to the supervision of a court within the United States and the control of one or more United States persons as described in Section 7701(a)(30) of the Code, or (ii) has a valid election in effect under applicable Treasury Regulations to be treated as a United States person. If a partnership holds Interests, the tax treatment of a partner will generally depend upon the status of the partner and the activities of the partnership. Persons that are partners in a partnership investing in the Fund should consult their own tax advisors. For purposes of this discussion, a "Non-U.S. Limited Partner" is a person (other than a partnership for United States federal income tax purposes) that is not a U.S. person as defined above.

**PARTNERSHIP STATUS**. The Fund will be classified and reported as a partnership for federal income tax purposes.

**TAXATION OF PARTNERS**. Each constituent partner (each a "***Partner***") will report on its federal income tax return its distributive share of the Fund's items of income, gain, loss, deduction, and credit for the taxable year. The character of such items, determined at the Fund level, will pass through to the Partners (for example, Partners will treat as interest, dividends or capital gain, their distributive shares of such items recognized by the Fund).

Each Partner will be required to report on its federal income tax return its distributive share of any income or gain recognized by the Fund, whether or not amounts representing such distributive share have been distributed to it.

Distributions from the Fund, whether made currently or upon liquidation of the Fund, generally may be received by a Partner without further tax. The general rules relating to the tax treatment of distributions to the Partners may be summarized as follows:

- Cash distributions will not be taxable to a Partner except to the extent they exceed the Partner's tax basis for its interest in the Fund. The excess generally would be taxable as long-term or short-term capital gain, depending on the Partner's holding period for its Fund interest;

- In-kind distributions of portfolio securities or other assets of the Fund generally will not be taxable to the recipient Partner or the Fund. A partner that receives a distribution of marketable securities from a partnership generally is required to recognize taxable gain to the extent that the fair market value of the distributed securities exceeds the partner's tax basis in its partnership interest. There are a number of exceptions to this rule, including an exception for distributions by qualified "investment partnerships." It is expected that the Fund will qualify as an "investment partnership" and that, accordingly, distributions of marketable securities by the Fund generally will not give rise to the current recognition of taxable gain;

- For purposes of determining a Partner's gain or loss on a subsequent sale of the Fund's assets distributed in kind (other than in liquidation of the Partner's interest in the Fund), the Partner's tax basis for such assets will be equal to the Fund's adjusted basis for the assets or, if less, the Partner's tax basis for its partnership interest immediately before the distribution. A Partner's tax basis for assets distributed in liquidation of its partnership interest will be equal to its tax basis in its partnership interest. The Partner's capital gain holding period for assets distributed without the recognition of gain will include the period during which the assets were held by the Fund; and

- No loss will be recognized by a Partner upon the receipt of a distribution from the Fund except where the distribution is a liquidating distribution consisting solely of cash, and the amount of cash is less than the Partner's tax basis in its partnership interest immediately before the distribution.

**DEDUCTIONS**. Subject to certain limitations described below, a Partner will be entitled to deduct on its federal income tax return its distributive share of Fund loss, but not in excess of its tax basis in its Fund interest. If a Partner's distributive share of Fund loss exceeds the Partner's tax basis in its Fund interest, such excess may not be deducted but will be carried over and become deductible in any later year if and to the extent the Partner's tax basis exceeds zero and such loss carryover is otherwise deductible. Each Limited Partner should have a sufficient tax basis in its Fund interest to deduct losses up to an amount equal to its cash investment in the Fund.

The "at risk" provisions of Section 465 of the Code, impose additional limitations on the deductibility of partnership losses, but the at-risk provisions are not expected to limit the Partners' ability to deduct Fund losses.

In the case of a Partner who is an individual, expenses of producing income, including management fees, are to be aggregated with unreimbursed employee business expenses and other expenses of producing income and the aggregate amount of such expenses will be deductible only to the extent such amount exceeds two percent (2%) of a taxpayer's adjusted gross income. In addition, total allowable itemized deductions, other than medical costs, casualty and theft losses, and investment interest expense, are generally reduced by a percentage of the amount of the taxpayer's adjusted gross income in excess of a threshold amount.

Expenses subject to the limitation in the preceding paragraph do not include expenses incurred in connection with a trade or business. The issue of whether the Fund will be engaged in a trade or business for federal income tax purposes is unclear. The General Partner believes that the Fund will not generally be engaged in a trade or business. Assuming the Fund is not engaged in a trade or business, an individual Partner's share of certain expenses of the Fund will be subject to the two limitations described in the preceding paragraph.

Section 469 of the Code limits the deductibility of losses from passive activities. These provisions apply to individuals, estates, trusts, personal service corporations and closely held corporations. In general, a taxpayer's losses from passive activities may only be offset against income from passive activities and not against income such as salary or investment income. Any amount of passive activity loss that is disallowed will be carried over to the following years to offset passive activity gains in such subsequent years. A passive activity is any activity that involves the conduct of any trade or business and in which the taxpayer does not materially participate. Although, as noted above, there is uncertainty whether the activities of the Fund will constitute a trade or business as that concept has been interpreted by the IRS and the courts, the General Partner believes that the Fund's activities will not be considered a trade or business activity to which the passive activity loss provisions of the Code would apply.

**Capital Gain, Dividend and Qualified Small Business Stock Tax Rates**. The Fund expects that its gains and losses from its securities transactions typically will be capital gains and capital losses. Property held for more than one year generally will be eligible for long-term capital gain or loss treatment.

Under current federal income tax law, the maximum federal ordinary income tax rate for individuals is thirty-seven percent (37%) and, in general, the maximum individual income tax rate for long-term capital gains and certain dividend income is twenty percent (20%). The excess of capital losses over capital gains may be offset against the ordinary income of an individual taxpayer, subject to an annual deduction limitation of $3,000; unused capital losses may be carried forward indefinitely but may not be carried back. For corporate taxpayers, the maximum federal income tax rate is twenty-one percent (21%). Capital losses of a corporate taxpayer may be offset only against capital gains, but unused capital losses may be carried back three (3) years (subject to certain limitations) and carried forward five (5) years.

A 3.8% Medicare tax is generally imposed on the net investment income of high-income individuals, estates, and trusts. Net investment income generally includes interest, dividends, and capital gain income. Fund capital gain and other income will generally be subject to the 3.8% Medicare tax in the case of Partners who are such persons.

In general, non-corporate investors that, directly or via a pass-through entity such as the Fund, hold "qualified small business stock" ("***QSBS***") for more than five (5) years are permitted to exclude from taxable income all or a portion of gain subsequently recognized upon a sale or exchange of such stock. Under current federal income tax law, the QSBS exclusion percentage is generally 100% for QSBS purchased on or after September 28, 2010. For each non-corporate investor, the amount of gain eligible for the QSBS exclusion generally is limited to the greater of: (i) 10 times the investor's basis in the stock or (ii) a total of $10 million with regard to stock in the issuing corporation. The remaining portion of the gain on such stock, if any, is subject to tax at a maximum capital gains rate. To be treated as small business stock eligible for the QSBS exclusion, stock must have been acquired at original issue from a qualified small business corporation after August 10, 1993. In general, a qualified small business corporation is a domestic "C" corporation that, immediately after issuing the stock in question, has $50 million or less in gross assets and satisfies certain other requirements. Because several of these requirements must continue to be satisfied after the issuance of qualified stock, it is possible that the stock may cease to qualify as small business stock due to events occurring after the issue date.

To be treated as small business stock eligible for the QSBS exclusion, stock must have been acquired at original issue from a qualified small business corporation after August 10, 1993. In general, a qualified small business corporation is a domestic "C" corporation that, immediately after issuing the stock in question, has $50 million or less in gross assets and satisfies certain other requirements. Because several of these requirements must continue to be satisfied after the issuance of qualified stock, it is possible that the stock may cease to qualify as small business stock due to events occurring after the issue date.

Accordingly, there can be no assurance that any stock acquired directly or indirectly by the Fund would qualify for the QSBS exclusion, even if such stock qualifies as small business stock at the time of acquisition. In addition, no assurances can be given that the General Partner will have or provide to Partners information about any particular stock investment necessary to determine its status as QSBS, or to satisfy applicable tax reporting requirements related to QSBS treatment.

**ROLLOVER FOR QUALIFIED SMALL BUSINESS STOCK**. Under Section 1045 of the Code, if an individual (i) realizes gain on a sale of QSBS that has been held by the individual for more than six (6) months, and (ii) within 60 days after such sale, purchases new QSBS, the individual generally is required to recognize (and pay tax on) such gain only to the extent that the net proceeds from the sale of the original stock exceed the cost of the newly purchased stock. Any remaining gain is carried over to the newly purchased stock and will generally be recognized (and be taxable) upon a subsequent disposition of such stock. The benefits of Section 1045 are generally available to individuals who purchase, hold and sell qualified small business stock indirectly through a pass-through entity such as the Fund, although the extent to which a qualifying rollover may be made through a pass-through entity is limited. No assurances can be given that the General Partner will have or provide to Partners information about any particular stock investment necessary to determine its eligibility for a Section 1045 rollover, or to satisfy applicable tax reporting requirements related to a rollover.

**INVESTMENT BY THE FUND IN CONTROLLED FOREIGN CORPORATIONS.** A non-United States corporation in which the Fund invests may be classified as a controlled foreign corporation ("***CFC***") in one or more taxable years while the corporation's stock is held by the Fund. In general, a foreign corporation will be classified as a CFC if five (5) or fewer 10% United States Shareholders (as defined below) own in the aggregate more than fifty percent (50%) of the voting power or value of the corporation's stock. A "***10% United States Shareholder***" is generally a U.S. person who owns, directly or indirectly, and with the application of certain attribution rules, ten percent (10%) or more of the voting power or value of the stock of a foreign corporation. The Fund will be considered a U.S. person for these purposes. Each 10% United States Shareholder who owns shares, directly or indirectly, in a CFC on the last day of the corporation's taxable year will be required to include an amount in gross income, subject to tax at ordinary income rates, equal to such 10% United States Shareholder's pro rata share of the corporation's (and each of the corporation's subsidiary CFCs) Subpart F income and global intangible low-taxed income ("***GILTI***"). In general, Subpart F income includes passive income and certain related party income. In addition, a 10% United States Shareholder may recognize ordinary income on all or a portion of the gain from the sale of stock of a CFC. GILTI is calculated based on a CFC's modified gross income (excluding Subpart F income, certain high-taxed income and certain other income) reduced by the excess of: (x) a 10% deemed return on the CFC's adjusted basis in certain tangible trade or business assets over (y) certain allocated interest expense.

**INVESTMENT BY THE FUND IN PASSIVE FOREIGN INVESTMENT COMPANIES.** A non-United States corporation in which the Fund invests may be classified as a passive foreign investment company ("***PFIC***") in one or more taxable years while the corporation's stock is held by the Fund. In general, a foreign corporation will be classified as a PFIC if (i) at least seventy-five percent (75%) of its gross income for the tax year is passive, or (ii) at least fifty percent (50%) of the assets held by the corporation during the year produce passive income. A direct or indirect United States shareholder of stock in a PFIC may defer United

States tax until the stock is disposed of or until a distribution is received from the corporation. Gains realized upon disposition of stock in a PFIC and certain excess distributions by the PFIC will be taxed as ordinary income and will cause a United States shareholder to pay interest on the tax deferral obtained by reason of holding stock in the PFIC. United States shareholders of a PFIC other than certain entities exempt from United States federal income tax under Section 501(a) of the Code may avoid such interest charges by making a qualified electing fund ("***QEF***") election in the first taxable year in which the corporation becomes a PFIC. A QEF election would result in an annual inclusion in gross income of such United States shareholder's pro rata share of the corporation's ordinary earnings and net capital gains irrespective of whether such income is actually distributed. In order for the Fund to make a valid QEF election with respect to a portfolio company, the PFIC must agree to provide detailed information concerning its operating income to the Fund. There is no guarantee that any given portfolio company would agree to provide such information. Accordingly, there can be no assurance that the Fund will be able to make a valid QEF election for any portfolio company that is a PFIC.

**TAX-EXEMPT LIMITED PARTNERS**. Income recognized by tax-exempt entities, including qualified retirement plans (stock, bonus, pension, or profit-sharing plans described in Section 401(a) of the Code) and individual retirement accounts, is generally exempt from federal income tax. Section 511 of the Code, however, imposes a tax on such an entity's unrelated business taxable income ("***UBTI***"). UBTI is income from an unrelated trade or business regularly carried on by a tax-exempt entity (or by a partnership in which the tax-exempt entity is a partner). Most types of passive investment income, including dividends, interest, royalties, and gains from the sale of securities are excluded from UBTI, unless such passive investment income qualifies as "unrelated debt financed income." Unrelated debt financed income is (i) income derived from property with respect to which there is outstanding acquisition indebtedness or (ii) gains from the disposition of property with respect to which there was acquisition indebtedness within twelve months prior to the disposition of the property, and the use of such property is unrelated to the tax-exempt entity's exempt purpose. In addition, UBTI could be generated by the Fund if it invests in businesses operated as pass-through entities such as partnerships and limited liability companies.

***Tax-exempt entities are urged to consult with their own tax advisors as to the potential impact to them of the UBTI rules as applied to their investment in the Fund.***

**FOREIGN PARTNERS**. The United States federal income tax treatment of Non-U.S. Limited Partners will vary depending on whether the Fund is treated as being engaged in a trade or business in the United States. If the Fund is treated as not engaged in a United States trade or business, Non-U.S. Limited Partners will be subject to United States taxation only in limited instances. Non-U.S. Limited Partners that are not engaged in a United States trade or business generally would be subject to a flat thirty percent (30%) withholding tax on the gross amount received in the form of United States source investment income. This would include dividends, royalties, certain interest and other similar income (but not capital gains, except as noted below) that is not related to the active conduct of a trade or business in the United States. The withholding tax is reduced or eliminated in some circumstances for residents of countries with which the United States has income tax treaties. A nonresident alien, but not a foreign corporation, is generally subject to a thirty percent (30%) tax on his United States source capital gains where such person is physically present in the United States for 183 days or more during the taxable year, although an alien who is present for such a period will generally be a United States tax resident and therefore subject to United States federal income taxation on his worldwide income. A nonresident alien who is present in the United States for 183 days or more is required to file a United States tax return and pay a tax of thirty percent (30%) on its net capital gains. Dispositions of United States real property interests are generally subject to U.S. tax under a special provision and do not fall within the general capital gains rule.

Interest from certain investments is exempt from the thirty percent (30%) withholding tax. For example, the portfolio interest exception represents a broad class of interest income, which is exempt from

withholding tax. In order to constitute portfolio interest, a debt obligation held by the Fund on which the interest is paid must generally be issued in registered form and the foreign partner must have provided the Fund with a properly completed IRS Form W-8 BEN or W-8 BEN-E. In order to constitute a registered obligation, the debt must be payable only to the named owner and any transfer of the obligation must be registered on the books of the issuer or the old note must be surrendered for cancellation and a new note issued in the name of the transferee.

The portfolio interest exemption does not apply to interest received by a shareholder who owns ten percent (10%) or more of the total combined voting power of a corporate borrower or a partner who owns ten percent (10%) or more of the capital or profits interest in a partnership borrower. In the case of a partnership lender (such as the Fund), this ten percent (10%) ownership test is applied at the partner level and so is not likely to prevent portfolio interest earned by the Fund from qualifying for the portfolio interest exemption.

On the other hand, if the Fund were engaged in a trade or business (either directly or indirectly through an investment in a flow-through entity such as a partnership or limited liability company) at any time during the taxable year, each Non-U.S. Limited Partner would be treated as being engaged in a United States trade or business and would be subject to United States income taxation (at the same net progressive rates applicable to United States citizens, residents and domestic corporations) on income that is effectively connected with the conduct of that trade or business. For corporate Partners an additional branch profits tax will generally be imposed on such effectively connected income. If the Fund were engaged in a United States trade or business, a withholding tax would be imposed on its effectively connected income allocable to foreign Partners.

The foregoing discussion relates only to recognized income. The unrealized appreciation in stock or other securities distributed in-kind by the Fund is generally not taxable until such stocks or securities are ultimately sold. The sale of stock by a Non-U.S. Limited Partner will generally not be taxed by the United States so long as the sale is not made through an office or fixed place of business maintained by the Non-U.S. Limited Partner in the United States.

***Each potential investor that is a non-resident alien of the United States is urged to consult with and must rely upon the advice of its own professional tax advisors with respect to the United States and foreign tax treatment of an investment in the Fund.***

**REPORTING.** The General Partner will furnish each Partner with an annual statement setting forth information relating to the operations of the Fund (including information regarding such Partner's distributive share of partnership income and gains, losses, deductions and credits for the taxable year) as is reasonably required to enable the Partner to properly report to the IRS with respect to such Partner's participation in the Fund.

The federal information tax returns filed by the Fund will be subject to audit by the IRS and the audit of the Fund's returns could result in an audit of the Partners' own federal income tax returns. In connection with such audits, adjustments to partnership items could result in the assertion of tax deficiencies (as well as interest and penalties thereon) against the Partners. Any administrative or judicial proceedings involving the federal income tax treatment of partnership items will generally be conducted on a unified basis, with binding effect on all Partners. The General Partner will serve as the Fund's "Tax Matters Partner" for purposes of coordinating any such proceedings and providing any required notices about such proceedings to the Partners. For fiscal years of the Fund beginning after December 31, 2017 (or if the effective date of Section 1101 of the Bipartisan Budget Act of 2015 is extended, such later extended date), the General Partner shall be designated the "partnership representative" within the meaning of Section 6223(a) of the Code.

Treasury regulations impose special reporting rules for "reportable transactions." A reportable transaction includes, among other things, a transaction in which an advisor limits the disclosure of the tax treatment or tax structure of the transaction and receives a fee in excess of certain thresholds. The General Partner believes and intends to take the position that an investment in the Fund did not constitute a reportable transaction. If it were determined that an investment in the Fund does constitute a reportable transaction, each Partner would be required to complete and file IRS Form 8886 with such Partner's tax return for the tax year that includes the date that such Partner acquired an interest in the Fund. The General Partner reserves the right to disclose certain information about the Partners and the Fund to the IRS on Form 8886, including the Partners' capital contributions, tax identification numbers (if any), and dates of admission to the Fund, to facilitate compliance with the reportable transaction rules if necessary. In addition, the Fund may engage in certain transactions which themselves constitute reportable transactions and with respect to which both the Fund and certain Partners may be required to file Form 8886. A significant penalty is imposed on taxpayers who participate in a "reportable transaction" and fail to make the required disclosure. Certain states have similar reporting requirements and may impose penalties for failure to report. Partners should consult their tax advisors for advice concerning compliance with the reportable transaction regulations.

The Code provides for optional, and in certain cases mandatory, adjustments to the basis of partnership property upon distributions of partnership property to a partner and transfers of partnership interests (including by reason of death). The General Partner may elect to adjust the basis of Fund property in its sole discretion. In addition, the General Partner will be entitled to require that each Partner provide it with any information necessary to allow the Fund to comply with its obligations under the rules relating to tax basis adjustments and disallowance of certain losses under Sections 734 or 743 of the Code. Partners permitted to transfer interests in the Fund will also be required to provide certain information regarding the transfer to the General Partner and any transferee.

**FATCA**. Pursuant to Code Sections 1471-1474 and the Treasury Regulations promulgated thereunder ("***FATCA***"), the Fund will be required to deduct a thirty percent (30%) withholding tax from payments of certain U.S. source income, including capital gains, made to its foreign Limited Partners unless the foreign Limited Partners are individuals or establish an exemption from this withholding tax. The FATCA withholding tax cannot be reduced under a tax treaty. Each Partner will be required to provide the Fund any and all information required for the Fund to meet its obligations under FATCA.

**GENERAL**. The foregoing discussion is for general information purposes and intended only as a general summary of some of the principal federal income tax aspects of participation in the Fund. The tax rules applicable with respect to the treatment of the Partners, the Fund and the transactions that the Fund may engage in are highly complex, and their effect, in certain instances, may not be free from doubt. It also must be emphasized that the tax rules presently applicable with respect to the transactions described in this offering are subject to change at any time, and any such changes may or may not be made with retroactive effect.

**B. CERTAIN SECURITIES LAW AND ANTI-MONEY LAUNDERING CONSIDERATIONS**

**INVESTMENT COMPANY ACT OF 1940**. The Fund will not be subject to the provisions of the Investment Company Act in reliance upon either Section 3(c)(1)[4] or Section 3(c)(7)[5] of the Investment Company Act. The Fund's Subscription Agreement and Partnership Agreement will contain representations and restrictions on transfer designed to ensure that the conditions of one or both of these provisions will be met. The Investment Company Act provides certain protections to investors and imposes certain restrictions on registered investment companies, none of which will apply to the Fund.

In addition, the General Partner will be entitled to form a separate, side-by-side partnership that would avoid the application of the Investment Company Act based on application of either Section 3(c)(1) of the Investment Company Act (if the Fund is relying on Section 3(c)(7) of the Investment Company Act) or Section 3(c)(7) of the Investment Company Act (if the Fund is relying on Section 3(c)(1) of the Investment Company Act).

**INVESTMENT ADVISORS ACT OF 1940**. As of the date hereof, there is no requirement that the General Partner must register under the Advisors Act. However, rules promulgated by the SEC under the Dodd-Frank Act may impose such a requirement. Please see "Risk Factors", above, for further information.

**SECURITIES ACT OF 1933**. The Interests described herein are not being registered under the Securities Act of 1933, as amended (the "***Securities Act***"), in reliance upon exemptions for transactions not involving a public offering. Each investor will be required to execute certain agreements in connection with its subscription for an Interest, and in so doing will make certain representations to the General Partner, including: (i) that it is an "accredited investor" as defined in Regulation D under the Securities Act; (ii) that it is acquiring its interest in the Fund for its own account, for investment purposes only, and not with a view to its distribution; (iii) that it has received or had access to all information it deems relevant to evaluate the merits and risks of the prospective investment and that it has reviewed and understood all such information; (iv) that it has the ability to bear the economic risk of an investment in the Fund for an indefinite period of time; and (v) that it has such knowledge and experience of financial and business matters that it is capable of evaluating the merits of an investment in the Fund.

Prior to sale, offerees and their advisors are invited to ask questions and obtain additional information from the General Partner concerning the Interests described herein, the terms and conditions of the offering, and any other relevant matters (including, but not limited to, additional information to verify the accuracy of the information set forth herein).

The Interests described herein will constitute "restricted securities" under the Securities Act and as such will be subject to certain restrictions on transferability. The Interests may not be transferred or sold unless the Interests have been registered under the Securities Act or an exemption from registration is available. It is not contemplated that registration under the Securities Act or other securities laws will ever be affected.

---

[4] Section 3(c)(1) excludes from the definition of "investment company" any issuer whose outstanding securities are beneficially owned by not more than one hundred (100) persons (as defined in this § 3(c)(1)), after giving effect to certain attribution rules, and that does not engage in a public offering of securities.

[5] Section 3(c)(7) excludes from the definition of "investment company" any issuer whose outstanding securities are beneficially owned only by "qualified purchasers" or "knowledgeable employees" and that does not engage in a public offering of securities. A "qualified purchaser" includes a natural person who owns not less than $5,000,000 in investments, or a natural person or company, acting for its own account or the accounts of other qualified purchasers, who owns and invests on a discretionary basis not less than $25,000,000 in investments and certain trusts.

The Interests are subject to further restrictions on transfer as described in the Partnership Agreement. The offering and sale of Interests is subject to additional restrictions in the jurisdictions in which the prospective investor resides.

**SECURITIES EXCHANGE ACT OF 1934.** The General Partner does not intend to register as a "municipal advisor" under the Section 15b of the United States Securities Exchange Act of 1934, as amended (the "***Exchange Act***"), and none of the General Partner or its respective affiliates provides, or intends to provide, advice to the Fund or to Limited Partners with respect to investment strategies that are "plans or programs for the investment of the proceeds of municipal securities or the recommendation of and brokerage of municipal escrow investments" (within the meaning of rule 15ba1-1 promulgated under the Exchange Act).

**ANTI-MONEY LAUNDERING REGULATIONS**. All subscriptions for the Interests described herein are subject to applicable anti-money laundering regulations. Investors will be required to comply with such anti-money laundering procedures as are required by the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA PATRIOT Act) Act of 2001 (Pub. L. No. 107 56).

As part of the Fund's responsibility to comply with regulations aimed at the prevention of money laundering, the Fund may require verification of identity from all prospective investors. The Fund may seek to: verify the identity of a prospective investor; ensure that the prospective investor is not named on one of the prohibited lists maintained by the U.S. Treasury Department; verify the source of a prospective investor's funds; once a prospective investor becomes a limited partner, monitor communications, capital contributions and withdrawals, and other payments involving the limited partner; and report suspicious activity to appropriate authorities. The Fund may be required to exercise special scrutiny when prospective investors employ certain-kinds of financial institutions or financial institutions from certain countries or when prospective investors are senior governmental or military officials or senior executives of government-owned businesses. U.S. anti-money laundering regulations are developing and changing continually, and the Fund may be required to implement other anti-money laundering measures from time to time. Prospective investors should be aware that in order to comply with any applicable anti-money laundering regulations, whether in the United States or any other applicable jurisdiction, certain information regarding prospective investors and partners may be required to be transmitted to, or held in, the United States or disclosed to certain regulatory authorities in any applicable jurisdiction. Depending on the circumstances of each subscription, it may not be necessary to obtain full documentary evidence of identity.

The Fund reserves the right to request such information as is necessary to verify the identity of a prospective investor. The Fund also reserves the right to request such identification evidence in respect of a transferee of the Interests. In the event of delay or failure by the prospective investor or transferee to produce any information required for verification purposes, the Fund may refuse to accept the application or (as the case may be) to give effect to the relevant transfer and (in the case of a subscription for the Interests) any funds received will be returned without interest to the account from which the monies were originally debited.

The Fund also reserves the right to refuse to make any distribution to a Limited Partner, if the General Partner suspects or is advised that the payment of any distribution proceeds to such Limited Partner might result in a breach or violation of any applicable anti-money laundering or other laws or regulations by any person in any relevant jurisdiction, or such refusal is considered necessary or appropriate to ensure the compliance by the Fund or the General Partner with any such laws or regulations in any relevant jurisdiction.

## C. CERTAIN ERISA CONSIDERATIONS

Each prospective investor that is an employee benefit plan or trust (an "***ERISA Plan***") within the meaning of, and subject to the provisions of, the Employee Retirement Income Security Act of 1974, as amended ("***ERISA***"), or a plan within the meaning of, and subject to the provisions of, Section 4975 of the Code, such as an individual retirement account (IRA) (a "***Code Plan***"), should consider the matters described in this section in determining whether to invest in the Fund. The provisions of ERISA are complex and their application to an investment in the Fund should be reviewed by the appropriate representatives of any prospective investor that is an ERISA Plan or a Code Plan (each a "***Plan***"). Each such prospective investor should consult with legal counsel concerning the issues described below. The following is intended to be a summary only and is not a substitute for careful planning with a professional adviser. The sale of an Interest to a Plan is in no respect a representation by the Fund, the General Partner or any other Person associated with the offering of interests in the Fund that such an investment meets all relevant legal requirements with respect to investments by Plans generally or any particular Plan, or that such an investment is appropriate for Plans generally or any particular Plan.

**FIDUCIARY MATTERS AND PROHIBITED TRANSACTIONS GENERALLY**. In considering an investment in the Fund of a portion of the assets of any ERISA Plan, any Code Plan and any entity whose underlying assets include plan assets by reason of an investment in such entity by an ERISA Plan or a Code Plan (but not a foreign or governmental benefit plan that is not subject to ERISA or the Code) (a "benefit plan investor"), a fiduciary should consider, among other factors, (i) whether the investment is in accordance with the documents and instruments governing the Plan; (ii) whether the investment satisfies the diversification requirements of Section 404(a)(1)(C) of ERISA, if applicable; (iii) whether the investment provides sufficient liquidity to permit benefit payments to be made as they become due; (iv) any requirement that the fiduciary annually value the assets of the Plan; (v) whether the investment is prudent, since there is a high degree of risk in purchasing interests in the Fund and it is not expected that there will be any public market in which the interests may be sold or otherwise disposed of; and (vi) whether the investment is for the exclusive purpose of providing benefits to participants and their beneficiaries.

ERISA and the Code prohibit Plan fiduciaries from engaging in various transactions ("prohibited transactions") involving Plan assets with persons who have certain relationships with respect to the Plan, such as Plan fiduciaries (a "party in interest"). Thus, for example, absent an exemption, the fiduciaries of a Plan should not purchase interests in the Fund with assets of any Plan if the General Partner or any of its affiliates (i) has investment discretion with respect to such assets; or (ii) gives individualized investment advice where there is an understanding that it will serve as the primary basis for the investment decisions made with respect to such assets.

**PLAN ASSETS**. If the underlying assets of the Fund (as opposed to interests in the Fund alone) were deemed to be "plan assets" under ERISA, (i) the prudence and other fiduciary responsibility standards of Title I of ERISA would extend to investments made by the Fund; and (ii) certain transactions in which the Fund might seek to engage could constitute Prohibited Transactions.

Under a regulation (the "***Plan Assets Regulation***") issued by the U.S. Department of Labor ("***DOL***"), the assets and properties of certain entities in which a Plan makes an equity investment (other than an investment in a publicly offered security or a security issued by an investment company registered under the Investment Company Act) would be deemed to be assets of the investing Plan unless (i) the entity is an "operating company" (including a "venture capital operating company") or (ii) equity participation by "benefit plan investors" is less than twenty-five percent (25%) of any class of equity of the entity. Interests in the Fund will be neither publicly offered nor securities issued by an investment company registered under the Investment Company Act, within the meaning of the Plan Assets Regulation, and it is possible

that benefit plan investors may purchase twenty-five percent (25%) or more of the limited partner interests in the Fund.

In general, the Fund will be considered to be a venture capital operating company if (i) as of the date of its initial long-term investment and on any date of each "annual valuation period" at least fifty percent (50%) of its assets, valued at cost and exclusive of short-term investments pending long-term commitment, are investments in operating companies as to which the Fund has contractual rights directly with the operating company to substantially participate in, or substantially influence, the conduct of such companies ("management rights") and (ii) the Fund actually exercises its management rights in at least one of such companies in the ordinary course of its business each year.

While the Fund expects to invest in operating companies (as defined in the Plan Assets Regulation) and generally to receive certain rights with respect to such companies (*e.g.*, the right to appoint directors to the board of the operating companies, the right to consult on the day-to-day operation of operating companies and to discuss financing and acquisition opportunities with management of the operating companies, and the right to receive financial information from, and examine the books of, operating companies), it is not clear whether, even if the Fund were to receive and exercise all the rights it expects to obtain, such rights would be deemed to constitute management rights within the meaning of the Plan Assets Regulation, because the DOL has said that such determination will be made on the basis of the particular facts involved in each case.

In the event that benefit plan investors purchase twenty-five percent (25%) or more of the limited partner interests in the Fund, the Fund expects to be operated as a venture capital operating company and intends to structure its investments in compliance with the requirements to qualify as such; however, the Fund cannot give any assurances as to whether it will be so considered.

**PLAN ASSET CONSEQUENCES; PROHIBITED TRANSACTION EXEMPTIONS**. If the Fund's assets were deemed to constitute "plan assets" subject to Title I of ERISA or Section 4975 of the Code and a nonexempt prohibited transaction were to occur, then the General Partner, as a fiduciary and "party in interest," and any other "party in interest" that engaged in the prohibited transaction could be required (i) to restore to the Plan any profit realized on the transaction and (ii) to reimburse the Plan for any losses suffered by the Plan as a result of such investment. In addition, each "party in interest" involved could be subject to an excise tax equal to fifteen percent (15%) of the amount involved in the prohibited transaction for each year such transaction continues and, unless such transaction were corrected within statutorily required periods, to an additional tax of 100%. Plan fiduciaries who make the decision to invest in an interest in the Fund could, under certain circumstances, be liable as co-fiduciaries for actions taken by the Fund or the General Partner.

Furthermore, unless appropriate administrative exemptions were available or were obtained, the Fund could be restricted from acquiring an otherwise desirable investment or from entering into an otherwise favorable transaction, if such acquisition or transaction would constitute a "prohibited transaction."

**FORM 5500 ALTERNATIVE REPORTING OPTION**. Most Plans must annually prepare and file with the Internal Revenue Service a Form 5500, Annual Return/Report of Employee Benefit Plan ("***Form 5500***") and Schedule C of Form 5500 requires detailed reporting of "indirect compensation" received by service providers to a Plan. "Indirect compensation" refers to compensation received from sources other than directly from a Plan or the sponsor of a Plan if received in connection with services rendered to the Plan. For this purpose, persons providing investment management services to a pooled investment fund in which a Plan invests are treated as indirectly providing investment management services to the Plan. Reportable "indirect compensation" thus includes fees received by a person from a pooled investment fund in which a Plan invests to the extent that such fees are charged against the fund and reflected in the value of the Plan's investment, such as, for example, an investment adviser asset-based investment management fee.

To the extent that "eligible indirect compensation" needs to be reported, the disclosure and description of the Fund's compensation arrangements contained in this Memorandum or the Partnership Agreement are intended to satisfy the requirements for the alternative reporting option for "eligible indirect compensation" that are set forth in the instructions to Schedule C of Form 5500 because they disclose and describe (a) the existence of the indirect compensation, (b) the services provided for the indirect compensation or the purpose for the payment of the indirect compensation, (c) the amount (or estimate) of the compensation or a description of the formula used to calculate or determine the compensation, and (d) the identity of the party or parties paying and receiving the compensation.

***EACH PLAN FIDUCIARY SHOULD CONSULT ITS LEGAL ADVISER CONCERNING THE POTENTIAL CONSEQUENCES UNDER ERISA, SECTION 4975 OF THE CODE OR SIMILAR STATE LAW BEFORE MAKING AN INVESTMENT IN THE FUND.***

## IX. ADDITIONAL INFORMATION

Prior to the consummation of the offering, the Fund will provide to each prospective investor and such investor's representatives and advisors, if any, the opportunity to ask questions and receive answers concerning the terms and conditions of the offering and to obtain any additional information which the Fund may possess or can obtain without unreasonable effort and expense that is necessary to verify the accuracy of the information furnished to such prospective investor.

This Memorandum is intended to present a general outline of the policies and structure of the Fund and the General Partner. The Partnership Agreement, which specifies the rights and obligations of the Limited Partners, should be reviewed thoroughly by each prospective investor. The "Summary of Principal Terms" of the terms and conditions of the Fund contained herein is necessarily incomplete and is qualified in its entirety by reference to such agreement and the subscription agreements relating to the purchase of limited partnership interests therein. In the event any description of the Fund's terms and conditions set forth in this Memorandum conflict with the provisions of such agreements, the terms and conditions set forth in such agreements shall control.

Any questions regarding this offering, and any requests for copies of the Memorandum, the Partnership Agreement and the Subscription Agreement should be directed to:

**SID JAWAHAR**
SWIFTARC BEAUTY FUND, LP
c/o Swiftarc Beauty Fund GP, LLC
801 Brickell Avenue, Office 709, Miami, FL, 33131
Sid@SwiftarcVentures.com

* * * * *

# APPENDIX A

## INFORMATION REQUIRED BY FOREIGN SECURITIES LAWS

*Prospective foreign investors should carefully consider the applicable legends stated below prior to deciding whether or not to invest in the Fund.*

**NOTICE TO INVESTORS IN, DOMICILED IN, OR WITH A REGISTERED OFFICE IN, THE UNITED KINGDOM**

THE INFORMATION CONTAINED IN THIS MEMORANDUM IS CONFIDENTIAL AND MUST NOT BE SHARED IN WHOLE OR IN PART WITH ANY OTHER PERSON, EXCEPT FOR THE PURPOSE OF TAKING PROFESSIONAL ADVICE IN CONNECTION WITH THE INVESTMENTS DESCRIBED IN THIS MEMORANDUM.

THIS IS NOT A "PROSPECTUS". IT HAS NOT BEEN PREPARED TO MEET THE REQUIREMENTS OF PART VI OF THE FINANCIAL SERVICES & MARKETS ACT 2000 ("***FSMA***") AND THE HANDBOOK OF RULES MAINTAINED BY THE FINANCIAL CONDUCT AUTHORITY ("***FCA***"); NOR HAS IT BEEN SUBMITTED TO, OR REGISTERED WITH, A REGULATOR, OR SUPERVISORY OR LISTING AUTHORITY OF ANY KIND, ANYWHERE IN THE WORLD. THE INVESTMENTS DESCRIBED HEREIN CANNOT LAWFULLY BE OFFERED OR SOLD TO THE PUBLIC IN THE UNITED KINGDOM; AND NO APPLICATION CAN OR WILL BE MADE FOR THESE INVESTMENTS TO BE ADMITTED TO TRADING ON A REGULATED MARKET IN THE UNITED KINGDOM OR ANYWHERE ELSE. ACCORDINGLY, THIS MEMORANDUM, AND THE INVESTMENTS DESCRIBED IN IT, CANNOT BE MADE AVAILABLE IN THE UNITED KINGDOM, OTHER THAN IN CIRCUMSTANCES WHERE A PROSPECTUS IS NOT REQUIRED. NO SINGLE INVESTOR MAY INVEST LESS THAN €100,000. THIS MEMORANDUM HAS BEEN PREPARED FOR INFORMATION PURPOSES ONLY. PROSPECTIVE INVESTORS SHOULD NOT CONSTRUE THE CONTENTS OF THIS MEMORANDUM AS INVESTMENT, LEGAL OR TAX ADVICE.

THIS MEMORANDUM IS, OR AT LEAST HAS THE POTENTIAL TO BE, A "FINANCIAL PROMOTION" AS THAT TERM IS USED IN AND DEFINED BY SECTION 21 OF FSMA.

OUR INTENTION IS TO COMMUNICATE THIS MEMORANDUM EXCLUSIVELY TO INVESTMENT PROFESSIONALS; HIGH NET WORTH COMPANIES, UNINCORPORATED ASSOCIATIONS, AND UNINCORPORATED PARTNERSHIPS; THE TRUSTEES OF HIGH VALUE TRUSTS; HIGH NET WORTH INDIVIDUALS; SELF-CERTIFIED SOPHISTICATED INVESTORS; AND CERTIFIED SOPHISTICATED INVESTORS, AS EACH OF THESE TERMS IS USED IN AND DEFINED BY THE FSMA (FINANCIAL PROMOTION) ORDER 2005 ("***FPO***"). ANY OTHER PERSON WHO RECEIVES THIS MEMORANDUM SHOULD RETURN OR DESTROY IT.

**NOTICE TO INVESTMENT PROFESSIONALS:** THIS MEMORANDUM IS DIRECTED AT PERSONS HAVING PROFESSIONAL EXPERIENCE IN MATTERS RELATING TO INVESTMENTS. ANY INVESTMENT OR INVESTMENT ACTIVITY TO WHICH IT RELATES IS AVAILABLE ONLY TO SUCH PERSONS AND WILL BE ENGAGED IN ONLY WITH SUCH PERSONS. PERSONS WHO DO NOT HAVE PROFESSIONAL EXPERIENCE IN MATTERS RELATING TO INVESTMENTS SHOULD NOT RELY ON THIS MEMORANDUM. THERE ARE PROPER SYSTEMS AND PROCEDURES IN PLACE TO PREVENT RECIPIENTS OTHER THAN INVESTMENT PROFESSIONALS ENGAGING IN THE INVESTMENT ACTIVITY TO WHICH THIS MEMORANDUM RELATES, WITH THE PERSON DIRECTING THE COMMUNICATION OF THIS MEMORANDUM, A CLOSE RELATIVE OF HIS OR A MEMBER OF THE SAME GROUP.

**NOTICE TO HIGH NET WORTH COMPANIES, UNINCORPORATED ASSOCIATIONS, AND UNINCORPORATED PARTNERSHIPS, & THE TRUSTEES OF HIGH VALUE TRUSTS:** THIS MEMORANDUM IS DIRECTED AT HIGH NET WORTH COMPANIES, UNINCORPORATED ASSOCIATIONS, AND UNINCORPORATED PARTNERSHIPS, & THE TRUSTEES OF HIGH VALUE TRUSTS. THE CONTROLLED INVESTMENTS AND CONTROLLED ACTIVITIES TO WHICH IT RELATES ARE AVAILABLE ONLY TO SUCH PERSONS. NO ONE ELSE SHOULD ACT OR RELY UPON THIS MEMORANDUM. THERE ARE PROPER SYSTEMS AND PROCEDURES IN PLACE TO PREVENT RECIPIENTS OTHER THAN HIGH NET WORTH COMPANIES, UNINCORPORATED ASSOCIATIONS AND UNINCORPORATED PARTNERSHIPS, & THE TRUSTEES OF HIGH VALUE TRUSTS ENGAGING IN THE INVESTMENT ACTIVITY TO WHICH THIS MEMORANDUM RELATES WITH THE PERSON DIRECTING THE COMMUNICATION OF THIS MEMORANDUM, A CLOSE RELATIVE OF HIS OR A MEMBER OF THE SAME GROUP.

**NOTICE TO HIGH NET WORTH INDIVIDUALS; AND SELF-CERTIFIED SOPHISTICATED AND CERTIFIED SOPHISTICATED INVESTORS:** THE COMMUNICATION OF THIS MEMORANDUM TO A HIGH NET WORTH INDIVIDUAL, OR A SELF-CERTIFIED SOPHISTICATED OR CERTIFIED SOPHISTICATED INVESTOR IS EXEMPT FROM THE GENERAL RESTRICTION IN SECTION 21 OF FSMA ON THE COMMUNICATION OF INVITATIONS OR INDUCEMENTS TO ENGAGE IN INVESTMENT ACTIVITY ON THE GROUND THAT IT IS MADE TO A HIGH NET WORTH INDIVIDUAL, OR A SELF-CERTIFIED SOPHISTICATED OR CERTIFIED SOPHISTICATED INVESTOR. THE CONTENT OF THIS MEMORANDUM HAS NOT BEEN APPROVED BY AN AUTHORIZED PERSON AND SUCH APPROVAL IS, UNLESS AN EXEMPTION APPLIES, REQUIRED BY SECTION 21 OF FSMA. RELIANCE ON THIS MEMORANDUM FOR THE PURPOSE OF ENGAGING IN ANY INVESTMENT ACTIVITY MAY EXPOSE THE INDIVIDUAL TO A SIGNIFICANT RISK OF LOSING ALL OF THE PROPERTY INVESTED OR OF INCURRING ADDITIONAL LIABILITY. ANY INDIVIDUAL WHO IS IN ANY DOUBT ABOUT THE INVESTMENT TO WHICH THIS MEMORANDUM RELATES SHOULD CONSULT AN AUTHORIZED PERSON SPECIALIZING IN ADVISING ON INVESTMENTS OF THE KIND IN QUESTION.

"***INVESTMENT PROFESSIONALS***" ARE (A) PERSONS WHO ARE AUTHORIZED BY THE UNITED KINGDOM'S FINANCIAL CONDUCT AUTHORITY OR PRUDENTIAL REGULATION AUTHORITY; (B) PERSONS WHO DO NOT HAVE TO BE AUTHORIZED BECAUSE THEY ARE EXEMPT FOR THE PURPOSES OF BUYING INTERESTS OF THE KIND DESCRIBED IN THIS MEMORANDUM; (C) OTHER PERSONS WHOSE ORDINARY ACTIVITIES INCLUDE BUYING SUCH INTERESTS FOR THE PURPOSES OF A BUSINESS CARRIED ON BY HIM OR THEM; (D) GOVERNMENTS, LOCAL AUTHORITIES OR INTERNATIONAL ORGANIZATIONS; AND (D) THE DIRECTORS, OFFICERS OR EMPLOYEES OF ANY OF (A) TO (D).

"***HIGH NET WORTH COMPANIES***" ARE CORPORATE BODIES THAT HAVE, OR ARE PART OF THE SAME GROUP AS ANOTHER CORPORATE BODY THAT HAS, A CALLED-UP SHARE CAPITAL OR NET ASSETS OF MORE THAN: (A) £500,000 (IF THE CORPORATE BODY OR ITS PARENT HAS MORE THAN 20 MEMBERS); OR (B) (OTHERWISE) £5M.

"***HIGH NET WORTH UNINCORPORATED ASSOCIATIONS***" ARE THOSE WITH NET ASSETS OF NOT LESS THAN £5M.

"***HIGH NET WORTH PARTNERSHIPS***" ARE THOSE WITH NET ASSETS OF NOT LESS THAN £5M.

"***HIGH VALUE TRUSTS***" ARE TRUSTS WHERE THE AGGREGATE VALUE OF THE CASH AND INVESTMENTS THAT FORM PART OF THE TRUST'S ASSETS (BEFORE DEDUCTING THE AMOUNT OF ITS LIABILITIES) IS £10M OR MORE; OR HAS BEEN £10M OR MORE AT ANY

TIME DURING THE YEAR IMMEDIATELY PRECEDING THE DATE ON WHICH THIS MEMORANDUM WAS FIRST COMMUNICATED TO THE TRUSTEE OF THE RELEVANT TRUST.

A "***HIGH NET WORTH INDIVIDUAL***" IS AN INDIVIDUAL WHO HAS SIGNED, WITHIN THE PERIOD OF 12 MONTHS ENDING WITH THE DAY ON WHICH THIS MEMORANDUM IS COMMUNICATED TO HIM, A STATEMENT COMPLYING WITH PART I OF SCHEDULE 5 TO THE FPO. AN INDIVIDUAL CAN ONLY SIGN SUCH A STATEMENT IF HE HAD, DURING THE FINANCIAL YEAR IMMEDIATELY PRECEDING THE DATE OF THAT STATEMENT, AN ANNUAL INCOME TO THE VALUE OF £100,000 OR MORE; OR HELD, THROUGHOUT THAT YEAR, NET ASSETS TO THE VALUE OF £250,000 OR MORE. "NET ASSETS" DO NOT INCLUDE: (A) THE PROPERTY WHICH IS THE RELEVANT INDIVIDUAL'S PRIMARY RESIDENCE OR ANY LOAN SECURED ON THAT RESIDENCE; (B) ANY RIGHTS THAT INDIVIDUAL MAY HAVE UNDER A QUALIFYING CONTRACT OF INSURANCE WITHIN THE MEANING OF THE FSMA (REGULATED ACTIVITIES) ORDER 2001; OR (C) ANY BENEFITS THAT ARE PAYABLE ON THE TERMINATION OF HIS SERVICE OR ON HIS DEATH OR RETIREMENT AND TO WHICH HE IS, OR TO WHICH HIS DEPENDENTS ARE, OR MAY BE, ENTITLED.

A "***SELF-CERTIFIED SOPHISTICATED INVESTOR***" IS A PERSON WHO HAS SIGNED WITHIN THE PERIOD OF 12 MONTHS ENDING WITH THE DAY ON WHICH THE COMMUNICATION OF THIS MEMORANDUM IS MADE TO HIM, A STATEMENT COMPLYING WITH PART II OF SCHEDULE 5 TO THE FPO. AN INDIVIDUAL CAN ONLY SIGN SUCH A STATEMENT IF AT LEAST ONE OF THE FOLLOWING APPLIES: (A) HE WAS A MEMBER OF A SYNDICATE OR NETWORK OF BUSINESS ANGELS AND HAD BEEN FOR AT LEAST THE LAST SIX MONTHS PRIOR TO THE DATE OF THE RELEVANT STATEMENT; (B) HE HAD MADE MORE THAN ONE INVESTMENT IN AN UNLISTED COMPANY IN THE TWO YEARS PRIOR TO THE DATE OF THE RELEVANT STATEMENT; (C) HE WAS WORKING, OR HAD WORKED IN THE TWO (2) YEARS PRIOR TO THE DATE OF THE RELEVANT STATEMENT, IN A PROFESSIONAL CAPACITY IN THE PRIVATE EQUITY SECTOR, OR IN THE PROVISION OF FINANCE FOR SMALL AND MEDIUM ENTERPRISES; OR (D) HE WAS, OR HE HAD BEEN IN THE TWO (2) YEARS PRIOR TO THE DATE OF THE RELEVANT STATEMENT, A DIRECTOR OF A COMPANY WITH AN ANNUAL TURNOVER OF AT LEAST £1MILLION.

A "***CERTIFIED SOPHISTICATED INVESTOR***" IS A PERSON WHO HAS A CURRENT CERTIFICATE IN WRITING OR SOME OTHER LEGIBLE FORM, SIGNED BY AN AUTHORIZED PERSON, TO THE EFFECT THAT HE IS SUFFICIENTLY KNOWLEDGEABLE TO UNDERSTAND THE RISKS ASSOCIATED WITH THAT DESCRIPTION OF INVESTMENT; AND WHO HAS SIGNED, WITHIN THE PERIOD OF 12 MONTHS ENDING WITH THE DAY ON WHICH THIS MEMORANDUM OR ANOTHER RELEVANT DOCUMENT IS COMMUNICATED TO HIM, A STATEMENT IN THE FOLLOWING TERMS: "I MAKE THIS STATEMENT SO THAT I AM ABLE TO RECEIVE PROMOTIONS WHICH ARE EXEMPT FROM THE RESTRICTIONS ON FINANCIAL PROMOTION IN THE FINANCIAL SERVICES AND MARKETS ACT 2000. THE EXEMPTION RELATES TO CERTIFIED SOPHISTICATED INVESTORS AND I DECLARE THAT I QUALIFY AS SUCH IN RELATION TO INVESTMENTS OF VENTURE CAPITAL AND OTHER PRIVATE EQUITY FUNDS. I ACCEPT THAT THE CONTENTS OF PROMOTIONS AND OTHER MATERIAL THAT I RECEIVE MAY NOT HAVE BEEN APPROVED BY AN AUTHORIZED PERSON AND THAT THEIR CONTENT MAY NOT THEREFORE BE SUBJECT TO CONTROLS WHICH WOULD APPLY IF THE PROMOTION WERE MADE OR APPROVED BY AN AUTHORIZED PERSON. I AM AWARE THAT IT IS OPEN TO ME TO SEEK ADVICE FROM SOMEONE WHO SPECIALIZES IN ADVISING ON HIS KIND OF INVESTMENT".