# EXHIBIT 4

**AMENDED AND RESTATED LIMITED PARTNERSHIP AGREEMENT**

**OF**

**SWIFTARC BEAUTY FUND, LP**

dated as of

September 29, 2021

THE CLASS I AND CLASS II LIMITED PARTNERSHIP INTERESTS (COLLECTIVELY, THE "***INTERESTS***") REFERRED TO IN THIS AMENDED AND RESTATED LIMITED PARTNERSHIP AGREEMENT (THE "***AGREEMENT***") HAVE NOT BEEN REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "***SECURITIES ACT***"), THE SECURITIES LAWS OF ANY STATE OF THE UNITED STATES OR ANY OTHER APPLICABLE SECURITIES LAWS IN RELIANCE UPON EXEMPTIONS FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT AND SUCH LAWS. SUCH INTERESTS MUST BE ACQUIRED FOR INVESTMENT ONLY AND MAY NOT BE OFFERED FOR SALE, PLEDGED, HYPOTHECATED, SOLD, ASSIGNED, TRANSFERRED OR OTHERWISE DISPOSED OF AT ANY TIME EXCEPT IN COMPLIANCE WITH (I) THE SECURITIES ACT, ANY APPLICABLE U.S. STATE SECURITIES LAWS, AND ANY OTHER APPLICABLE SECURITIES LAWS; AND (II) THE TERMS AND CONDITIONS OF THIS AGREEMENT. THEREFORE, PURCHASERS OF INTERESTS WILL BE REQUIRED TO BEAR THE RISK OF THEIR INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.



DS
JMH
Joanne Marie Holiday

**TABLE OF CONTENTS**

ARTICLE I DEFINITIONS ....5

Section 1.01 Definitions....5
Section 1.02 Interpretation....18

ARTICLE II GENERAL PROVISIONS....18

Section 2.01 Formation and Continuation. ....18
Section 2.02 Name....19
Section 2.03 Principal Office....19
Section 2.04 Registered Office; Registered Agent. ....19
Section 2.07 Conflict between Agreement and Statute. ....19

ARTICLE III PURPOSE AND BUSINESS....19

Section 3.01 Purpose....20
Section 3.02 Authorized Activities....20
Section 3.03 Investment Restrictions....21
Section 3.04 Alternative Investment Vehicles....22
Section 3.05 Co-investment Opportunities....23
Section 3.06 Parallel Vehicles. ....23
Section 3.07 Feeder Vehicles....24
Section 3.08 Operating and Organizational Expenses....24

ARTICLE IV THE GENERAL PARTNER....24

Section 4.01 Management and Authority. ....24
Section 4.02 Transactions with Affiliates....25
Section 4.03 Liability for Acts and Omissions. ....26
Section 4.04 General Partner Clawback. ....28
Section 4.06 Successor Funds; Presentation of Opportunities to the Partnership. ....29
Section 4.07 Other Activities....30
Section 4.08 Miscellaneous Revenues....30
Section 4.09 Transfer or Withdrawal by the General Partner....31
Section 4.10 Bankruptcy or Dissolution of the General Partner....31
Section 4.11 Removal of the General Partner....32
Section 4.12 Obligations of a Former General Partner....33
Section 4.13 Successor to the General Partner. ....33

ARTICLE V LIMITED PARTNERS....34

Section 5.01 No Participation in Management of the Partnership....34
Section 5.02 Limitation on Liability....34
Section 5.03 Power of Attorney....34

ARTICLE VI INTERESTS; CAPITAL CONTRIBUTIONS; CAPITAL ACCOUNTS ....36

Section 6.01 General Partner. ....36
Section 6.02 Limited Partners....36
Section 6.03 Capital Contributions....36

Section 6.04 Maintenance of Capital Accounts. 37
Section 6.05 Default by Partners. 38
Section 6.06 Interest. 39
Section 6.07 Withdrawal of Capital Contributions. 39
Section 6.08 Succession Upon Transfer. 40
Section 6.09 Restoration of Negative Capital Accounts. 40
Section 6.10 Admission of Limited Partners After Initial Closing. 40

ARTICLE VII ALLOCATIONS 41

Section 7.01 Allocations of Net Income and Net Loss and Special Allocations 41
Section 7.02 Regulatory Allocations. 42
Section 7.03 Tax Allocations. 42
Section 7.04 Allocations to Transferred Interests. 43

ARTICLE VIII DISTRIBUTIONS 43

Section 8.01 Distributions. 43
Section 8.02 Tax Distributions. 44
Section 8.03 Withholding and Income Taxes. 44
Section 8.04 Form of Distributions. 46
Section 8.05 Retention of Distributable Cash. 47

ARTICLE IX THE INVESTMENT MANAGER 47

Section 9.01 Investment Management Agreement. 47
Section 9.02 Investment Management Fees. 47

ARTICLE X ACCOUNTING AND REPORTS 47

Section 10.01 Books and Records. 48
Section 10.02 Partnership Representative. 48
Section 10.03 Reports to Partners. 49

ARTICLE XI TRANSFER OF LIMITED PARTNERSHIP INTERESTS 50

Section 11.01 Transfers. 50
Section 11.02 Transfer by Limited Partners 50
Section 11.03 Substitute Limited Partners. 51
Section 11.04 Involuntary Withdrawal by Limited Partners. 52
Section 11.05 Required Withdrawals. 52

ARTICLE XII DISSOLUTION AND LIQUIDATION 53

Section 12.01 Dissolution. 53
Section 12.02 Liquidation. 53

ARTICLE XIII REPRESENTATIONS AND WARRANTIES OF THE GENERAL PARTNER 54

Section 13.01 Representations and Warranties of the General Partner. 54

ARTICLE XIV ERISA CONSIDERATIONS 55

Section 14.01 Status Under ERISA Plan Asset Rules. 55
Section 14.02 VCOC/REOC Procedures. 56
Section 14.03 Significant Participation and Plan Asset Procedures. 56

Section 14.04 Consequences of ERISA Plan Asset Status. ....56

ARTICLE XV ADVISORY COMMITTEE ....58

Section 15.01 Advisory Committee. ....58
Section 15.02 Meetings of and Action by the Advisory Committee. ....58
Section 15.03 Fees of Advisory Committee. ....59
Section 15.04 Member Removal or Resignation. ....59

ARTICLE XVI AMENDMENTS AND MEETINGS ....59

Section 16.01 Amendment Procedure. ....59
Section 16.02 Exceptions. ....60
Section 16.03 Meetings and Voting. ....60

ARTICLE XVII MISCELLANEOUS ....61

Section 17.01 Severability. ....61
Section 17.02 Governing Law. ....61
Section 17.03 Submission to Jurisdiction. ....61
Section 17.04 Successors and Assigns. ....61
Section 17.05 Waiver of Jury Trial. ....62
Section 17.06 Waiver of Action for Partition. ....62
Section 17.07 Record of Limited Partners. ....62
Section 17.08 Headings. ....62
Section 17.09 Counterparts. ....62
Section 17.10 Notices. ....62
Section 17.11 Entire Agreement. ....63
Section 17.12 No Third-party Beneficiaries. ....63
Section 17.13 Counsel. ....63
Section 17.14 Side Letter Agreements. ....63
Section 17.15 Confidentiality. ....63

## AMENDED AND RESTATED LIMITED PARTNERSHIP AGREEMENT

This Amended and Restated Limited Partnership Agreement of Swiftarc Beauty Fund, LP, a Delaware limited partnership (the "***Partnership***"), is entered into as of September 29, 2021 by and among Swiftarc Beauty Fund GP, LLC, a Delaware limited liability company, as the General Partner and those additional parties listed from time to time on Schedule A to this Agreement that have been or shall be admitted as Limited Partners (as defined herein) in accordance with the terms of this Agreement.

## RECITALS

**WHEREAS**, the General Partner formed the Partnership pursuant to a certificate of limited partnership of the Partnership (the "***Certificate of Limited Partnership***") filed with the Secretary of State of the State of Delaware on May 25, 2021, and has been operated in accordance with that certain Limited Partnership Agreement dated as of May 25, 2021 (the "***Original Agreement***"); and

**WHEREAS**, the parties hereto wish to enter into this Agreement in order to amend and restate the Original Agreement in its entirety, create two (2) classes of Limited Partners (Class I Limited Partners and Class II Limited Partners, as defined herein), admit the Class I Limited Partners and Class II Limited Partners listed on Schedule A as limited partners of the Partnership, and operate the Partnership on the terms set forth herein.

**NOW, THEREFORE**, in consideration of the mutual covenants herein contained and of other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound hereby, agree as follows:

## ARTICLE I
## DEFINITIONS

**Section 1.01 Definitions.** Capitalized terms used herein and not otherwise defined shall have the meanings set forth in this Section 1.01:

"***Advisers Act***" means the Investment Advisers Act of 1940, as amended from time to time.

**"*Advisory Committee*"** means the committee described in ARTICLE XV.

"***Advisory Committee Consent***" means the consent of a majority of the members of the Advisory Committee.

"***Affiliate***" means, with respect to any Person, any other Person that, directly or indirectly (including through one or more intermediaries), controls, is controlled by or is under common control with such person. The term "control" means (a) the legal or beneficial ownership of securities representing a majority of the voting power of any Person or (b) the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of any Person, whether through ownership of voting securities or partnership or other

ownership interests, by contract or otherwise; and the terms "controlling" and "controlled" shall have correlative meanings.

"***After-Tax Amount***" means an amount equal to (a) the amount of Carried Interest Distributions to the General Partner with respect to a Limited Partner minus (b) the amount of income tax imposed on the General Partner and its direct and indirect members with respect to (i) allocations of taxable income related to such Carried Interest or (ii) Carried Interest Distributions (including taxes borne by the General Partner and its direct and indirect members for the sale of securities initially received in kind pursuant to Section 8.04 assuming such securities were sold immediately after such distributions in kind), in each case based on the Assumed Tax Rate plus (c) the aggregate amount of tax benefit that is realized by the General Partner, or its direct or indirect members, attributable solely to paying the Clawback, and calculated after all applicable restrictions on deductions, losses, credits or other items have been taken into account by the General Partner (or its direct or indirect members) in the taxable year of the Clawback Determination Date and assuming that the only items of income, gain, loss deduction or credit of the General Partner, or its direct or indirect members, are attributable to the General Partner's investment in the Partnership. In calculating the After-Tax Amount, (a) the Assumed Tax Rate shall be the Assumed Tax Rate in effect in the Fiscal Year of any such allocation, distribution or sale of securities and (b) the determination of the amount of income tax imposed shall include the aggregate allocations of losses, deductions and credits received directly or indirectly from the Partnership (over the life of the Partnership) that would be available to offset the taxable income or reduce the tax liability of the General Partner, or its direct or indirect members, after all applicable restrictions on such tax items have been taken into account and assuming the only items of income, gain, loss, deduction or credit of the General Partner, or its direct or indirect members, are attributable to the General Partner's investment in the Partnership.

"***Aggregate Contributions***" means the sum of the Capital Contributions and Parallel Vehicle Contributions.

"***Agreement***" means this Amended and Restated Limited Partnership Agreement, as it may be amended, modified, supplemented, or restated from time to time, as provided herein (including, without limitation, by a Side Letter Agreement in respect of one or more Limited Partners).

"***Alternative Investment Vehicle***" has the meaning set forth in Section 3.04(a).

"***AML Laws***" has the meaning set forth in Section 11.05(a).

"***Assumed Tax Rate***" means the highest effective marginal combined federal, state, and local income tax rate for a Fiscal Year prescribed for an individual residing in New York, New York, taking into account the character (for example, long-term or short-term capital gain, ordinary or exempt) of the applicable income.

**"*Available Assets*"** means, for any period, the excess of (a) Distributable Cash and other property to be distributed pursuant to Section 8.01 and Temporary Investments over (b) the sum of (i) Investment Expenses, (ii) amounts paid or payable in respect of any loan or other

Indebtedness of the Partnership and (iii) the amount of reserves established by the General Partner as contemplated by Section 3.02(o).

"***Bankruptcy***" means, with respect to any Person, the occurrence of any of the following: (a) the filing of an application by such Person for, or consent to, the appointment of a trustee of such Person's assets; (b) the filing by such Person of a voluntary petition in bankruptcy or the filing of a pleading in any court of record admitting in writing such Person's inability to pay its debts as they come due; (c) the making by such Person of a general assignment for the benefit of such Person's creditors; (d) the filing by such Person of an answer admitting the material allegations of, or such Person's consenting to, or defaulting in answering a bankruptcy petition filed against, such Person in any bankruptcy proceeding; or (e) the expiration of sixty (60) days following the entry of an order, judgment or decree by any court of competent jurisdiction adjudicating such Person a bankrupt or appointing a trustee of such Person's assets.

"***BBA***" means the Bipartisan Budget Act of 2015.

"***Benefit Plan Investor***" means a limited partner that is any of the following:

(a) an "employee benefit plan" within the meaning of Section 3(3) of ERISA that is subject to Title I of ERISA;

(b) a "plan" within the meaning of, and subject to, Section 4975 of the Code; or

(c) any person or entity whose assets are deemed to include the assets of any such "employee benefit plan" or "plan" under the Plan Asset Rules or otherwise for purposes of Section 406 of ERISA or Section 4975 of the Code.

"***Book Depreciation***" means, with respect to any Partnership asset for each Fiscal Year, the Partnership's depreciation, amortization, or other cost recovery deductions determined for federal income tax purposes, except that if the Book Value of an asset differs from its adjusted tax basis at the beginning of such Fiscal Year, Book Depreciation shall be an amount which bears the same ratio to such beginning Book Value as the federal income tax depreciation, amortization, or other cost recovery deduction for such Fiscal Year bears to such beginning adjusted tax basis; provided, that if the adjusted basis for federal income tax purposes of an asset at the beginning of such Fiscal Year is zero and the Book Value of the asset is positive, Book Depreciation shall be determined with reference to such beginning Book Value using any permitted method selected by the General Partner in accordance with Treasury Regulation Section 1.704-1(b)(2)(iv)(g)(3).

"***Book Value***" means, with respect to any Partnership asset, the adjusted basis of such asset for federal income tax purposes, except as follows:

(a) the initial Book Value of any Partnership asset contributed by a Partner to the Partnership shall be the gross Fair Market Value of such Partnership asset as of the date of such contribution;

(b) immediately prior to the distribution by the Partnership of any Partnership asset to a Partner, the Book Value of such asset shall be adjusted to its gross Fair Market Value as of the date of such distribution;

(c) the Book Value of all Partnership assets shall be adjusted to equal their respective gross Fair Market Values, as reasonably determined by the General Partner, as of the following times:

(i) the acquisition of an additional Interest in the Partnership by a new or existing Partner in consideration of a Capital Contribution of more than a *de minimis* amount;

(ii) the distribution by the Partnership to a Partner of more than a *de minimis* amount of property (other than cash) as consideration for all or a part of such Partner's Interest;

(iii) the liquidation of the Partnership within the meaning of Treasury Regulation Section 1.704-1(b)(2)(ii)(g);

(iv) provided, that adjustments pursuant to subclauses (i), (ii) and (iii) above need not be made if the General Partner reasonably determines that such adjustment is not necessary or appropriate to reflect the relative economic interests of the Partners and that the absence of such adjustment does not adversely and disproportionately affect any Partner;

(d) the Book Value of each Partnership asset shall be increased or decreased, as the case may be, to reflect any adjustments to the adjusted tax basis of such Partnership asset pursuant to Sections 734(b) or 743(b) of the Code, but only to the extent that such adjustments are taken into account in determining Capital Account balances pursuant to Treasury Regulation Section 1.704-1(b)(2)(iv)(m); provided, that Book Values shall not be adjusted pursuant to this paragraph (d) to the extent that an adjustment pursuant to paragraph (c) above is made in conjunction with a transaction that would otherwise result in an adjustment pursuant to this paragraph (d); and

(e) if the Book Value of a Partnership asset has been determined pursuant to paragraph (a) or adjusted pursuant to paragraphs (c) or Section 1.01(d) above, such Book Value shall thereafter be adjusted to reflect the Book Depreciation taken into account with respect to such Partnership asset for purposes of computing Net Income and Net Losses.

"***Business Day***" means any day other than a Saturday, Sunday or other day on which commercial banks in the City of New York are authorized or required to close.

"***Capital Account***" has the meaning set forth in Section 6.04.

"***Capital Contribution***" means, with respect to any Partner at any time, unless otherwise provided in this Agreement, the aggregate amount of capital actually contributed by such Partner to the Partnership pursuant to a Subscription Agreement or an Alternative Investment Vehicle

pursuant to the terms of this Agreement. The initial Capital Contributions of each Partner is set forth on Schedule A.

"***Carried Interest Distributions***" means all amounts distributed to the General Partner pursuant to Section 8.01(b) and Section 12.02 (to the extent made in accordance with the priorities of Section 8.01(b)) and advances to the General Partner pursuant to Section 8.02 to the extent not repaid from subsequent distributions, less any payments made by the General Partner pursuant to Section 4.04(a).

"***Cause***" means either (i) a Change of Control of the General Partner or (ii) a final determination by a court of competent jurisdiction or a government body, or an admission or plea of nolo contendere by the General Partner or any of its Affiliates in a settlement of any lawsuit, that the General Partner or any of its Affiliates has committed an act constituting bad faith, fraud, gross negligence, willful misconduct, a violation of federal securities laws, breach of fiduciary duty, or a material breach of this Agreement that has a material adverse effect on the business of the Partnership.

"***Certificate of Cancellation***" has the meaning set forth in Section 12.02(d).

"***Change of Control of the General Partner***" means (i) the sale of all or substantially all of the assets of the General Partner to an independent third party; (ii) a sale resulting in more than fifty (50%) of the membership interests of the General Partner being held by an independent third party; or (iii) a merger, consolidation, recapitalization or reorganization of the General Partner with or into an independent third party, if and only if such event listed in this clause (iii) results in the inability of the Principal to designate or elect a majority of the managers or the board of directors (or its equivalent) of the resulting Person.

"***Class I Limited Partner***" means those persons and entities listed on Schedule A as Class I Limited Partners who have made a minimum investment of $250,000 in the Partnership and have who properly subscribed to Class I Interests and meet the suitability standards as provided in the Subscription Agreement and Private Placement Memorandum.

"***Class I Distribution Rate***" means ninety percent (90%) to the Class I Limited Partners and ten percent (10%) to the General Partner.

"***Class II Limited Partner***" means those persons and entities listed on Schedule A as Class II Limited Partners who have made a minimum investment of $50,000 in the Partnership and have who properly subscribed to Class II Interests and meet the suitability standards as provided in the Subscription Agreement and Private Placement Memorandum.

"***Class II Distribution Rate***" means eighty percent (80%) to the Class II Limited Partners and twenty percent (20%) to the General Partner.

"***Clawback***" has the meaning set forth in Section 4.04(a).

"***Clawback Determination Date***" has the meaning set forth in Section 4.04(a).

"***Closing***" means the Initial Closing or any Subsequent Closing, as the case may be.

"***Code***" means the U.S. Internal Revenue Code of 1986, as amended.

"***Co-investment Opportunities***" has the meaning set forth in Section 3.05.

"***Co-investment Vehicle***" has the meaning set forth in Section 3.05.

"***Controlling Person***" means any person or entity (other than a Benefit Plan Investor), or any affiliates (within the meaning of 29 C.F.R. Section 2510.3-101(f)(3)) of such person or entity, who exercises control over the assets of the Partnership or provides investment advice with respect to such assets for a fee, directly or indirectly.

"***Covered Person***" means the General Partner (including, without limitation, the General Partner in its role as the Partnership Representative and, if applicable, in its capacity as a special limited partner or a former general partner), the Investment Manager, each of their Affiliates, any officers, directors, managers, employees, shareholders, partners, members, agents and consultants of any of the foregoing, the members of the Advisory Committee (including the Limited Partners represented by any member of the Advisory Committee) and any director, officer or manager of any entity in which the Partnership invests serving in such capacity at the request of the General Partner or the Investment Manager.

"***Defaulting Partner***" has the meaning set forth in Section 6.05(a).

"***Delaware Act***" means the Delaware Revised Uniform Limited Partnership Act (6 Del. C. § 17) and any successor statute, as amended from time to time.

"***Disposition***" means, with respect to any Portfolio Investment, (a) the sale, exchange or other disposition by the Partnership of all or any portion of that Portfolio Investment for cash or in exchange for Marketable Securities that are distributed to the Partners pursuant to ARTICLE VIII (including receipt by the Partnership of a liquidating dividend, distribution upon a sale of all or substantially all of the assets of a Portfolio Company or other like distribution for cash or for Marketable Securities of a Portfolio Investment or any portion thereof which can be distributed to the Partners pursuant to ARTICLE VIII), (b) the distribution in kind of all or any portion of that Portfolio Investment as permitted hereby or (c) a Write-off of such Portfolio Investment.

"***Distributable Cash***" means all cash received by the Partnership relating to the Portfolio Investments or Temporary Investments other than Capital Contributions, including, without limitation, income, dividends, distributions, interest and proceeds from the Disposition of a Portfolio Investment and any other miscellaneous receipts or revenues of the Partnership related directly to Portfolio Investments held by the Partnership, to the extent that such cash constitutes Available Assets.

"***ECI***" means "effectively connected income" as defined in Section 864 of the Code or income treated as "effectively connected" under Section 897 of the Code.

"***ERISA***" means the Employee Retirement Income Security Act of 1974, as amended from time to time.

"***ERISA Partner***" means any Limited Partner that is a Benefit Plan Investor and any other Limited Partner to the extent that the General Partner has agreed to treat such Limited Partner as an ERISA Partner.

"***Expert***" has the meaning set forth in Section 4.10(b).

"***Fair Market Value***" of any asset as of any date means the purchase price that a willing buyer having all relevant knowledge would pay a willing seller for such asset in an arm's length transaction, as determined in good faith by the General Partner based on such factors as the General Partner, in the exercise of its reasonable business judgment, considers relevant.

"***Fair Value***" means the fair value of any Interest or Portfolio Investment, as determined in good faith by the General Partner or, in the case of Sections 4.10 and 4.11, as determined by an Expert, using generally accepted valuation methods. All valuations shall be made taking into account all relevant factors that might reasonably affect the sales price of the Interest or Portfolio Investment in question. For all purposes of this Agreement, all valuations made in accordance with the foregoing shall be final and conclusive on the Fund, the Fund Investors, the General Partner, the Related Vehicle Managers, and their successors and assigns, absent manifest error.

"***Feeder Vehicle***" has the meaning set forth in Section 3.07.

"***Fiscal Year***" means the calendar year, unless the Partnership is required to have a taxable year other than the calendar year, in which case the Fiscal Year shall be the period that conforms to its taxable year.

"***Follow-On Investment***" has the meaning set forth in Section 3.03(b).

"***Foreign Taxes***" has the meaning set forth in Section 7.01(c).

"***Fund***" means the Partnership and any Parallel Vehicles, Alternative Investment Vehicles and Feeder Vehicles, collectively.

"***Fund Investors***" means, collectively, the Limited Partners, the Parallel Vehicle Limited Partners and the limited partners and members or other equity holders of the Feeder Vehicles (but not counting a Feeder Vehicle as a limited partner of the Fund).

"***General Partner***" means Swiftarc Beauty Fund GP, LLC or any other Person who becomes a successor general partner pursuant to the terms of this Agreement.

"***Governmental Authority***" means any federal, state, local or foreign government or political subdivision thereof, or any agency or instrumentality of such government or political subdivision, or any self-regulated organization or other non-governmental regulatory authority or quasi-governmental authority (to the extent that the rules, regulations or orders of such organization or authority have the force of law), or any arbitrator, court or tribunal of competent jurisdiction.

"***Indebtedness***" means, with respect to any Person, (a) (i) all indebtedness of such Person for borrowed money or for the deferred purchase price of property, goods or services, (ii) all

other obligations, contingent or otherwise, of such Person for the repayment of borrowed money in the form of surety bonds, letters of credit and bankers' acceptances whether or not matured, and (iii) all net payment obligations under hedges and other derivative contracts and similar financial instruments, (b) all obligations of such Person evidenced by notes, bonds, debentures or similar instruments, (c) all capital lease obligations of such Person and (d) all indebtedness referred to in clause (a), (b) or (c) above secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any lien upon or in property (including accounts and contract rights) owned by such Person, even though such Person has not assumed or become liable for the payment of such indebtedness (and thus such indebtedness is not an obligation of such Person).

"***Initial Closing***" means the first Closing at which a Limited Partner was admitted to the Partnership.

"***Interest***" means the partnership interest of a Partner in the Partnership at any particular time, including the right of such Partner to any and all benefits to which such Partner may be entitled as provided in this Agreement or under the Delaware Act, together with the obligations of such Partner to comply with all the terms and provisions of this Agreement and of the Delaware Act, which may also be referred to herein as "***Class I Interest***" or "***Class II Interest***", with respect to Class I Limited Partners and Class II Limited Partners, as applicable.

"***Investment Company Act***" means the Investment Company Act of 1940, as amended.

"***Investment Expenses***" means the sum of (a) the Investment Management Fee, (b) Organizational Expenses and (c) Operating Expenses.

"***Investment Management Agreement***" has the meaning set forth in Section 9.01.

"***Investment Management Fee***" has the meaning set forth in Section 9.02.

"***Investment Management Fee Commencement Date***" has the meaning set forth in Section 9.02.

"***Investment Manager***" means Swiftarc Ventures, LLC, engaged by the Fund in accordance with the Investment Management Agreement.

"***Investment Period***" means the period beginning in the Initial Closing and ending on the earliest to occur of (a) the second (2nd) anniversary of the Initial Closing and (b) the date on which the aggregate Capital Contributions of the Partners have been used, committed or reserved for a specific purpose (including, without limitation, Portfolio Investments, Follow-On Investments and Investment Expenses); provided, that the General Partner may extend the Investment Period to the third (3rd) anniversary of the Initial Closing, in its sole discretion, if the General Partner believes such an extension is necessary or desirable.

"***Legal Violation***" has the meaning set forth in Section 11.05(a).

"***Limited Partner***" means any Class I Limited Partner or any Class II Limited Partner, which shall be referred to herein collectively as the "***Limited Partners***".

"***Liquidator***" has the meaning set forth in Section 12.02(a).

"***Majority in Interest***" means Limited Partners or Fund Investors, as applicable, whose Aggregate Contributions represent greater than fifty percent (50%) of the Aggregate Contributions of all Limited Partners or Fund Investors, as applicable; *provided*, that neither the Capital Contribution of a Defaulting Partner nor the Parallel Vehicle Contribution of a defaulting Parallel Vehicle Limited Partner shall be counted for any purpose (and accordingly, shall also be excluded in calculating the Aggregate Contributions of all Limited Partners or Fund Investors, as applicable). Except as otherwise specifically provided herein, the Limited Partners or the Fund Investors, as applicable, shall be considered to constitute a single class or group, the vote of which shall be counted together for purposes of granting any consent of a Majority in Interest pursuant to this Agreement or the Delaware Act.

"***Marketable Securities***" means Securities that (a) are tradable on an established national U.S. or non-U.S. stock exchange or reported through NASDAQ or a comparable established non-U.S. over-the-counter trading system and (b) are not subject to restrictions on transfer under the Securities Act or contractual restrictions on transfer.

"***NASDAQ***" means The Nasdaq Stock Market LLC.

"***Net Adjusted Capital Contribution***" means, with respect to each Partner, as of any time, the aggregate Capital Contributions of such Partner as of such time, less the sum of (a) any distributions in return of such Capital Contributions previously made to such Partner pursuant to Section 8.01(a) and (b) any refunds of Capital Contributions made (x) pursuant to Section 6.03(a) or (y) by Partners participating in a Subsequent Closing in accordance with Section 6.10.

"***Net Income or Net Loss***" means, for each Fiscal Year or other period specified in this Agreement, an amount equal to the Partnership's taxable income or taxable loss, or particular items thereof, determined in accordance with Section 703(a) of the Code (where, for this purpose, all items of income, gain, loss or deduction required to be stated separately pursuant to Section 703(a)(1) of the Code shall be included in taxable income or taxable loss), but with the following adjustments:

(a) any income realized by the Partnership that is exempt from federal income taxation, as described in Section 705(a)(1)(B) of the Code, shall be added to such taxable income or taxable loss, notwithstanding that such income is not includable in gross income;

(b) any expenditures of the Partnership described in Section 705(a)(2)(B) of the Code, including any items treated under Treasury Regulation Section 1.704-1(b)(2)(iv)(i) as items described in Section 705(a)(2)(B) of the Code, shall be subtracted from such taxable income or taxable loss, notwithstanding that such expenditures are not deductible for federal income tax purposes;

(c) any gain or loss resulting from any disposition of Partnership property with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Book Value of the property so disposed, notwithstanding that the adjusted tax basis of such property differs from its Book Value;

(d) any items of depreciation, amortization and other cost recovery deductions with respect to Partnership property having a Book Value that differs from its adjusted tax basis shall be computed by reference to the property's Book Value (as adjusted for Book Depreciation) in accordance with Treasury Regulation Section 1.704-1(b)(2)(iv)(g);

(e) if the Book Value of any Partnership property is adjusted as provided in the definition of Book Value, then the amount of such adjustment shall be treated as an item of gain or loss and included in the computation of such taxable income or taxable loss; and

(f) to the extent an adjustment to the adjusted tax basis of any Partnership property pursuant to Sections 732(d), 734(b) or 743(b) of the Code is required, pursuant to Treasury Regulation Section 1.704-1(b)(2)(iv)(m), to be taken into account in determining Capital Accounts, the amount of such adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis).

"***Non-Public Information***" has the meaning set forth in Section 17.15(b).

"***Nonrecourse Deductions***" mean nonrecourse deductions as described in Treasury Regulation Section 1.704-2(c).

"***Nonrecourse Liability***" has the meaning set forth in Treasury Regulation Section 1.704-2(b)(3).

"***Non-United States Limited Partner***" means a Limited Partner that is not a "United States person" as that term is defined in Section 7701(a)(30) of the Code.

"***Operating Expenses***" means, except as otherwise specifically provided in this Agreement, the Partnership's *pro rata* share (based on the ratio of aggregate Capital Contributions to Aggregate Contributions) of all third-party costs and expenses of maintaining the operations of the Fund and appraising and valuing, acquiring, maintaining, financing, hedging and disposing of Portfolio Investments), including broken deal expenses (to the extent not paid for or reimbursed by Portfolio Investments), including, without limitation, taxes, fees and other governmental charges levied against the Fund; insurance; administrative and research fees; expenses of custodians, outside advisors, counsel (including Partnership Counsel), accountants, auditors, administrators and other consultants and professionals; expenses and costs incurred in connection with the maintenance of the Fund's books of account and the preparation of audited or unaudited financial statements; expenses associated with forming and operating Alternative Investment Vehicles and other holding vehicles related to a Portfolio Investment; technological expenses; interest on and fees, costs and expenses arising out of all financings entered into by the Fund (including, without limitation, those of lenders, investment banks, and other financing sources); brokerage commissions; appraisal fees; investment costs; custodial expenses; litigation expenses (including the amount of any judgments or settlements paid in connection therewith); winding up and liquidation expenses; expenses incurred in connection with any tax audit, investigation, settlement or review; expenses relating to a defaulting limited partner; expenses incurred in connection with preparing and making regulatory filings; expenses for business development, reasonable travel, lodging and entertainment directly related to the

development and management of any Portfolio Company and prospective Portfolio Investments, to the extent not reimbursed by a third party, and expenses incurred in connection with distributions to Partners; expenses of the Advisory Committee members and the costs of any services provided by the General Partner or its Affiliates in accordance with Section 4.02; expenses associated with meetings of the Advisory Committee and the Fund Investors and the preparation and distribution of reports, financial statements, tax returns and K-1s to the Fund Investors; indemnification and other unreimbursed expenses; and any extraordinary expenses to the extent not reimbursed or paid by insurance, but specifically excluding the Investment Management Fee and Organizational Expenses.

"***Organizational Expenses***" means the Partnership's *pro rata* share (based on the ratio of aggregate Capital Contributions to Aggregate Contributions) of all out-of-pocket expenses incurred in connection with the organization and formation of the General Partner, the Partnership and any Related Investment Vehicle, and other related entities organized by the General Partner or its Affiliates and the offering of the interests therein, including, without limitation, legal and accounting fees and expenses; printing costs; filing fees; and the transportation, meal, and lodging expenses of the personnel of the General Partner and the Investment Manager, but specifically excluding all Placement Fees.

"***Parallel Vehicle Contribution***" means, with respect to each Parallel Vehicle Partner at any time, the amount of its Capital Contribution reflected in the books and records of the applicable Parallel Vehicle.

"***Parallel Vehicle Limited Partner***" means any Person that is listed as a limited partner, member, or other equity holder of a Parallel Vehicle in the books and records of such Parallel Vehicle.

"***Parallel Vehicle Partner***" means any Parallel Vehicle Limited Partner and/or the general partner, managing member or other acting manager, as applicable, of a Parallel Vehicle.

"***Parallel Vehicles***" has the meaning set forth in Section 3.06(a).

"***Partner(s)***" means, as the context may require, some or all of the General Partner and the Limited Partners.

"***Partner Nonrecourse Debt***" means "partner nonrecourse debt" as defined in Treasury Regulation Section 1.704-2(b)(4).

"***Partner Nonrecourse Debt Minimum Gain***" means an amount, with respect to each Partnership Nonrecourse Debt, equal to the Partnership Minimum Gain that would result if the Partner Nonrecourse Debt were treated as a Nonrecourse Liability, determined in accordance with Treasury Regulation Section 1.704-2(i)(3).

"***Partner Nonrecourse Deductions***" mean "partner nonrecourse deductions" as defined in Treasury Regulation Section 1.704-2(i)(2).

"***Partnership***" means the limited partnership referred to in this Agreement, as it may from time to time be constituted.

"***Partnership Counsel***" has the meaning set forth in Section 17.13.

"***Partnership Interest Rate***" has the meaning set forth in Section 8.03(b).

"***Partnership Minimum Gain***" means for any Fiscal Year of the Partnership the "partnership minimum gain" as determined in accordance with Treasury Regulation Section 1.704-2(b)(2)and Section 1.704-2(d).

"***Partnership Representative***" has the meaning set forth in Section 10.02.

"***Percentage Interest***" means, as to any Partner, a fraction, expressed as a percentage, equal to the amount of the Capital Contribution of such Partner divided by the aggregate Capital Contributions received from all Partners, as may be adjusted from time to time in accordance with the provisions of this Agreement.

"***Person***" means any individual, corporation, partnership, joint venture, limited liability company, Governmental Authority, unincorporated organization, trust, association, or other entity.

"***Placement Agent***" means any placement agent, financial advisor, or finder retained by the General Partner in connection with the offering and sale of the Interests.

"***Placement Fees***" has the meaning set forth in Section 3.08(b).

"***Plan Asset Rules***" mean Department of Labor regulation 29 CFR § 2510.3-101, as modified by Section 3(42) of ERISA, as modified or amended from time to time.

"***Portfolio Company***" means a Person whose Securities have been acquired, directly or indirectly, in whole or in part, by the Partnership, other than through a Temporary Investment. A Portfolio Company may also include a Person formed by the Partnership that acquires the assets of a third party for investment purposes, other than through a Temporary Investment.

"***Portfolio Investments***" mean investments in Securities of the Portfolio Company made (directly or indirectly) by the Partnership. A Follow-On Investment shall be deemed to be part of the Portfolio Investment to which it relates. Multiple assets acquired in a single transaction or series of related transactions, to the extent such assets are intended to be aggregated and managed collectively or by a single Portfolio Company, shall be treated as a single Portfolio Investment.

"***Prime Rate***" means, on any day, the annual rate of interest for such day published by *The Wall Street Journal* as the "U.S. Prime Rate" and, if not published by *The Wall Street Journal*, then the rate of interest publicly announced from time to time by any money center bank as its prime rate in effect at its principal office, as notified in writing by the General Partner to the Limited Partners.

"***Principal***" means Sid Jawahar.

"***Private Placement Memorandum***" means the Confidential Private Placement Memorandum of the Fund, dated September 1, 2021, as amended and/or supplemented from time to time.

"***Realized Investment***" means a Portfolio Investment or portion thereof that has been the subject of a Disposition.

"***Regulations***" mean the final or temporary regulations of the United States Department of Treasury promulgated under the Code, and any successor regulations.

"***Related Investment Vehicle***" means any Parallel Vehicle or Feeder Vehicle.

"***Related Vehicle Manager***" means the general partner, managing member or other similar manager of any Related Investment Vehicle.

"***Revised Partnership Audit Rules***" has the meaning set forth in Section 10.02(a).

"***Securities***" means shares of capital stock, partnership interests, limited liability company interests, warrants, options, bonds, notes, debentures and other equity and debt instruments of any kind of any Person.

"***Securities Act***" means the Securities Act of 1933, as amended, or any successor federal statute, and the rules and regulations thereunder, which shall be in effect at the time.

"***Service***" means the U.S. Internal Revenue Service, a branch of the U.S. Treasury Department.

"***Similar Law***" means any federal, state, local or foreign law or regulation that would cause the underlying assets of the Partnership to be treated similar to "plan assets" under the Plan Asset Rules and impose on the General Partner, Investment Manager (or other Persons responsible for the operation and management of the Partnership and investment of the Partnership's assets) responsibilities similar to those of a "fiduciary" within the meaning of ERISA, and/or subject the Partnership to restrictions on investment activities and other dealings similar to the prohibited transaction rules under Title I of ERISA or Section 4975 of the Code.

"***Subscription Agreement***" means the agreement executed and delivered by a Limited Partner pursuant to which it makes a Capital Contribution to the Partnership and agrees to be bound by the terms of this Agreement as a Class I Limited Partner or Class II Limited Partner, a form of which is attached hereto as Exhibit A.

"***Subsequent Closing***" means a Closing that occurs after the Initial Closing, at which any additional Fund Investor is admitted to the Partnership or any Related Investment Vehicle.

"***Substitute Limited Partner***" has the meaning set forth in Section 11.03.

"***Successor Fund***" has the meaning set forth in Section 4.06(a).

"***Tax Exempt Limited Partner***" means a Limited Partner that is exempt from United States federal income taxation, including a partner that is exempt under Section 501 of the Code.

"***Taxing Authority***" means any federal, state, local or foreign taxing authority.

"***Temporary Investments***" has the meaning set forth in Section 3.02(l).

"***Transaction in Progress***" has the meaning set forth in Section 3.03(b).

"***Transfer***" means to directly or indirectly, sell, transfer, assign, pledge, encumber, hypothecate or similarly dispose of, either voluntarily or involuntarily, by operation of law or otherwise, or to enter into any contract, option or other arrangement or understanding with respect to the sale, transfer, assignment, pledge, encumbrance, hypothecation or similar disposition of, all or a portion of an Interest or beneficial ownership thereof. "***Transfer***" when used as a noun shall have a correlative meaning.

"***UBTI***" means "unrelated business taxable income" within the meaning of Section 512 of the Code, determined without regard to the special rules contained in Section 512(a)(3) of the Code that are applicable solely to organizations described in paragraphs (7), (9), (17) or (20) of Section 501(c) of the Code.

"***Withholding Advances***" has the meaning set forth in Section 8.03(b).

"***Write-off***" means a Portfolio Investment that the Investment Manager has ceased to actively manage on behalf of the Partnership following a determination by the General Partner, in its sole discretion, that the Portfolio Investment has a *de minimis* or no value.

**Section 1.02 Interpretation.** For purposes of this Agreement, (a) the words "include," "includes" and "including" shall be deemed to be followed by the words "without limitation"; (b) the word "or" is not exclusive; and (c) the words "herein," "hereof," "hereby," "hereto" and "hereunder" refer to this Agreement as a whole. The definitions given for any defined terms in this Agreement shall apply equally to both the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine, and neuter forms. Unless the context otherwise requires, references herein: (x) to Articles, Sections, Exhibits and Schedules mean the Articles and Sections of, and the Exhibits and Schedules attached to, this Agreement; (y) to an agreement, instrument or other document means such agreement, instrument or other document as amended, supplemented and modified from time to time to the extent permitted by the provisions thereof and (z) to a statute means such statute as amended from time to time and includes any successor legislation thereto and any regulations promulgated thereunder. This Agreement shall be construed without regard to any presumption or rule requiring construction or interpretation against the party drafting an instrument or causing any instrument to be drafted.

## ARTICLE II
## GENERAL PROVISIONS

**Section 2.01 Formation and Continuation.** The Partners hereby agree to continue the Partnership as a limited partnership under the laws of the State of Delaware. The term of the

Partnership commenced upon the filing of the Certificate of Limited Partnership with the Secretary of State of Delaware and shall continue until dissolution of the Partnership in accordance with the provisions of ARTICLE XII. This Agreement amends, restates and supersedes the Original Agreement in its entirety. The General Partner may execute and file any amendments to the Certificate as may be required by the Delaware Act and any other instruments, documents and certificates that, in the opinion of the General Partner, may from time to time be required by the laws of Delaware or any other jurisdiction in which the Partnership conducts or will conduct business, as determined by the General Partner, or that the General Partner may deem necessary, advisable or appropriate to effectuate, implement and continue the valid existence and business of the Partnership.

**Section 2.02 Name.** The name of the Partnership is Swiftarc Beauty Fund, LP. The General Partner is authorized to make any variations in the Partnership's name that the General Partner may deem necessary or advisable to comply with the laws of any jurisdiction in which the Partnership may elect to conduct business; *provided*, that such name as varied shall be a name permitted for a limited partnership under the Delaware Act and the General Partner shall promptly give notice of any such variation to the Limited Partners.

**Section 2.03 Principal Office.** The principal place of business and office of the Partnership is located at 801 Brickell Avenue, Office 709, Miami, Florida 33131, or such other place or places as the General Partner may from time to time designate. The General Partner may establish such additional places of business of the Partnership in such other jurisdictions as it may from time to time determine. The General Partner shall provide notice to the Limited Partners of any change in the Partnership's principal place of business.

**Section 2.04 Registered Office; Registered Agent.**

(a) The registered office of the Partnership shall be the office of the initial registered agent named in the Certificate of Limited Partnership or such other office (which need not be a place of business of the Partnership) as the General Partner may designate from time to time in the manner provided by the Delaware Act.

(b) The registered agent for service of process on the Partnership in the State of Delaware shall be the initial registered agent named in the Certificate of Limited Partnership or such other Person or Persons as the General Partner may designate from time to time in the manner provided by the Delaware Act.

**Section 2.05 Conflict Between Agreement and Statute.** This Agreement shall constitute the "limited partnership agreement" (as that term is used in the Delaware Act) of the Partnership. The rights, powers, duties, obligations, and liabilities of the Partners shall be determined pursuant to the Delaware Act and this Agreement. To the extent that the rights, powers, duties, obligations and liabilities of any Partner are different by reason of any provision of this Agreement than they would be under the Delaware Act in the absence of such provision, this Agreement shall, to the extent permitted by the Delaware Act, control.

## ARTICLE III
## PURPOSE AND BUSINESS

**Section 3.01 Purpose.** The purpose of the Partnership is to make, directly or indirectly, hold, manage, sell, exchange or otherwise deal in Portfolio Investments and to engage in any other acts or activities necessary, advisable, related or incidental thereto and in any other acts or activities permitted by law. The Partnership's focus will be on early-stage beauty and wellness companies.

**Section 3.02 Authorized Activities.** In carrying out the purposes of this Agreement, the Partnership and the General Partner, acting on behalf of the Partnership, shall have all powers necessary, suitable or convenient thereto, including, without limitation, the power and authority to do or cause to be done, or not to do, any and all acts deemed by the General Partner in good faith to be necessary or appropriate in furtherance of the purposes of the Partnership including, without limitation, the power and authority to:

(a) acquire, invest in, hold, pledge, manage, sell, transfer, operate, or otherwise deal in or with the Portfolio Investments;

(b) open, maintain, and close bank, brokerage, and money market accounts and draw checks and other orders for the payment of moneys;

(c) provide interim financing on behalf of a Portfolio Company (each, a "***Bridge Financing***") in order to preserve enhance, make available or otherwise facilitate a Portfolio Investment; *provided*, that the amount of a Bridge Financing, when added to the capital contributions previously invested by the Fund in the applicable Portfolio Investment, shall not exceed twenty-five percent (25%) of the aggregate capital contributions (including the amount of the Bridge Financing) invested by the Fund in such Portfolio Investment;

(d) borrow money or otherwise incur Indebtedness for any Partnership purpose, enter into credit facilities, issue evidences of Indebtedness and guarantees, and secure any such evidences of Indebtedness and guarantees by pledges or other liens on assets of the Partnership; provided, that such outstanding Indebtedness shall not, at any time, exceed twenty percent (20.0%) of the Capital Contributions;

(e) hire consultants, advisors, custodians, attorneys, accountants, placement agents, and such other agents and employees of the Partnership, and authorize each such Person to act for and on behalf of the Partnership;

(f) enter into, perform and carry out contracts and agreements of any kind necessary, advisable or incidental to the accomplishment of the purposes of the Partnership;

(g) bring, sue, prosecute, defend, settle, or compromise actions and proceedings at law or in equity or before any Governmental Authority;

(h) have and maintain one or more offices and in connection therewith to rent or acquire office space and to engage personnel;

(i) execute, deliver, and perform all agreements in connection with the sale of Interests, including but not limited to the Subscription Agreements and any side letters with one or more Limited Partners;

(j) form one or more subsidiary corporations or partnerships or other entities, including Alternative Investment Vehicles;

(k) incur all expenditures and pay the fees described in Sections 3.08 and 9.02;

(l) (i) make Investments in (A) marketable direct obligations issued or unconditionally guaranteed by the United States, or issued by any agency thereof, maturing within one year from the date of acquisition; (B) money market instruments, commercial paper or other short-term debt obligations rated Aa or P-1 (or the equivalent thereof) or better by Moody's Investors Service Inc. or A-1 (or its equivalent) or better by Standard & Poor's Corporation; (C) certificates of deposit maturing within one year from the date of acquisition, money market accounts, savings accounts, checking accounts, or any combination thereof in banks, in each case, which have total assets of $100,000,000 or more; and (D) any other Securities that the General Partner reasonably determines are appropriate for short term investments (collectively "***Temporary Investments***") and (ii) in connection with its Portfolio Investments, enter into derivative contracts and other financial instruments for the purpose of hedging such Portfolio Investments;

(m) make any and all elections under the Code or any state or local tax law (except as otherwise provided herein), including pursuant to Sections 734(b), 743(b), and 754 of the Code, provided that the General Partner shall not cause the Partnership to make an election to be treated as other than a partnership for United States federal income tax purposes;

(n) take all actions it deems necessary or appropriate so that the assets of the Partnership and any Alternative Investment Vehicle do not constitute "plan assets" for purposes of ERISA and the Plan Asset Rules;

(o) maintain cash reserves for anticipated Investment Expenses, liabilities, and obligations of the Partnership, whether actual or contingent, in such amounts as the General Partner in its reasonable discretion deems necessary or advisable; and

(p) carry on any other activities necessary to, in connection with, or incidental to, any of the foregoing or the Partnership's investment and other activities.

**Section 3.03 Investment Restrictions.** Notwithstanding any other provision of this Agreement, the General Partner agrees that it shall not, without Advisory Committee Consent, cause the Partnership to:

(a) make a Portfolio Investment if it would result in more than $2,500,000.00 being invested in any one Portfolio Investment; or

(b) make a new Portfolio Investment after the end of the Investment Period, other than (i) a potential Portfolio Investment with respect to which the Partnership has, directly or indirectly, made a written offer or entered into a letter of intent, memorandum of understanding (or similar document), notice of intention to exercise an option or other right to purchase a Portfolio Investment (or similar document or communication), or a definitive agreement prior to the end of the Investment Period, as applicable, and which is identified as such in a writing delivered to the Advisory Committee by the General Partner promptly after the end of the Investment Period, as applicable (a "***Transaction in Progress***") or (ii) a Portfolio Investment in an existing Portfolio Company (a "***Follow-On Investment***").

**Section 3.04 Alternative Investment Vehicles.**

(a) ***Formation of Alternative Investment Vehicles***. If the General Partner determines at any time that for legal, tax, regulatory, or other similar considerations, all or a portion of a potential or existing Portfolio Investment (or multiple Portfolio Investments) be made or held through an alternative investment structure, the General Partner shall notify the affected Limited Partners of such determination and shall be permitted to structure the making or holding of all or a portion of such Portfolio Investment outside of the Partnership by (A) in the case of a potential Portfolio Investment, making all or a portion of such Portfolio Investment through one or more partnerships or other vehicles that shall invest on a parallel or other basis with or in lieu of the Partnership (any such partnership or other vehicle, an "***Alternative Investment Vehicle***") or (B) in the case of an existing Portfolio Investment, transferring all or a portion of such Portfolio Investment to an Alternative Investment Vehicle.

(b) ***Alternative Investment Conditions***. Each Partner shall have the same economic interest in all material respects in Portfolio Investments held or made pursuant to this Section 3.04 as such Partner would have if such Portfolio Investment had been held or made solely by the Partnership, and the other terms of such Alternative Investment Vehicle shall be substantially similar in all material respects to those of the Partnership, subject to the applicable legal, tax, regulatory and other similar considerations, *provided* that the pre-tax gains and losses of any such Alternative Investment Vehicle shall be treated as having been realized by the Partnership for all economic calculations under this Agreement with respect to the Partners who participate in such Alternative Investment Vehicle (including, without limitation, Articles VII and VIII and the calculation of the General Partner's Clawback obligation pursuant to Section 4.04) unless the General Partner elects otherwise based on its determination that such treatment increases the risk of or otherwise imposes on the Partnership, the Partners, or such Alternative Investment Vehicle adverse tax consequences, legal or regulatory constraints, or undesirable contractual or business risks. With respect to any Portfolio Investment, if an Alternative Investment Vehicle invests with the Partnership in a particular Portfolio Investment, subject to the applicable legal, tax, regulatory and other similar considerations, (i) the Partnership and such Alternative Investment Vehicle shall invest and divest on economic terms that are the same, and at the same time, in all material respects and (ii) the respective interests of the Partnership and such Alternative Investment Vehicle generally shall be in proportion to the respective aggregate capital contributions of their partners in such Portfolio Investment and they shall similarly share any related Investment Expenses and Indemnification Obligations.

(c) ***Mechanics of Formation of Alternative Investment Vehicles***. Each Alternative Investment Vehicle shall be controlled by the General Partner or an Affiliate thereof. The governing documents of each Alternative Investment Vehicle shall be substantially similar in all material respects to those of the Partnership, with such differences as the General Partner determines are necessary or advisable in respect of the applicable legal, tax, regulatory, and other similar considerations, and will be executed on behalf of the Limited Partners investing therein by the General Partner pursuant to the power of attorney granted by the Limited Partners as set forth in Section 5.03(a)(v).

**Section 3.05 Co-investment Opportunities.** The General Partner may, but shall not be obligated to, offer opportunities to invest in Portfolio Investments alongside the Partnership (the "***Co-investment Opportunities***") to certain Limited Partners or other Persons on such terms and conditions as shall be determined by the General Partner. The General Partner or its Affiliates may, but shall not be obligated to, form a separate investment vehicle for the purpose of investing in one or more Co-investment Opportunities (the "***Co-Investment Vehicle***"). The General Partner may offer a Co-investment Opportunity to one or more Limited Partners or other Persons without offering such Co-investment Opportunity to other Limited Partners or Persons. Co-investment Opportunities may be allocated to such Persons that may provide a benefit to the Fund in the General Partner's sole discretion. No Limited Partner shall have any obligation to participate in any Co-investment Opportunity. Each Limited Partner hereby acknowledges that the General Partner and/or its Affiliates may receive a carried interest and management or other fees in respect of any Co-investment Opportunity.

**Section 3.06 Parallel Vehicles.**

(a) ***Formation of Parallel Vehicles.*** In order to accommodate legal, tax, regulatory, or other similar considerations of certain types of investors, the General Partner may establish one or more additional collective investment vehicles for such investors to invest in Portfolio Investments with the Partnership (each, a "***Parallel Vehicle***"). The General Partner may, at any time, with the consent of the applicable Limited Partner (i) transfer all or a portion of an affected Limited Partner's Capital Contribution to such Parallel Vehicle or (ii) transfer all or a portion of an affected Parallel Vehicle Partner's Parallel Vehicle Contribution to the Partnership.

(b) ***Parallel Vehicle Investment Conditions***. To the extent the Partnership and one or more Parallel Vehicles participate in the same Portfolio Investment, subject to the applicable legal, tax, regulatory, or other similar considerations, (i) the Partnership and any Parallel Vehicle shall invest and divest on economic terms that are the same, and at the same time, in all material respects and (ii) the respective interests of the Partnership and any Parallel Vehicle in any Portfolio Investment generally shall be in proportion to the respective aggregate capital contributions of their partners in such Portfolio Investment and they shall similarly share any related Investment Expenses and Indemnification Obligations.

(c) ***Mechanics of Formation of Parallel Vehicles***. Each Parallel Vehicle shall be controlled by the General Partner or an Affiliate thereof. The governing documents of each Parallel Vehicle shall contain terms substantially the same as those contained herein, except to the extent reasonably necessary or desirable to address the applicable legal, tax, regulatory, or other considerations of the Parallel Vehicle or one or more Parallel Vehicle Limited Partners.

**Section 3.07 Feeder Vehicles.** The General Partner and its Affiliates may establish one or more vehicles to facilitate investment in the Partnership by certain investors (each such vehicle, a "***Feeder Vehicle***"). Each Feeder Vehicle shall be controlled by the General Partner or an Affiliate thereof.

**Section 3.08 Operating and Organizational Expenses.**

(a) Except as otherwise provided, and subject to any limits in this Agreement, the Partnership will pay all Operating Expenses, and will reimburse the General Partner or any of its Affiliates, as applicable, for its payment of Operating Expenses. Notwithstanding the foregoing and except as otherwise specifically provided in this Agreement, neither the General Partner nor the Investment Manager shall be reimbursed for any costs and expenses relating to the general operation of their businesses.

(b) Except as otherwise provided in this Agreement, the Partnership will pay the Partnership's pro rata share (based on the ratio of aggregate Capital Contributions to Aggregate Contributions) of all amounts payable to a Placement Agent by or on behalf of the Fund in connection with the offering and sale of interests in the Fund and any related expenses (the "***Placement Fees***") and Organizational Expenses, and will reimburse the General Partner or any of its Affiliates, as applicable, for its payment of Placement Fees and Organizational Expenses on the Fund's behalf; *provided*, that, the Investment Management Fee shall be reduced dollar-for-dollar by all Placement Fees paid by the Partnership; any excess shall be carried forward for offset against future installments of the Investment Management Fee and, on liquidation of the Partnership, against any distributions owing to the General Partner, and if such offsets are insufficient, the General Partner shall contribute the amount not offset to the Partnership; *provided further*, that such Organizational Expenses shall not exceed $250,000.

## ARTICLE IV
## THE GENERAL PARTNER

**Section 4.01 Management and Authority.**

(a) Subject to the provisions of this Agreement, the General Partner shall have the absolute, exclusive and complete right, power, authority, obligation, and responsibility vested in or assumed by a general partner of a limited partnership under the Delaware Act and as otherwise provided by law, including those necessary to make all decisions regarding the business of the Partnership and to take the actions specified in Section 3.02, and is hereby vested with absolute, exclusive and complete right, power, and authority to operate, manage, and control the affairs of the Partnership and carry out the business of the Partnership.

(b) The General Partner shall have the authority to bind the Partnership to any obligation consistent with the provisions of this Agreement and the operative documents of the Parallel Vehicles. Subject to, and except as otherwise provided in Section 4.02, the General Partner may contract with any Person for the transaction of the business of the Partnership, and the General Partner shall use reasonable care in the selection and retention of such Persons. The General Partner may delegate the management, operation, and control of the Partnership to the Investment Manager to the fullest extent permitted by law, provided that any such delegation

shall not relieve the General Partner of its obligations to the Limited Partners under this Agreement.

(c) The General Partner may rely in good faith on and shall be protected in acting or refraining from acting upon any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order, bond, debenture, or other paper or document reasonably believed by it to be genuine and to have been signed or presented by the proper party or parties.

(d) The General Partner may consult with legal counsel (including Partnership Counsel), accountants, appraisers, management consultants, investment bankers, and other consultants and advisers selected by it with reasonable care, and shall not have any liability to the Partnership or any other Partner for any act taken or omitted to be taken in good faith reliance upon the opinion or advice of such Persons.

(e) Investments identified by the General Partner in its good faith judgment as being reasonably likely to generate UBTI for Tax Exempt Limited Partners or ECI for Non-United States Limited Partners shall not exceed twenty-five percent (25%) of aggregate Capital Contributions. The incurrence of UBTI or ECI by the Partnership shall in no way indicate that the General Partner has failed to comply with this covenant. The General Partner's obligation to minimize the incurrence of UBTI and ECI shall be deemed satisfied if it offers to use an Alternative Investment Vehicle to minimize UBTI or ECI.

**Section 4.02 Transactions with Affiliates.**

(a) Except as otherwise provided in Section 4.02(b) or with Advisory Committee Consent, the General Partner shall not cause the Partnership or its subsidiaries to enter into any transaction with the General Partner or its Affiliates (including acquiring all or a portion of a Portfolio Investment from or selling a Portfolio Investment to the General Partner or its Affiliates) or any transaction pursuant to which the General Partner or its Affiliates will receive compensation.

(b) Notwithstanding anything to the contrary set forth in Section 4.02(a), the General Partner may:

(i) Enter into (or cause its Affiliates other than the Partnership to enter into) agreements with one or more Portfolio Companies for the provision of advisory or consulting services relating to such Portfolio Companies, for compensation and on terms that are typically available in arm's-length transactions; *provided*, that each such agreement involving annual compensation, reimbursements, payments, obligations, fees, costs or expenses in excess of One Hundred Thousand Dollars ($100,000.00) shall be submitted to the Advisory Committee for prior approval;

(ii) cause the Partnership to enter into the Investment Management Agreement as provided in Section 9.01;

(iii) receive the amounts described in Sections 3.08 and 9.02; and

(iv) cause the Partnership to make Portfolio Investments in accordance with the terms of this Agreement with Parallel Vehicles, Alternative Investment Vehicles, Co-investment Vehicles, or Successor Funds.

**Section 4.03 Liability for Acts and Omissions.**

(a) To the fullest extent permitted by applicable law, no Covered Person shall be liable, in damages or otherwise, to the Partnership, the Limited Partners, or any of their Affiliates for any act or omission in connection with or in any way relating to the Partnership's business or affairs (including the business or affairs of any Alternative Investment Vehicle or Feeder Vehicle) and matters related to Portfolio Investments (including, without limitation, any act or omission performed or omitted by such Covered Person in accordance with the provisions of this Agreement or in good faith reliance upon the opinion or advice of experts selected with reasonable care by the General Partner), except in the case of any act or omission with respect to which a court of competent jurisdiction (or other similar tribunal) has issued a final and non-appealable decision, judgment or order that such act or omission resulted from (i) in the case of a Covered Person that is a member of the Advisory Committee or a Limited Partner represented by a member of the Advisory Committee, such Covered Person's bad faith or (ii) in the case of any other Covered Person, such Covered Person's bad faith, gross negligence, willful misconduct, fraud or a material breach of this Agreement or the Investment Management Agreement. The provisions of this Agreement, to the extent that such provisions expressly restrict or eliminate the duties (including fiduciary duties) and liabilities of a Covered Person otherwise existing at law or in equity are agreed by the Partners to replace such other duties and liabilities of such Covered Person.

(b) To the fullest extent permitted by applicable law, the Partnership shall and does hereby agree to indemnify and hold harmless each Covered Person from and against any damages, costs, losses, claims, liabilities, actions, and expenses (including reasonable legal and other professional fees and disbursements and all expenses reasonably incurred investigating, preparing, or defending against any claim whatsoever, judgment, fines, and settlements (collectively "***Indemnification Obligations***") incurred by such Covered Person arising out of or relating to this Agreement, the Investment Management Agreement, any Alternative Investment Vehicle, any Feeder Vehicle, or any entity in which the Partnership, any Feeder Vehicle, or any Alternative Investment Vehicle invests (including, without limitation, any act or omission as a director, officer, manager or member of an Affiliate of the Partnership), except in the case of any act or omission with respect to which a court of competent jurisdiction (or other similar tribunal) has issued a final and non-appealable decision, judgment or order that such act or omission resulted from (i) in the case of a Covered Person that is a member of the Advisory Committee or a Limited Partner represented by a member of the Advisory Committee, such Covered Person's bad faith or (ii) in the case of any other Covered Person, such Covered Person's bad faith, gross negligence, willful misconduct, fraud or a material breach of this Agreement or the Investment Management Agreement. The indemnity set forth herein shall not apply to an internal dispute among the Covered Persons to which the Partnership is not a party. The provisions set forth in this Section 4.03(b) shall survive the termination of this Agreement.

(c) No Covered Person shall be liable to the Partnership or any Limited Partner for, and the Partnership shall also indemnify and hold harmless each Covered Person

from and against any and all Indemnification Obligations suffered or sustained by such Covered Person by reason of, any acts or omissions of any broker or other agent of the Partnership (or any Alternative Investment Vehicle or Feeder Vehicle) unless such broker or agent was selected, engaged, or retained by such Covered Person and the standard of care exercised by such Covered Person in such selection, engagement or retention constituted bad faith, gross negligence, willful misconduct, fraud, or a material breach of this Agreement or the Investment Management Agreement.

(d) The satisfaction of any indemnification pursuant to this Section 4.03 shall be from and limited to Partnership assets.

(e) Expenses reasonably incurred by a Covered Person in defense or settlement of any claim that may be subject to a right of indemnification hereunder shall be advanced by the Partnership prior to the final disposition thereof upon receipt of a written undertaking by or on behalf of such Covered Person to repay such amount to the extent that it is ultimately determined that such Covered Person is not entitled to be indemnified hereunder. The termination of a proceeding or claim against a Covered Person by settlement or a plea of nolo contendere or its equivalent, shall not, of itself, create a presumption that any Covered Person's conduct constituted bad faith, gross negligence, willful misconduct, fraud, or a material breach of this Agreement or the Investment Management Agreement. Without prejudicing the General Partner's or its Affiliates' right to indemnification under this Section 4.03, the Partnership shall not advance funds to the General Partner or its Affiliates for legal expenses or other costs incurred as a result of any derivative legal action or proceeding commenced against the General Partner or its Affiliates by Fund Investors representing a majority of the Percentage Interests of the Fund Investors. Any expenses incurred under this Section 4.03(e) shall be disclosed to the Advisory Committee on a quarterly basis.

(f) The right of any Covered Person to the indemnification provided herein shall be cumulative of, and in addition to, any and all rights to which such Covered Person may otherwise be entitled by contract or as a matter of law or equity and shall extend to such Covered Person's heirs, successors, and assigns.

(g) Any Person entitled to indemnification from the Partnership hereunder shall initially seek recovery under any other indemnity or any insurance policies maintained by any Portfolio Investment or the Partnership by which such Person is indemnified or covered, as the case may be, but only to the extent that the applicable indemnitor or insurer provides (or acknowledges its obligation to provide) such indemnity or coverage on a timely basis. A Covered Person other than the General Partner shall obtain the written consent of the General Partner (which shall not be unreasonably withheld) prior to entering into any compromise or settlement which would result in an obligation of the Partnership to indemnify such Person. If liabilities arise out of the conduct of the affairs of the Partnership and any other Person for which the Person entitled to indemnification from the Partnership hereunder was then acting in a similar capacity, the amount of the indemnification provided by the Partnership shall be limited to the Partnership's proportionate share thereof as determined in good faith by the General Partner.

(h) The General Partner may, but shall not be required to, cause the Partnership to purchase and maintain insurance coverage reasonably satisfactory to the General

Partner that provides the Partnership with coverage with respect to losses, claims, damages, liabilities, and expenses that would otherwise be Indemnification Obligations. The fees and expenses incurred in connection with obtaining and maintaining any such insurance policy or policies, including any commissions and premiums, shall be Operating Expenses.

**Section 4.04 General Partner Clawback.**

(a) Subject to Section 4.04(b), as of the date of the completion of the dissolution and winding up of the Partnership and the final distribution of the Partnership's assets among the Partners (the "***Clawback Determination Date***"), the General Partner will refund to the Partnership an aggregate amount (the "***Clawback***") equal to, with respect to each Limited Partner, the amount, if any, by which the aggregate Carried Interest Distributions with respect to such Limited Partner exceed the Carried Interest Distributions the General Partner would have received if all distributions made to the General Partner had been made immediately after the Partnership completed the distribution of the proceeds of its liquidation and the amount distributable to the General Partner was calculated on the basis of all Capital Contributions made by Partners, and all distributions made to Partners, during the life of the Partnership, including distributions of the proceeds of the liquidation of the Partnership (i.e., as though all of the Portfolio Investments had been a single Portfolio Investment, all Capital Contributions had been made with regard to that Portfolio Investment, all Distributable Cash had been derived from that Portfolio Investment).

(b) The amount of the Clawback in respect of any Limited Partner shall not exceed the After-Tax Amount of the aggregate Carried Interest Distributions in respect of such Limited Partner.

(c) The General Partner shall cause each of its members (or, in the case of any such member that is not a natural person, each of the natural persons that is the ultimate beneficial owner of such member) to execute an unconditional and irrevocable guarantee with respect to its pro rata share of the General Partner's Clawback obligation under this Section 4.04 for the benefit of the Limited Partners; *provided*, that any guarantee executed pursuant to this Section 4.04(c) may be amended, modified or replaced solely in accordance with the procedures set forth in ARTICLE XVI.

(d) Amounts contributed by the General Partner in respect of the Clawback shall, subject to the Delaware Act, be distributed to each Limited Partner in respect of which such amounts were contributed based on the calculations in Section 4.04(a) and shall be considered a distribution of Distributable Cash.

**Section 4.05 Limited Partner Giveback**. Notwithstanding anything herein to the contrary and subject to the provisions of this Section 4.05, the Partnership may require the Limited Partners to return distributions to the Partnership to the extent not previously returned in an amount sufficient to satisfy the Indemnification Obligations pursuant to Section 4.03 and the Investment Expenses, whether such obligations or liabilities arise before or after the termination of the Fund or, with respect to any Limited Partner, before or after such Limited Partner's withdrawal from the Partnership.

(a) The Limited Partners shall return distributions with respect to their share of any such indemnification obligation or liability as follows:

(i) if the obligation or liability arises out of a Portfolio Investment:

(A) first, by each Limited Partner returning amounts distributed to such Partner in connection with such Portfolio Investment in the reverse order in which such amounts were originally distributed so that each Limited Partner retains cumulative distributions from the Fund (net of any returns of distributions pursuant to this Section 4.05) equal to the cumulative amount that would have been distributed to and retained by such Limited Partner had the amount originally distributed with respect to such Portfolio Investment been, at the time of such distribution, reduced by the amount of such obligation or liability; and

(B) thereafter, by the Limited Partners in proportion to their Percentage Interest with respect to such Portfolio Investment; or

(ii) in any other circumstances, in the reverse order in which distributions were originally made pursuant so that each Limited Partner retains cumulative distributions from the Fund (net of any returns of distributions under this Section 4.05) following such return equal to the cumulative amount that would have been distributed to and retained by such Limited Partner taking into account all Capital Contributions and other payments made by each Limited Partner to the Fund and all distributions made to each Limited Partner by the Fund as of the date of determination.

(b) A Limited Partner's aggregate liability under this Section 4.05 shall be limited to an amount equal to the lesser of (i) forty percent (40%) of all distributions received by such Limited Partner from the Fund, and (ii) twenty percent (20%) of such Limited Partner's initial Capital Contribution. Notwithstanding the foregoing, no Limited Partner shall be required to return to the Fund any amount distributed by the Fund to such Limited Partner after the earlier of (A) the second (2nd) anniversary of such distribution, provided that, if at the end of such period, there are any Proceedings actually taking place against the Fund that the General Partner determines are likely to require the return of such distribution in the future, the General Partner may notify such Limited Partner within thirty (30) days following the end of such period that the obligation to return all or any portion of such distribution for the purpose of meeting the obligations of the Fund shall (subject to clause (B) of this Section) survive until the date that each such Proceeding is ultimately resolved and satisfied, and (B) the second (2nd) anniversary of the date of termination of the Fund. Any amounts returned by a Limited Partner pursuant to this Section 4.05 shall be treated as reductions of the applicable distribution amounts received by such Partner and shall not be treated as Capital Contributions. Nothing in this Section 4.05, express or implied, is intended or shall be construed to give any Person other than the Fund or the Partners any legal or equitable right, remedy or claim under or with respect to this Section 4.05 or any provision contained herein.

**Section 4.06 Successor Funds; Presentation of Opportunities to the Partnership.**

(a) Without consent of Fund Investors whose aggregate Capital Contributions represent at least two-thirds (2/3) of the Aggregate Contributions of all Fund Investors (not counting capital contributions of Defaulting Partners or Parallel Vehicle Contributions of defaulting Parallel Vehicle Limited Partners and also excluding such Fund Investors in calculating the Aggregate Contributions of all Fund Investors), until the earlier of (i) the termination of the Investment Period and (ii) the date on which seventy-five percent (75%) of the Aggregate Contributions of the Fund Investors have been invested, committed and/or reserved for investment (including Capital Contributions reserved for funding of Follow-On Investments or for repayment of Indebtedness) and/or have been reserved to fund Investment Expenses, the General Partner shall not, and shall cause each of its Affiliates not to, hold a closing with third party investors on behalf of another pooled investment fund, for which the General Partner or its Affiliate acts as a manager or the primary source of transactions, with objectives substantially similar to those of the Partnership (a "***Successor Fund***").

(b) Until the date on which the General Partner may sponsor a Successor Fund in accordance with Section 4.06(a), the General Partner and its Affiliates shall offer to the Fund any investment opportunities presented to them that the General Partner determines in good faith to be suitable and appropriate for the Fund and consistent with the investment objectives set forth in Section 3.01. Notwithstanding the foregoing, (i) the Partnership may share investment opportunities and invest side-by-side with any Person (other than an Affiliate of the General Partner or the Investment Manager) in instances where such Person provides investment opportunities, operating capabilities, or other strategic or competitive opportunities or advantages to the Partnership, (ii) the Investment Manager or any Affiliate thereof may make (as principal or on behalf of other investment vehicles) any investment which the General Partner has not made or pursued, in whole or in part, on behalf of the Partnership after making the assessment set forth in this Section 4.06(b) and (iii) the Fund may co-invest with a Successor Fund in any investment opportunity offered to the Fund, and the General Partner may allocate such portion of such investment opportunity to such Successor Fund as the General Partner determines, in its sole discretion, to be appropriate.

**Section 4.07 Other Activities.** The General Partner and its Affiliates (subject to Sections 4.06 and 4.08) and the Fund Investors and their respective Affiliates may engage in or possess an interest in other business ventures of every nature and description for their own account, independently or with others, whether or not such other enterprises shall be in competition with any activities of the Partnership. None of the Partnership, the Fund Investors, the General Partner, and the Related Vehicle Managers shall have any right by virtue of this Agreement in and to such independent ventures or to the income or profits derived therefrom.

**Section 4.08 Miscellaneous Revenues.** Except for any fees authorized, acknowledged or approved in accordance with this Agreement, the General Partner shall apply the Partnership's *pro rata* share (based on the ratio of aggregate Capital Contributions to Aggregate Contributions) of any fees (including director fees (including the value of any options, warrants and other non-cash compensation), break-up fees and fees for advisory, consulting, monitoring or other similar services) paid by third parties to the General Partner or its Affiliates arising from the Partnership's Portfolio Investments or potential Portfolio Investments to offset, pay or reserve for the payment of Investment Expenses (or repay any credit facility drawdowns used to pay the same) or to offset the next installment of the Investment Management Fee

payable by the Partnership to the Investment Manager under this Agreement; *provided*, that, if an Alternative Investment Vehicle, Co-investment Vehicle, Successor Fund or any other Person invests or had proposed to invest in a Portfolio Investment with the Fund, then the Partnership's share of such fees shall be a portion of such fees which is applicable to the Partnership's share of the proportionate amount which the Fund has or would have invested in the Portfolio Investment or unconsummated transaction. If any such fees exceed such next installment of the Investment Management Fee payable by the Partnership to the Investment Manager under this Agreement and the operative documents of each Parallel Vehicle, the excess shall be carried forward for offset against future installments of such Investment Management Fees. To the extent any such fees have not been set off against the Investment Management Fee payable by the Partnership to the Investment Manager under this Agreement prior to the liquidation of the Partnership, such excess fees shall be remitted to the Partnership by the General Partner immediately prior to liquidation.

**Section 4.09 Transfer or Withdrawal by the General Partner.** The General Partner shall not have the right to Transfer its Interest as the general partner of the Partnership and shall not have the right to withdraw from the Partnership; *provided*, that, without the consent of any Limited Partner, the General Partner may, at its own expense, (a) be reconstituted as or converted into a corporation or other form of entity (any such reconstituted or converted entity being deemed to be the General Partner for all purposes hereof) by merger, consolidation, conversion, or otherwise or (b) transfer all of its Interest as the general partner of the Partnership to one of its Affiliates so long as, in either case, (i) such reconstitution or Transfer does not have material adverse tax or legal consequences for the Fund Investors and (ii) such other entity shall have assumed in writing the obligations of the General Partner under this Agreement, the Subscription Agreements and any other related agreements to which the General Partner is a party (including the operative documents of any Parallel Vehicles). In the event of a Transfer of all of its Interest as a general partner of the Partnership in accordance with this Section 4.09, its transferee shall be substituted in its place as general partner of the Partnership and immediately thereafter the General Partner shall withdraw as the general partner of the Partnership and the business of the Partnership shall be continued without dissolution.

**Section 4.10 Bankruptcy or Dissolution of the General Partner.**

(a) Upon the Bankruptcy or dissolution of the General Partner, (i) the General Partner or its legal representative shall give notice to the Fund Investors of such event and shall automatically, with or without delivery of such notice, become a special Limited Partner with no power, authority, or responsibility to bind the Partnership or to make decisions concerning, or manage or control, the affairs of the Partnership, and the Partnership's certificate of limited partnership shall be amended to reflect such fact, and (ii) such Person as may be selected and approved by consent of a Majority in Interest of the Limited Partners within 90 days of the date of the Bankruptcy or dissolution of the General Partner shall be admitted to the Partnership as a successor to the General Partner (effective as of the date of the Bankruptcy or dissolution of the General Partner) and such successor shall continue the business of the Partnership without dissolution. If a successor to the General Partner is not approved to be admitted to the Partnership (effective as of the date of the Bankruptcy or dissolution of the General Partner) by consent of a Majority in Interest of the Limited Partners within such 90-day period, the

Partnership shall dissolve in accordance with Article XII. The General Partner shall not take any action seeking its voluntary dissolution.

(b) In the case of a conversion of the General Partner to a special Limited Partner and continuance of the Partnership without dissolution, the Advisory Committee shall select an Expert reasonably acceptable to the special Limited Partner and such Expert shall determine the Fair Value of the General Partner's Interest as of the date of the Bankruptcy or dissolution of the General Partner, taking into account all Net Income, Net Loss, gains, deductions, distributions and other credits and charges to which the General Partner was and would have been entitled under this Agreement if all Portfolio Investments of the Partnership were sold on the effective date of such Bankruptcy or dissolution for their Fair Value and the proceeds were distributed on such date in accordance with Section 8.01. Thereafter, the General Partner, in its capacity as a special Limited Partner, shall be entitled to a percentage of all future Net Income, Net Loss, gains, deductions, distributions and other credits and charges of the Partnership arising from the Portfolio Investments held as of the date of the Bankruptcy or dissolution of the General Partner equal to the quotient of (x) the Fair Value of the General Partner's Interest as of the date of the Bankruptcy or dissolution of the General Partner divided by (y) the amounts that would have been available for distribution to all Partners as of such date, in each case as determined by the Expert. The determinations of the Expert shall be final and conclusive. The fees and expenses of the Expert retained pursuant to this Section 4.10 shall be borne by the General Partner. The successor General Partner shall be paid by the Partnership any reimbursements of expenses due and owing to the former General Partner by the Partnership determined as of the effective date of the former General Partner's Bankruptcy or dissolution.

**Section 4.11 Removal of the General Partner.**

(a) The Fund Investors may, at any time, by consent of a Majority in Interest of the Fund Investors, send notice to the General Partner that the General Partner will be removed as the general partner of the Partnership and each Parallel Vehicle pursuant to this Section 4.11 for Cause; *provided*, that such removal shall not become effective until a successor to the General Partner is admitted pursuant to Section 4.13.

(b) The Advisory Committee shall select an Expert reasonably acceptable to the removed General Partner and such Expert shall determine the Fair Value of the removed General Partner's Interest as of the effective date of the removal, taking into account all Net Income, Net Loss, gains, deductions, distributions and other credits and charges to which the General Partner was and would have been entitled under this Agreement if all Portfolio Investments of the Partnership were sold on the effective date of such removal of the General Partner for their Fair Value and the proceeds were distributed on such date in accordance with Section 8.01. The determinations of the Expert shall be final and conclusive. The fees and expenses of the Expert retained pursuant to this Section 4.11(b) shall be borne by the General Partner.

(c) Promptly upon the disclosure by the Expert of the Fair Value of the General Partner's Interest, the removed General Partner's Interest shall be converted to that of a special Limited Partner. Following such conversion, the special Limited Partner shall not be

entitled to vote with the Limited Partners upon any matter that requires the consent of the Limited Partners or the Fund Investors under this Agreement or the Delaware Act.

(d) The special Limited Partner shall be entitled to a percentage of all future Net Income, Net Loss, distributions and other credits and charges of the Partnership arising from the Portfolio Investments held as of the date of removal equal to the quotient of (x) the value of the General Partner's Interest as of the date of removal divided by (y) the amounts which would be available for distribution to all Partners as of such date, in each case as determined by the Expert.

**Section 4.12 Obligations of a Former General Partner.** In the event that the General Partner withdraws from the Partnership or Transfers its Interest, in each case, in accordance with Section 4.09 or has its Interest redeemed in accordance with Section 4.10 or 4.11, it shall have no further obligation or liability as a general partner to the Partnership pursuant to this Agreement in connection with any obligations or liabilities arising from and after such withdrawal, Transfer, redemption or conversion, and all such future obligations and liabilities shall automatically cease and terminate and be of no further force or effect; *provided*, that nothing contained herein shall be deemed to relieve the General Partner of any obligations or liabilities (a) arising prior to such withdrawal, Transfer, redemption, or conversion or (b) resulting from a dissolution of the Partnership caused by an act of the General Partner where liability is imposed upon the General Partner by law or by the provisions of this Agreement, including Section 4.04; *provided, further*, that the General Partner shall continue to be indemnified in accordance with Section 4.03 with respect to the activities of the Partnership prior to such Transfer.

**Section 4.13 Successor to the General Partner.**

(a) Following the proposed withdrawal or removal of the General Partner, Fund Investors, by consent of a Majority in Interest of the Fund Investors, may propose for admission a successor General Partner. If a successor General Partner proposed pursuant to this Section 4.13 satisfies the terms and conditions set forth in Section 4.13(b), then such proposed successor General Partner shall become the successor General Partner as of the date of withdrawal or removal of the General Partner and shall thereupon continue the Partnership's business.

(b) A Person shall be admitted as a successor General Partner only if the following terms and conditions are satisfied:

(i) except as permitted by Section 4.09, the admission of such Person shall have been approved by consent of a Majority in Interest of the Limited Partners;

(ii) the Person shall have accepted and agreed to be bound by all the terms and provisions of this Agreement and the operative documents of each Parallel Vehicle by executing a counterpart hereof and thereof and such other documents or instruments as may be required or appropriate in order to effect the admission of such Person as a general partner of the Partnership; and

(iii) the Partnership's certificate of limited partnership and each Related Investment Vehicle's and Alternative Investment Vehicle's operative documents shall be amended to reflect the admission of such Person as a general partner (or managing member, as applicable).

(c) If, within ninety (90) calendar days of the date of the General Partner's withdrawal or removal, a Majority in Interest of the Limited Partners has not approved the admission of a successor General Partner, effective as of the date of the General Partner's withdrawal or removal, then the Partnership shall thereupon terminate and dissolve in accordance with Article XII.

## ARTICLE V
## LIMITED PARTNERS

**Section 5.01 No Participation in Management of the Partnership.** Without limiting a Limited Partner's participation on the Advisory Committee, no Limited Partner shall participate in the management or control of the business and affairs of the Partnership or have any authority or right to act on behalf of the Partnership in connection with any matter or the transaction of any business. No Limited Partner shall have any rights and powers with respect to the Partnership, except as provided in the Delaware Act or by this Agreement. The exercise of any of the rights and powers of the Limited Partners pursuant to the Delaware Act or the terms of this Agreement, including participation on the Advisory Committee, shall not be deemed taking part in the day-to-day affairs of the Partnership or the exercise of control over the business and affairs of the Partnership.

**Section 5.02 Limitation on Liability.** No Limited Partner shall have any obligation to contribute any amounts to the Partnership except to the extent set forth in a Subscription Agreement or as otherwise provided in this Agreement and the Delaware Act, and the liability of each Limited Partner shall be limited to such amounts. No Limited Partner shall be obligated to repay to the Partnership, any Partner or any creditor of the Partnership all or any portion of the amounts distributed to such Limited Partner except as may be required pursuant to Section 4.05.

**Section 5.03 Power of Attorney.**

(a) Each Limited Partner hereby irrevocably constitutes and appoints the General Partner, with full power of substitution, as its true and lawful attorney-in-fact (which appointment shall be deemed to be coupled with an interest) and agent, to execute, acknowledge, verify, swear to, deliver, record and file, in its or its assignee's name, place and stead, all in accordance with the terms of this Agreement:

(i) all certificates and other instruments, and amendments thereto, which the General Partner deems necessary or desirable to form, qualify or continue the Partnership as a limited partnership (or a partnership in which the Limited Partners have limited liability) in all jurisdictions in which the Partnership conducts or plans to conduct its affairs;

(ii) any agreement or instrument which the General Partner deems necessary or desirable to effect (a) the complete or partial Transfer, addition, substitution,

withdrawal or removal (voluntary or involuntary) of any Limited Partner or the General Partner pursuant to this Agreement; (b) the dissolution and liquidation of the Partnership in accordance with the provisions of ARTICLE XII or (c) any amendment or modification to this Agreement adopted in accordance with Section 16.01;

(iii) all conveyances and other instruments which the General Partner deems necessary or desirable to reflect the dissolution and termination of the Partnership pursuant to ARTICLE XII, including the requirements of the Delaware Act;

(iv) certificates of assumed name or fictitious name certificates and such other certificates and instruments as may be necessary under the fictitious or assumed name statutes from time to time in effect in all jurisdictions in which the Partnership conducts or plans to conduct its affairs;

(v) all agreements and instruments necessary or desirable to organize any Alternative Investment Vehicle, including the execution of the operative documents with respect to an Alternative Investment Vehicle (and amendments thereto);

(vi) all certificates or other instruments necessary or desirable to accomplish the business, purposes and objectives of the Partnership or required by any applicable law; and

(vii) all other documents or instruments that may reasonably be considered necessary by the General Partner to carry out the foregoing.

(b) Such attorney-in-fact and agent shall not, however, have the right, power, or authority to amend or modify this Agreement when acting in such capacities, except to the extent expressly authorized herein. Each Limited Partner hereby agrees not to revoke this power of attorney. This power of attorney shall terminate upon (i) with respect to such Limited Partner, a Transfer of the Limited Partner's entire Interest in accordance with the terms of this Agreement, and (ii) the removal, Bankruptcy, dissolution, or withdrawal of the General Partner, except that such power of attorney shall remain in effect with respect to any successor General Partner. The power of attorney granted herein shall be irrevocable, shall survive and not be affected by the death, incapacity, dissolution, Bankruptcy or legal disability of the Limited Partner, shall extend to its successors and assigns and may be exercisable by the General Partner by executing any instrument on behalf of the Limited Partner as its attorney-in-fact. To the fullest extent permitted by applicable law, this power of attorney may be exercised by such attorney-in-fact and agent for all Limited Partners (or any of them) by a single signature of the General Partner acting as attorney-in-fact with or without listing all of the Limited Partners executing an instrument. Any Person dealing with the Partnership may conclusively presume and rely upon the fact that any instrument referred to above, executed by the General Partner as attorney-in-fact, is authorized, regular and binding, without further inquiry. If required, each Limited Partner shall execute and deliver to the General Partner, within five Business Days after receipt of a request from the General Partner, such further designations, powers of attorney or other instruments as the General Partner shall determine to be necessary for the purposes hereof consistent with the provisions of this Agreement, including as required by any applicable state statute or other similar legal requirement.

## ARTICLE VI
## INTERESTS; CAPITAL CONTRIBUTIONS; CAPITAL ACCOUNTS

**Section 6.01 General Partner.**

(a) The name and address of the General Partner is Swiftarc Beauty Fund GP, LLC, a Delaware limited liability company, having an address at 801 Brickell Avenue, Office 709, Miami, FL 33131.

(b) The General Partner shall make a Capital Contribution of five percent (5%) of the Aggregate Contributions of the Fund Investors, with such amount not to exceed $500,000.

(c) The General Partner shall also be a Limited Partner to the extent that it subscribes for or becomes a transferee of all or any part of the Class I Interest or Class II Interest of a Limited Partner, and to such extent shall be treated as a Class I Limited Partner or Class II Limited Partner in all respects, except as otherwise provided in this Agreement.

**Section 6.02 Limited Partners**. Except as provided in ARTICLE XI, a Person shall be admitted as a Limited Partner only after such Person's Subscription Agreement is accepted by the General Partner and when the General Partner holds a Closing with respect to such Person; *provided*, that the General Partner may admit as a Limited Partner any Fund Investor that desires to Transfer its interest in the Fund from any Related Investment Vehicle to the Partnership without holding a Closing. The General Partner shall maintain a record of the name, address, and Capital Contributions of each Limited Partner.

**Section 6.03 Capital Contributions**.

(a) Each Limited Partner participating in a Closing shall make a Capital Contribution as of the date of such Closing as set forth in the applicable Subscription Agreement. Each Limited Partner shall make additional Capital Contributions in accordance with the terms and conditions of Section 6.03(a). The General Partner shall not have any obligation to make a Capital Contribution other than as specified in Section 6.01(b), but one or more Principals or their respective Affiliates may participate and make additional Capital Contributions as Limited Partners.

(b) The General Partner may in its sole discretion exclude a particular Limited Partner from participating in all or any part of a Portfolio Investment if the General Partner determines that (i) participation by such Limited Partner in all or any part of such Portfolio Investment would have a reasonable likelihood of a violation of applicable law or (ii) such participation would result in a significant delay, extraordinary expense, or material adverse effect with respect to such Portfolio Investment or the Fund, would materially increase the risk that such Portfolio Investment will not be consummated or would impose any material filing, tax, regulatory, or other burden to which the Fund, the General Partner, the Portfolio Company, or any Partner or any of their respective Affiliates would not otherwise be subject. In the event a Limited Partner is excluded from participating in all or any part of a Portfolio Investment, the General Partner may utilize additional Capital Contributions from the other Fund Investors. The remaining Partners' Capital Contributions with respect to such Portfolio Investment shall be

calculated excluding such Limited Partner and such Partner shall be excluded from any entitlement to or participation in distributions arising from such Portfolio Investment.

(c) Beginning upon the end of the Investment Period (or before if reasonably deemed necessary by the General Partner), each Limited Partner shall make an additional Capital Contribution to the Partnership, payable by check or wire transfer in immediately available funds, if requested by the General Partner (as determined in its reasonable discretion), to provide the Partnership with sufficient cash to pay the Investment Expenses of the Partnership in a given calendar year; provided, that, in no event, shall the amount requested from a Limited Partner in a given year be greater than three percent (3.0%) of such Limited Partner's Capital Contributions as of the beginning of such year. Any such request for additional Capital Contributions by the General Partner shall be made in writing pursuant to Section 17.10 (the "***Expense Drawdown Notice***") at least ten (10) days' prior to the date on which such additional Capital Contribution must be made (the "***Expense Drawdown Date***") and specify the amount of the additional Capital Contribution (the "***Expense Drawdown Amount***"). The Expense Drawdown Amounts of the Limited Partners specified in any Expense Drawdown Notice shall be proportional to their respective Percentage Interests and shall be used to pay Investment Expenses of the Partnership in the applicable year; provided, that any Expense Drawdown Amounts not used to pay for Investment Expenses of the Partnership in such year shall be retained by the Partnership to cover Investment Expenses in future years as will be determined by the General Partner in its sole discretion.

**Section 6.04 Maintenance of Capital Accounts.** The Partnership shall establish and maintain for each Partner a separate capital account (a "***Capital Account***") on its books and records in accordance with this Section 6.04. Each Capital Account shall be established and maintained in accordance with the following provisions:

(a) Each Partner's Capital Account shall be increased by:

(i) the cash amount of all Capital Contributions made by such Partner to the Partnership;

(ii) the amount of any Net Income or other item of income or gain allocated to such Partner pursuant to ARTICLE VII; and

(iii) any liabilities of the Partnership that are assumed by such Partner or secured by any property distributed to such Partner.

(b) Each Partner's Capital Account shall be decreased by:

(i) the cash amount or Book Value of any property distributed to such Partner;

(ii) the amount of any Net Loss or other item of loss or deduction allocated to such Partner pursuant to ARTICLE VII and;

(iii) the amount of any liabilities of such Partner assumed by the Partnership or which are secured by any property contributed by such Partner to the Partnership.

**Section 6.05 Default by Partners.**

(a) In the event that any Limited Partner fails to make all or any portion of any Capital Contribution pursuant to Section 6.03 to the Partnership and such failure continues for five (5) Business Days following notice thereof from the General Partner, the General Partner may, in its sole discretion, designate such Limited Partner in default under this Agreement (a "***Defaulting Partner***") and such Limited Partner shall thereafter be subject to the provisions of this Section 6.05. The General Partner may (without limiting any legal rights or remedies it or the Fund may have), in its sole discretion, choose not to designate any Limited Partner as a Defaulting Partner and may agree to waive or permit the cure of any default by a Partner, subject to such conditions as the General Partner and such Limited Partner may agree upon.

(b) (i) The General Partner in its sole discretion may charge a Defaulting Partner interest at a rate equal to the Prime Rate plus two percent (2%) on unpaid amounts in respect of its obligation to make a Capital Contribution, from and after the original due date until the payment in full of all amounts due and, to the extent allowed by the terms of the Partnership's Indebtedness, such unpaid amounts shall be secured by the Defaulting Partner's Interest (and all distributions related thereto). The payment of interest charged pursuant to this Section 6.05(b) shall not be deemed a Capital Contribution. (ii) The General Partner shall have the right, in its sole discretion, to allow some or all of the Fund Investors to purchase all or a portion of the Interest of the Defaulting Partner for an amount, in cash, equal to fifty percent (50%) of the Fair Value of such Interest as of the date of such default. The calculation of Fair Value for these purposes shall take into account all Net Income, Net Loss, gains, deductions, distributions, and other credits and charges to which the Defaulting Partner was and would be entitled under this Agreement if all Portfolio Investments of the Partnership were sold on the date of such default for their Fair Value as of the most recent valuations, net of all costs and expenses associated with such acquisition and after the satisfaction of all of the Defaulting Partner's Partnership obligations, and the proceeds were distributed on such date pursuant to this Agreement. Any Fund Investors electing to so purchase all or a portion of the Defaulting Partner's Interest shall do so by delivering a notice of such intent to such Defaulting Partner within twenty (20) Business Days of such default. Each Fund Investor participating in the sale of the Defaulting Partner's Interest shall have the right (but not the obligation) to purchase up to its pro rata portion (based on the respective capital contributions of all participating Fund Investors) of such Defaulting Partner's Interest; *provided*, that, if the Fund Investors do not elect to purchase one hundred percent (100%) of the Defaulting Partner's Interest, the General Partner may solicit one or more Persons (which may include the General Partner or any of its Affiliates) to purchase, in cash, all, but not less than all, of the remaining portion of the Defaulting Partner's Interest at a price to be determined by the General Partner, in its sole discretion (but not less than the price offered to the Fund Investors), and such Person(s) shall be admitted as Limited Partner(s). In the event that the General Partner permits the Fund Investors or any third parties to purchase the Defaulting Partner's Interest as set forth in this Section 6.05(b), each Fund Investor or third party that elects to purchase a portion of the Defaulting Partner's Interest shall pay the corresponding portion of the then unpaid capital call.

(c) In the event that the Interest of the Defaulting Partner is not sold in full or the General Partner elects not to offer such Defaulting Partner's Interest for sale, in each case as provided in Section 6.05(c):

(i) Unless otherwise determined by the General Partner, in addition to the other remedies set forth in this Section 6.05, a Defaulting Partner shall not be entitled to (A) receive any further distributions by the Partnership until the final liquidation and termination of the Partnership or, (B) appoint or prevent the removal of a member of the Advisory Committee. No Defaulting Partner's Interest shall be counted in connection with the giving or withholding of any consent. Each Defaulting Partner shall remain fully liable to the creditors of the Partnership, to the extent provided by law, as if such default had not occurred; the full amount of such Defaulting Partner's Capital Contribution shall be included in calculating the amount of the Investment Management Fee and such Defaulting Partner shall remain liable for its share of the Investment Management Fee.

(ii) Furthermore, the General Partner may cause the Defaulting Partner to forfeit up to fifty percent (50%) of its Interest (including all rights to allocations and distributions with respect thereto) and cause the Capital Account associated with such forfeited Interest to be reallocated among all non-defaulting Partners.

(iii) Prior to the dissolution and liquidation of the Partnership, amounts distributable to a Defaulting Partner may be used to pay such Defaulting Partner's portion of the Investment Management Fee or the Partnership's Indebtedness.

(d) Each of the Limited Partners hereby consents to the application to it of the remedies provided in this Section 6.05 in recognition that the General Partner and the Fund may have no adequate remedy at law for a breach hereof except for ascertainable damages and that other damages resulting from such breach may be impossible to ascertain at the time hereof or of such breach. No right, power, or remedy conferred upon the General Partner in this Section 6.05 shall be exclusive, and each such right, power or remedy shall be cumulative and in addition to every other right, power, or remedy whether conferred in this Section 6.05 or now or hereafter available at law or in equity or by statute or otherwise. The General Partner in its sole discretion may waive any of the foregoing remedies with respect to any Defaulting Partner. No course of dealing between the General Partner and any Defaulting Partner and no delay in exercising any right, power, or remedy conferred in this Section 6.05 or now or hereafter existing at law or in equity or by statute or otherwise shall operate as a waiver or otherwise prejudice any such right, power, or remedy.

**Section 6.06 Interest.** Interest, if any, earned on Partnership funds shall inure to the benefit of the Partnership. The Partners shall not receive interest on their Capital Contributions (other than as provided in Section 6.10) or Capital Accounts. The General Partner shall have no obligation to keep Partnership funds in an interest-bearing account.

**Section 6.07 Withdrawal of Capital Contributions.** Except as otherwise provided in this Agreement or by law, (a) no Partner shall have the right to withdraw its Capital Contributions, or to demand and receive property other than property distributed by the Partnership in accordance with the terms hereof in return for its Capital Contributions, and (b)

any return of Capital Contributions to the Limited Partners shall be solely from Partnership assets, and the General Partner shall not be personally liable for any such return.

**Section 6.08 Succession Upon Transfer.** In the event that an Interest is transferred in accordance with the terms of this Agreement, the transferee shall succeed to the Capital Account of the transferor to the extent that it relates to the transferred Interest and shall receive allocations and distributions pursuant to ARTICLE VII and ARTICLE VIII in respect of such Interest.

**Section 6.09 Restoration of Negative Capital Accounts.** Subject to Sections 4.04 and 5.02, neither the General Partner nor any other Partner shall be obligated to restore any deficit balance in a Partner's Capital Account. A deficit in a Partner's Capital Account shall not constitute a Partnership asset.

**Section 6.10 Admission of Limited Partners After Initial Closing.**

(a) The Limited Partners agree that the General Partner shall have the right to admit additional Limited Partners to the Partnership in one or more Subsequent Closings held within eighteen (18) months of the Initial Closing in accordance with the terms hereof. Notwithstanding the foregoing, the General Partner may extend the period for Subsequent Closings to twenty-four (24) months, in its sole discretion, if the General Partner believes such an extension is necessary or desirable. The Limited Partners hereby consent to such admission of any additional Limited Partners and agree to take all actions reasonably requested by the General Partner to give effect to the foregoing. Each additional Limited Partner admitted in a Subsequent Closing shall contribute to the Partnership an amount equal to the sum of (i) the product of (A) a fraction, the numerator of which equals the additional Limited Partner's Capital Contribution and the denominator of which equals the Capital Contributions of all Partners as of such Subsequent Closing (including the Capital Contributions of all additional Limited Partners) and (B) all Net Adjusted Capital Contributions (other than amounts contributed (1) to fund the cost of Portfolio Investments to the extent such Portfolio Investments have been realized prior to the date of such Subsequent Closing or (2) to pay the Investment Management Fee), *plus* (ii) the Investment Management Fee attributable to the additional Limited Partner's Capital Contribution as if such Capital Contribution had been made on the date of the Initial Closing (whether as a Class I Limited Partner or a Class II Limited Partner), *plus* (iii) an amount representing interest on the average daily balance of such amounts described in clauses (i) and (ii) of this sentence at a *per annum* rate equal to (A) five percent (5%) for Limited Partners admitted more than six (6) but less than twelve (12) months following the Initial Closing and (B) ten percent (10%) for Limited Partners admitted more than twelve (12) but less than eighteen (18) or twenty-four (24) months, as applicable, following the Initial Closing (in each case, as if such additional Limited Partner had made a *pro rata* Capital Contribution as of each applicable date that the existing Limited Partners of the same class made Capital Contributions to the Partnership prior to such Subsequent Closing); *provided,* that such amounts representing interest shall not be deemed a Capital Contribution. Amounts contributed pursuant to clause (i) above and interest on such amounts contributed pursuant to clause (ii) above will be refunded to existing Partners *pro rata* in accordance with their Net Adjusted Capital Contributions. For all purposes of this Agreement, Capital Contributions made pursuant to this Section 6.10 and refunded to a Partner that participated in a previous Closing will be deemed to have been made by the contributing Partner (and not the refunded Partner) as of the date on which the refunded Partner actually made such

Capital Contribution. No amount distributed to a refunded Partner pursuant to this Section 6.10 shall be considered a distribution of Distributable Cash.

(b) In the event the General Partner forms a Parallel Vehicle, the General Partner shall take such actions as are reasonably appropriate to cause the provisions of Section 6.10(a) to be applied to all Fund Investors without regard for the vehicle through which a particular Fund Investor participates in the Fund.

## ARTICLE VII
## ALLOCATIONS

**Section 7.01 Allocations of Net Income and Net Loss and Special Allocations**.

(a) ***Net Income and Net Loss***. Except as otherwise provided in this Agreement, for each Fiscal Year (or portion thereof), Net Income and Net Loss (and, to the extent necessary, individual items of income, gain, loss or deduction) of the Partnership shall be allocated among the Partners in a manner such that, after giving effect to the special allocations set forth in Section 7.02(c) and Section 7.02(d), the Capital Account balance of each Partner, immediately after making such allocations, is, as nearly as possible, equal to (i) the Distributions that would be made to such Partner pursuant to Sections 8.01 and 12.02(c)(iii) if the Partnership were dissolved, its affairs wound up and its assets sold for cash equal to their Book Value, all Partnership liabilities were satisfied (limited with respect to each Nonrecourse Liability to the Book Value of the assets securing such liability), and the net assets of the Partnership were Distributed, in accordance with Sections 8.01 and 12.02(c)(iii), to the Partners immediately after making such allocations, minus (ii) such Partner's share of Partnership Minimum Gain and Partner Nonrecourse Debt Minimum Gain, computed immediately prior to the hypothetical sale of assets, minus (iii) in the case of the General Partner, any obligation of the General Partner to make a capital contribution to the Partnership pursuant to Section 4.04 if the Partnership were liquidated at such time, plus (iv) in the case of each Limited Partner, such Limited Partner's share of the amount of the capital contribution of the General Partner referred to in clause (iii) hereof (if it were made at such time). Notwithstanding the foregoing, the General Partner may make such allocations as it deems reasonably necessary to give economic effect to the provisions of this Agreement taking into account such facts and circumstances as the General Partner deems reasonably necessary for this purpose.

(b) ***Investment Management Fees***. For each Fiscal Year or portion thereof, deductions of the Partnership related to the Investment Management Fee shall be allocated to the Limited Partners in proportion to their respective shares of such fees.

(c) ***Withholding and Income Taxes***. Any withholding or income taxes imposed by any non-United States jurisdiction ("***Foreign Taxes***") (and related tax credits) on items of income, gain, loss, or deduction of the Partnership or incurred directly or indirectly by the Partnership with respect to any investment shall be allocated to each Partner in accordance with each such Partner's respective share of the Capital Contributions attributable to the investment giving rise to income or gains subject to Foreign Taxes. Notwithstanding the foregoing, any increase or decrease in such Foreign Taxes (and related tax credits) resulting from the identity, nationality, residence or status of a Partner, or from the failure of a Partner or its

direct or indirect members to provide information as requested pursuant to Section 8.03(a), will be specially allocated to such Partner.

**Section 7.02 Regulatory Allocations.** Notwithstanding the provisions of Section 7.01:

(a) ***Minimum Gain Chargeback.*** If there is a net decrease in Partnership Minimum Gain (determined according to Treasury Regulation Section 1.704-2(d)(1)) during any Fiscal Year, each Partner shall be specially allocated Net Income for such Fiscal Year (and, if necessary, subsequent Fiscal Years) in an amount equal to such Partner's share of the net decrease in Partnership Minimum Gain, determined in accordance with Treasury Regulation Section 1.704-2(g). The items to be so allocated shall be determined in accordance with Treasury Regulation Sections 1.704-2(f)(6) and 1.704-2(j)(2). This Section 7.02(a) is intended to comply with the minimum gain chargeback requirement in Treasury Regulation Section 1.704-2(f) and shall be interpreted consistently therewith.

(b) ***Partner Minimum Gain Chargeback.*** If there is a net decrease in Partner Nonrecourse Debt Minimum Gain attributable to a Partner Nonrecourse Debt during any Fiscal Year, each Partner with a share of such Partner Nonrecourse Debt Minimum Gain (determined according to Treasury Regulation Section 1.704-2(i)(5)) shall be specially allocated Net Income for such Fiscal Year (and, if necessary, subsequent Fiscal Years) in an amount equal to that Partner's share of the net decrease in Partner Nonrecourse Debt Minimum Gain. The items to be so allocated shall be determined in accordance with Treasury Regulation Sections 1.704-2(i)(4) and 1.704-2(j). This Section 7.02(b) is intended to comply with the "minimum gain chargeback" requirement in Treasury Regulation Section 1.704-2(i)(4) and shall be interpreted consistently therewith.

(c) ***Nonrecourse Deductions.*** Nonrecourse Deductions for any Fiscal Year shall be allocated to the Partners in accordance with their respective Percentage Interests.

(d) ***Partner Nonrecourse Deductions.*** Partner Nonrecourse Deductions for any Fiscal Year shall be allocated to the Partner or Partners that bear the economic risk of loss with respect to the Partner Nonrecourse Debt to which such Partner Nonrecourse Deductions are attributable in the manner required by Treasury Regulation Section 1.704-2(i).

(e) ***Qualified Income Offset.*** In the event any Partner unexpectedly receives any adjustments, allocations or distributions described in Treasury Regulation Section 1.704-1(b)(2)(ii)(d)(4), (5) or (6), Net Income shall be specially allocated to such Partner in an amount and manner sufficient to eliminate the deficit balance in its Capital Account created by such adjustments, allocations, or distributions as quickly as possible. This Section 7.02(e) is intended to comply with the qualified income offset requirement in Treasury Regulation Section 1.704-1(b)(2)(ii)(d) and shall be interpreted consistently therewith.

**Section 7.03 Tax Allocations.**

(a) Subject to Section 7.03(b), Section 7.03(c) and Section 7.03(d), all income, gains, losses, and deductions of the Partnership shall be allocated, for federal, state, and local income tax purposes, among the Partners in accordance with the allocation of such income,

gains, losses, and deductions among the Partners for computing their Capital Accounts, except that if any such allocation for tax purposes is not permitted by the Code or other applicable law, the Partnership's subsequent income, gains, losses, and deductions shall be allocated among the Partners for tax purposes, to the extent permitted by the Code and other applicable law, so as to reflect as nearly as possible the allocation set forth herein in computing their Capital Accounts.

(b) Items of Partnership taxable income, gain, loss, and deduction with respect to any property contributed to the capital of the Partnership shall be allocated among the Partners in accordance with Section 704(c) of the Code and any reasonable method selected by the General Partner, so as to take account of any variation between the adjusted basis of such property to the Partnership for federal income tax purposes and its Book Value.

(c) If the Book Value of any Partnership asset is adjusted pursuant to Treasury Regulation Section 1.704-1(b)(2)(iv)(f) as provided in clause (c) of the definition of Book 0, subsequent allocations of items of taxable income, gain, loss, and deduction with respect to such asset shall take account of any variation between the adjusted basis of such asset for federal income tax purposes and its Book Value in the same manner as under Section 704(c) of the Code.

(d) Allocations of tax credit, tax credit recapture and any items related thereto shall be allocated to the Partners according to their interests in such items as determined by the General Partner taking into account the principles of Treasury Regulations Section 1.704-1(b)(4)(ii).

(e) Allocations pursuant to this Section 7.03 are solely for purposes of federal, state, and local taxes and shall not affect, or in any way be taken into account in computing, any Partner's Capital Account or share of Net Income, Net Losses, distributions, or other items pursuant to any provisions of this Agreement.

**Section 7.04 Allocations to Transferred Interests.** In the event an Interest is assigned during a Fiscal Year in compliance with the provisions of ARTICLE XI, Net Income, Net Losses, and other items of income, gain, loss, and deduction of the Partnership attributable to such Interest for such Fiscal Year shall be determined using the interim closing of the books method.

## ARTICLE VIII
## DISTRIBUTIONS

**Section 8.01 Distributions.** Subject to Sections 6.05, 8.02, 8.05 and 4.11, the Partnership shall make distributions of Distributable Cash to the extent constituting (i) proceeds of a Disposition of a Portfolio Investment, within ninety (90) days following the receipt thereof, (ii) income, dividends, distributions, or interest from a Portfolio Investment, within a reasonable period of time following the end of the fiscal quarter in which such amounts are received, and (iii) income from Temporary Investments, within a reasonable period of time following the end of the fiscal year in which such amounts are received or more frequently in the sole discretion of the General Partner, in each case in the order of priority set forth below. Notwithstanding any other provision of this Agreement, distributions shall be made only to the extent of Available

Assets and in compliance with the Delaware Act and other applicable law. Distributable Cash shall initially be notionally apportioned among the Partners (including the General Partner in its capacity as a Partner, and the amount so apportioned to the General Partner shall be distributed to the General Partner) in proportion to their relative Capital Contributions with respect to the applicable Portfolio Investment or Temporary Investment. The amount apportioned to each Limited Partner shall be distributed as follows:

(a) First, one hundred percent (100%) to such Limited Partner until distributions to such Limited Partner of Distributable Cash on a cumulative basis pursuant to this clause (a) equal such Limited Partner's Capital Contributions with respect to the applicable Portfolio Investment or Temporary Investment; and

(b) Thereafter, (i) with respect to each Class I Limited Partner, such Class I Limited Partner's *pro rata* share of the distributions of Distributable Cash made pursuant to this clause (b) at the Class I Distribution Rate, and (ii) with respect to each Class II Limited Partner, such Class II Limited Partner's *pro rata* share of the distributions of Distributable Cash made pursuant to this clause (b) at the Class II Distribution Rate.

**Section 8.02 Tax Distributions.** Notwithstanding any provision in Section 8.01 to the contrary, the General Partner may receive a cash advance against distributions to be paid pursuant to Section 8.01(b) to the extent that cumulative distributions actually received by the General Partner pursuant to Section 8.01(b) are not sufficient for the General Partner or any of its direct or indirect members to pay when due (including estimated income tax) the cumulative amount of taxes imposed on it (excluding penalties) resulting from allocations of income and gain from the Partnership to the General Partner in respect of Carried Interest Distributions, calculated using the Assumed Tax Rate. Future distributions otherwise to be made to the General Partner pursuant to Section 8.01(b) shall be reduced by the amount of any prior advances made to the General Partner pursuant to this Section 8.02. If such distributions are not sufficient to offset distributions made pursuant to this Section 8.02, the proceeds of liquidation otherwise payable to the General Partner shall be so reduced. To the extent an amount otherwise distributable to the General Partner is not actually distributed to take into account previous distributions under this Section 8.02, the amount shall be treated for all purposes under this Agreement as if it had actually been distributed.

**Section 8.03 Withholding and Income Taxes.**

(a) ***Tax Withholding Information.*** Each Partner agrees to:

(i) provide any information, certification, representation, form, or other document reasonably requested by and acceptable to the General Partner for the purpose of (A) obtaining any exemption, reduction, or refund of any withholding or other taxes imposed by any Taxing Authority or other governmental agency (including withholding taxes imposed pursuant to Sections 1471-1474 of the Code and the Treasury Regulations thereunder) or (B) to satisfy reporting or other obligations under the Code and the Treasury Regulations thereunder;

(ii) update or replace such information, certification, representation, form, or other document in accordance with its terms or subsequent amendments; and

(iii) otherwise comply with any reporting obligations or information disclosure requirements imposed by the United States or any other jurisdiction and any reporting obligations that may be imposed by future legislation.

If a Limited Partner fails or is unable to deliver to the General Partner such information, certification, representation, form, or other document described in Section 8.03(a)(i), the General Partner shall have full authority on behalf of the Partnership to withhold any taxes required to be withheld pursuant to any applicable laws, regulations, rules. or agreements.

(b) ***Withholding Advances.*** The Partnership is hereby authorized at all times to make payments ("***Withholding Advances***") with respect to each Partner in amounts required to discharge any obligation of the Partnership (pursuant to the Code or any provision of United States federal, state or local or non-United States tax law or otherwise) to withhold or make payments to any Taxing Authority with respect to any distribution or allocation by the Partnership of income or gain to such Partner and to withhold the same from distributions to such Partner (including payments made pursuant to Section 6225 of the Code and allocable to a Partner as determined by the Partnership Representative in its sole discretion). Any funds withheld from a distribution by reason of this Section 8.03(b) shall nonetheless be deemed distributed to the Partner in question for all purposes under this Agreement and, at the option of the General Partner, shall be charged against the Partner's Capital Account.

(c) ***Repayment of Withholding Advances.*** Any Withholding Advance made by the Partnership to a Taxing Authority on behalf of a Partner and not simultaneously withheld from a distribution to that Partner shall, with interest thereon accruing from the date of payment at a rate equal to the Prime Rate plus two percent (2%):

(i) be promptly repaid to the Partnership by the Partner on whose behalf the Withholding Advance was made (which repayment by the Partner shall not constitute a Capital Contribution, but shall credit the Partner's Capital Account if the General Partner shall have initially charged the amount of the Withholding Advance to the Capital Account); or

(ii) with the consent of the General Partner, be repaid by reducing the amount of the next succeeding distribution or distributions to be made to such Partner (which reduction amount shall be deemed to have been distributed to the Partner, but which shall not further reduce the Partner's Capital Account if the General Partner shall have initially charged the amount of the Withholding Advance to the Capital Account).

Interest shall cease to accrue from the time the Partner on whose behalf the Withholding Advance was made repays such Withholding Advance (and all accrued interest) by either method of repayment described above.

(d) ***Indemnification.*** Each Partner hereby agrees to indemnify and hold harmless the Partnership and the other Partners from and against any liability with respect to taxes, interest, or penalties, which may be asserted by reason of the Partnership's failure to

deduct and withhold tax on amounts distributable or allocable to such Partner. The provisions of this Section 8.03(d) and the obligations of a Partner pursuant to Section 8.03(c) shall survive the termination, dissolution, liquidation, and winding up of the Partnership and the withdrawal of such Partner from the Partnership or transfer of its Interest. The Partnership may pursue and enforce all rights and remedies it may have against each Partner under this Section 8.03, including bringing a lawsuit to collect repayment with interest of any Withholding Advances.

(e) ***Overwithholding.*** Neither the Partnership nor the General Partner shall be liable for any excess taxes withheld in respect of any distribution or allocation of income or gain to a Partner. In the event of an overwithholding, a Partner's sole recourse shall be to apply for a refund from the appropriate Taxing Authority.

(f) ***Calculation of Net Available Investment Cash Flow Before Income and Withholding Taxes.*** The amount of any Distributable Cash treated as distributed to the Partners pursuant to Section 8.01 shall include the amount of any withholding or income taxes imposed by any jurisdiction directly or indirectly on the Partnership with respect to any Portfolio Investment.

**Section 8.04 Form of Distributions.** Distributions of Distributable Cash made prior to the dissolution and liquidation of the Fund may only take the form of cash or Marketable Securities. Upon liquidation and termination of the Fund, the Fund may distribute non-Marketable Securities or other assets, in the sole discretion of the General Partner (or Liquidator, if different). In the event that the General Partner (or Liquidator, if different) intends to make a distribution of assets in kind, the General Partner (or Liquidator, if different) shall deliver a notice to the Limited Partners not less than fifteen (15) Business Days prior to making such distribution. The General Partner may cause certificates evidencing any Securities to be distributed to be imprinted with legends as to such restrictions on transfer that it may in its sole discretion deem necessary or appropriate, including legends as to applicable federal or state securities laws or other legal or contractual restrictions, and may require any Partner to which Securities are to be distributed to agree in writing (a) that such Securities will not be transferred except in compliance with such restrictions and (b) to such other matters as the General Partner may deem necessary or appropriate. The General Partner (or Liquidator, if different) will not make any distribution of Marketable Securities, non-Marketable Securities, or other assets to any Limited Partner if, not more than five (5) Business Days after it discloses the intended distribution, the General Partner (or Liquidator, if different) has received notice from such Limited Partner not to do so. In the event of any such notification, the General Partner (or Liquidator, if different) will, subject to applicable legal restrictions, retain such Marketable Securities, non-Marketable Securities, or other assets and use reasonable commercial efforts to sell on behalf of and at the direction of such Limited Partner any Marketable Securities, non-Marketable Securities or other assets that would otherwise have been distributed to such Limited Partner and shall distribute to such Limited Partner the proceeds of such sale, net of the expenses related thereto. Notwithstanding the foregoing, any retained Marketable Securities, non-Marketable Securities, or other assets shall be deemed for all purposes to have been distributed to such Limited Partner at their Fair Value regardless of ultimate sales proceeds. Distributions of assets in kind shall be allocated in accordance with Section 8.01 as if such assets (valued at their Fair Value) were Distributable Cash.

**Section 8.05 Retention of Distributable Cash.** The Partnership shall be permitted, in the sole discretion of the General Partner, to retain and not distribute some or all of the Distributable Cash from one or more of the Portfolio Investments for purposes of (a) completing Transactions in Progress, (b) subject to **Error! Reference source not found.**, effecting any Follow-On Investment and (c) acquiring the Interest of any Defaulting Partner pursuant to Section 6.05.

## ARTICLE IX
## THE INVESTMENT MANAGER

**Section 9.01 Investment Management Agreement.** The Fund has entered into an agreement with the Investment Manager (as amended, supplemented or otherwise modified from time to time in accordance with the provisions thereof and of this Agreement and a form of which is attached hereto as Exhibit B, the "***Investment Management Agreement***"), pursuant to which the Investment Manager will provide investment management services to the Partnership and be paid the Investment Management Fee as described in Section 9.02; provided, that the Investment Management Agreement shall provide that it may be terminated by the Partnership without penalty upon the removal or withdrawal of the General Partner.

**Section 9.02 Investment Management Fees.** The Investment Manager or an Affiliate thereof shall be paid an annual investment management fee (the "***Investment Management Fee***") by the Partnership, subject to reduction as set forth in Section 3.08(b) and Section 4.08, quarterly in advance beginning on either (a) the date of the Initial Closing or (b) such later date as the General Partner may determine in its sole discretion (the "***Investment Management Fee Commencement Date***") with subsequent installments to be paid quarterly on the first (1st) Business Day of each quarter of the Fiscal Year. Any payment of the Investment Management Fee in respect of a period less than a quarter of a Fiscal Year shall be prorated based on the actual number of days in such period. The Investment Management Fee shall accrue in respect of the Capital Contributions of each Limited Partner from the Investment Management Fee Commencement Date through the termination of the Partnership regardless of the Closing in which such Limited Partner is admitted to the Partnership. A Limited Partner participating in a Subsequent Closing shall fund its portion of all prior installments of the Investment Management Fee, plus interest thereon, in accordance with Section 6.10. Each installment of the Investment Management Fee shall be due and payable based on an annual amount equal to (i) one percent (1%) of (x) during the Investment Period, the Capital Contributions of the Class I Limited Partners and (y) after the end of the Investment Period, the unrecovered Capital Contributions of the Class I Limited Partners (plus any Capital Contributions of the Class I Limited Partners reserved to be used and invested in a Transaction in Progress), and (ii) two percent (2%) of (x) during the Investment Period, the Capital Contributions of the Class II Limited Partners and (y) after the end of the Investment Period, the unrecovered Capital Contributions of the Class II Limited Partners (plus any Capital Contributions of the Class II Limited Partners reserved to be used and invested in a Transaction in Progress). The portions of Capital Contributions transferred to and/or invested in Alternative Investment Vehicles will be included without duplication for purposes of determining the Investment Management Fee payable pursuant to this Section 9.02.

## ARTICLE X
## ACCOUNTING AND REPORTS

**Section 10.01 Books and Records.**

(a) The General Partner shall maintain at the office of the Partnership full and accurate books of the Partnership (which at all times shall remain the property of the Partnership), in the name of the Partnership and separate and apart from the books of the General Partner and its Affiliates, including a list of the names, addresses and interests of all Limited Partners and all other books, records and information required by the Delaware Act. The Partnership's books and records shall be maintained in U.S. dollars and in accordance with U.S. generally accepted accounting principles. The General Partner may cause the Partnership to retain any other nationally or regionally recognized accounting firm as its independent certified public accounting firm as it may from time to time determine and shall provide notice of such retention to the Limited Partners.

(b) Subject to Section 17.15, each Limited Partner shall be allowed full and complete access to review all records and books of account of the Partnership for a purpose reasonably related to such Limited Partner's Interest as a limited partner at the offices of the General Partner (or such other location designated by the General Partner in its sole discretion) during regular business hours, at its expense and upon two Business Days' notice to the General Partner. The General Partner shall retain all records and books relating to the Partnership for a period of at least five years after the termination of the Partnership. Each Limited Partner agrees that (i) such books and records contain confidential information relating to the Partnership and its affairs that is subject to Section 17.15, and (ii) the General Partner shall have the right, except as prohibited by the Delaware Act, to prohibit or otherwise limit in its reasonable discretion the making of any copies of such books and records.

**Section 10.02 Partnership Representative.**

(a) ***Designation.*** The General Partner shall be designated as the "partnership representative" (the "***Partnership Representative***") as provided in Section 6223(a) of the Code (or under any applicable state or local law providing for an analogous capacity). Any expenses incurred by the Partnership Representative in carrying out its responsibilities and duties under this Agreement shall be an Operating Expense of the Partnership for which the Partnership Representative shall be reimbursed. The Partnership Representative shall appoint an individual meeting the requirements of Treasury Regulation Section 301.6223-1(c)(3) as the sole person authorized to represent the Partnership Representative in audits and other proceedings governed by the partnership audit procedures set forth in Subchapter C of Chapter 63 of the Code as amended by the BBA (the "***Revised Partnership Audit Rules***").

(b) ***Tax Examinations and Audits.*** The Partnership Representative is authorized and required to represent the Partnership in connection with all examinations of the affairs of the Partnership by any Taxing Authority, including any resulting administrative and judicial proceedings, and to expend funds of the Partnership for professional services and costs associated therewith. Each Partner agrees that any action taken by the Partnership Representative in connection with audits of the Partnership shall be binding upon such Partners and that such Partner shall not independently act with respect to tax audits or tax litigation affecting the Partnership. The Partnership Representative shall have sole discretion to determine whether the Partnership (either on its own behalf or on behalf of the Partners) will contest or continue to

contest any tax deficiencies assessed or proposed to be assessed by any Taxing Authority. Each Partner agrees to cooperate with the Partnership Representative and to do or refrain from doing any or all things reasonably requested by the Partnership Representative with respect to the conduct of examinations by Taxing Authorities and any resulting proceedings; *provided*, that a Partner shall not be required to file an amended federal income tax return, as described in Section 6225(c)(2)(A) of the Code, or pay any tax due and provide information to the Service as described in Section 6225(c)(2)(B) of the Code.

(c) ***Revised Partnership Audit Rules.*** Except as otherwise set forth herein, in the event of an audit of the Partnership that is subject to the Revised Partnership Audit Rules or any analogous provision of state or local law, the Partnership Representative, in its sole discretion, shall have the right to make any and all elections and to take any actions that are available to be made or taken by the Partnership Representative or the Partnership under the Revised Partnership Audit rules (or analogous provisions of state or local law). To the extent that the Partnership Representative does not make an election under Section 6221(b) of the Code, the Partnership Representative shall use commercially reasonable efforts to reduce to the extent possible the amount of tax owed by the Partnership pursuant to an audit under the Revised Partnership Audit Rules (or analogous state or local partnership audit procedures) by either (i) making any modifications available under Section 6225(c)(3), (4), and (5) of the Code (or analogous provisions of state or local law) or (ii) making a timely election under Section 6226 of the Code (or an analogous provision of state or local law). If an election under Section 6226(a) of the Code is made, the Partnership shall furnish to each Partner for the year under audit a statement of the Partner's share of any adjustment set forth in the notice of final partnership adjustment, and each Partner shall take such adjustment into account as required under Section 6226(b) of the Code.

**(d)** ***Tax Returns and Tax Deficiencies.*** Each Partner agrees that such Partner shall not treat any Partnership item inconsistently on such Partner's federal, state, foreign or other income tax return with the treatment of the item on the Partnership's return. Any deficiency for taxes imposed on any Partner (including penalties, additions to tax or interest imposed with respect to such taxes and any tax deficiency imposed pursuant to Section 6226 of the Code) will be paid by such Partner and if required to be paid (and actually paid) by the Partnership, will be recoverable from such Partner as provided in Section 8.03(d).

(e) ***Tax Returns.*** The General Partner shall cause to be prepared and timely filed all U.S. and non-U.S. tax returns required to be filed by or for the Partnership.

**Section 10.03 Reports to Partners**.

(a) The General Partner shall cause to be prepared and furnished to each Limited Partner at the Partnership's expense with respect to each Fiscal Year of the Partnership within ninety (90) days after the close of such Fiscal Year (subject to reasonable delays due to late receipt of necessary information from the Portfolio Company):

(i) audited financial statements of the Partnership (including an income statement, balance sheet, statement of cash flows, and statement of partners' capital) prepared in accordance with U.S. generally accepted accounting principles;

(ii) an annual report, which includes a summary of any material events regarding the of the Portfolio Investment and the business of the Partnership, including any Disposition of the Portfolio Investment, during such Fiscal Year; and

(iii) a statement of the amount of such Limited Partner's share in the Partnership's taxable income or loss for such Fiscal Year and information relating to the nature thereof, (including copies of IRS Schedule K-1) in sufficient detail to enable it to prepare its federal, state, and local income tax and information returns.

(b) The General Partner shall cause to be prepared and furnished to each Limited Partner with respect to each fiscal quarter (other than the Partnership's last fiscal quarter of each Fiscal Year) within sixty (60) days after the close of such fiscal quarter:

(i) a valuation of each Portfolio Investment during such quarterly period; and

(ii) a summary description of (A) each Portfolio Investment, (B) any material event regarding the business of the Partnership, and (C) each Disposition of a Portfolio Investment, during such quarterly period.

## ARTICLE XI
## TRANSFER OF LIMITED PARTNERSHIP INTERESTS

**Section 11.01 Transfers.** A Limited Partner may not Transfer its Interest in the Partnership or any part thereof except (a) as provided in Section 6.05(b) or Section 3.06(a) or (b) as permitted in this ARTICLE XI. Any Transfer in violation of this ARTICLE XI shall be null and void and of no force or effect.

**Section 11.02 Transfer by Limited Partners.**

(a) A Limited Partner may Transfer all or a portion of its Interest in the Partnership only if the General Partner consents in writing to the Transfer, which consent it may grant or withhold in its sole discretion, and all of the following conditions are satisfied (provided that the transferring Limited Partner shall continue to be subject to the provisions of Section 8.03 and Section 17.15):

(i) the transferring Limited Partner and proposed transferee file a notice, signed and certified by the transferring Limited Partner, with the General Partner at least thirty (30) Business Days in advance of the proposed Transfer which contains (A) the terms and conditions of and the circumstances under which the proposed Transfer is to be made, (B) a description of the Interests to be transferred, and (C) all other information reasonably requested by the General Partner;

(ii) the Transfer does not cause the Partnership to be treated as a "publicly traded partnership" within the meaning of Section 7704 of the Code and the regulations promulgated thereunder;

(iii) all costs and expenses incurred by the Partnership in connection with the Transfer are paid by the transferring Limited Partner to the Partnership, and the transferring Limited Partner shall be responsible for such costs and expenses whether or not the proposed Transfer is consummated;

(iv) a fully executed and acknowledged written transfer agreement between the transferring Limited Partner and the transferee has been filed with the Partnership;

(v) the transferee has executed a copy of this Agreement; and

(vi) the General Partner determines, and such determination is confirmed by an opinion of counsel satisfactory to the General Partner stating, that (A) the Transfer does not violate the Securities Act, applicable state securities laws, (B) the Transfer will not require the Partnership or the General Partner to register as an investment company under the Investment Company Act, (C) the Transfer will not require the General Partner or any Affiliate that is not registered under the Advisers Act to register as an investment adviser under the Advisers Act, (D) notwithstanding such Transfer, the Partnership shall continue to be treated as a partnership under the Code (including Section 7704 of the Code), (E) the Transfer would not pose a material risk that (1) all or any portion of the assets of the Partnership would constitute "plan assets" under the Plan Asset Rules of any existing or contemplated ERISA Partner or (2) the Partnership would be subject to the provisions of ERISA, Section 4975 of the Code or any applicable Similar Law or (3) the General Partner would become a fiduciary with respect to any existing or contemplated ERISA Partner or other Partner, pursuant to ERISA or the applicable provisions of any Similar Law or otherwise, and (F) the Transfer will not violate the applicable laws of any state or the applicable rules and regulations of any Governmental Authority; *provided*, that the delivery of such opinion may be waived, in whole or in part, at the sole discretion of the General Partner.

(b) Notwithstanding the foregoing, the General Partner shall not unreasonably withhold consent to a Transfer that otherwise satisfies Section 11.02(a) in the event such Transfer is to an Affiliate of the transferring Limited Partner; *provided* that the General Partner is reasonably satisfied that such Affiliate, other than a Benefit Plan Investor, has the financial capability to meet its obligations under this Agreement.

(c) If a Person who is a transferee in compliance with this Section 11.02 is not admitted to the Partnership as a Substitute Limited Partner pursuant to Section 11.03, such transferee shall be entitled only to the allocations and distributions with respect to its Interest in accordance with this Agreement and, to the fullest extent permitted by applicable law, shall not have any non-economic rights of a Limited Partner of the Partnership, including, without limitation, the right to require any information on account of the Partnership's business, inspect the Partnership's books, or vote on Partnership matters.

**Section 11.03 Substitute Limited Partners.** A transferee of all or a portion of an Interest in the Partnership pursuant to Section 11.02 shall have the right to become a substitute

Limited Partner (a "***Substitute Limited Partner***") in place of its transferor, effective as of the last day of a fiscal quarter, only if all of the following conditions are satisfied:

(a) the fully executed and acknowledged written instrument of Transfer has been filed with the Partnership;

(b) the transferee executes, adopts and acknowledges this Agreement and is listed in the books and records of the Partnership as a Limited Partner;

(c) any costs and expenses of Transfer incurred by the Partnership are paid to the Partnership; and

(d) the General Partner shall have provided its consent in writing to the substitution, which consent it may grant or withhold in its sole discretion, and which consent may be conditioned upon, among other things, delivery of the opinion of counsel, satisfactory to the General Partner, as to the matters referred to in the opinion described in Section 11.02(a)(vi) as such matters relate to the transferee becoming a Substitute Limited Partner; *provided*, that a consent to a Transfer shall be a consent to substitution.

**Section 11.04 Involuntary Withdrawal by Limited Partners.**

(a) Upon the death, Bankruptcy, dissolution or other cessation of existence of a Limited Partner, the authorized representative of such Limited Partner shall have all the rights of a Limited Partner for the purpose of settling or managing the estate or effecting the orderly winding up and disposition of the business of such Limited Partner and such power as such Limited Partner possessed to designate a successor as a transferee of its Interest and to join with such transferee in making application to substitute such successor or transferee as a Substitute Limited Partner. Such Limited Partner shall not be entitled to receive the Fair Value of its Interest in the Partnership.

(b) The death, Bankruptcy, dissolution, disability, or legal incapacity of a Limited Partner shall not dissolve or terminate the Partnership.

**Section 11.05 Required Withdrawals.**

(a) If the General Partner determines, in good faith after consultation with counsel, that the continued participation of a Limited Partner in the Partnership would be reasonably likely to result in a violation of any law or regulation applicable to the Partnership (including, without limitation, the anti-money laundering or anti-terrorism laws or regulations, including Title III of the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA PATRIOT ACT) Act of 2001 (the "***AML Laws***")) or subject the Partnership to any unintended law or regulatory scheme (including, without limitation, ERISA) (a "***Legal Violation***"), then the General Partner shall notify such Limited Partner of such Legal Violation and such Limited Partner shall be required to withdraw from the Partnership immediately following such notification; *provided*, that, if the General Partner in its sole discretion determines that the Legal Violation (other than a Legal Violation involving the AML Laws) is capable of being reasonably mitigated, prevented or cured, then the General Partner and such Limited Partner may take actions as the General Partner deems

necessary and appropriate to mitigate, prevent or cure such Legal Violation, including (i) converting such Limited Partner's Interest into a non-voting Interest, (ii) allowing, in the General Partner's sole discretion, some or all of the Fund Investors or other Persons to purchase all or a portion of the Interest of such Limited Partner for an amount, in cash, equal to the Fair Value of such Interest, and/or (iii) making appropriate applications to the relevant Governmental Authority in respect of such Legal Violation.

(b) A withdrawing Limited Partner under Section 11.05(a) shall be entitled to receive a distribution equal to any amounts it would have been entitled to if the Partnership, in accordance with the provisions hereof, dissolved, liquidated, and distributed all the proceeds thereof as of the date of withdrawal of such Limited Partner.

## ARTICLE XII
## DISSOLUTION AND LIQUIDATION

**Section 12.01 Dissolution.** The Partnership shall be dissolved upon the first to occur of the following:

(a) an election to dissolve the Partnership is made by the General Partner with consent of a Majority in Interest of the Fund Investors;

(b) after the end of the Investment Period, the reduction to cash of all of the Portfolio Investments of the Partnership;

(c) subject to the provisions of Sections 4.09 through 4.13, the Bankruptcy, dissolution, removal or other withdrawal of the General Partner or the Transfer of the General Partner's Interest in the Partnership;

(d) the fifth (5th) anniversary of the Initial Closing, unless extended by the General Partner, in its sole and absolute discretion, for up to two (2) additional consecutive two (2)-year periods each;

(e) as provided in Section 14.04(b);

(f) the entry of a decree of a judicial dissolution pursuant to the Delaware Act; or

(g) any other event causing dissolution of the Partnership under the Delaware Act.

**Section 12.02 Liquidation.**

(a) Upon dissolution of the Partnership and subject to Section 12.02(b), the General Partner, or if the General Partner's withdrawal, removal, or Bankruptcy caused the dissolution of the Partnership, such other Person who may be appointed by consent of a Majority in Interest of the Limited Partners, who shall be responsible for taking all action necessary or appropriate to wind up the affairs and distribute the assets of the Partnership following its dissolution (the "***Liquidator***") shall wind up the affairs of the Partnership and proceed within a

reasonable period of time to sell or otherwise liquidate the assets of the Partnership, subject to obtaining fair value for such assets and any tax or other legal considerations, and, after paying or making due provision by the setting up of reserves for all liabilities to creditors of the Partnership who are not Partners, distribute the proceeds therefrom among the Partners in accordance with Section 12.02(c). Notwithstanding the foregoing, the Liquidator may, if it determines that it is in the best interests of the Partnership, distribute part or all of any Portfolio Investments to the Partners in kind (utilizing the principles of Section 8.04 and the valuation procedures described herein).

(b) No Partner shall be liable for the return of the Capital Contributions of any other Partner; *provided*, that this provision shall not relieve any Partner of any other duty or liability it may have under this Agreement.

(c) Upon liquidation of the Partnership, all of the assets of the Partnership, and any proceeds therefrom, shall be applied in the following order of priority:

(i) first, in discharge of (1) all claims of creditors of the Partnership who are not Partners and (2) all expenses of liquidation;

(ii) second, to establish any reserves which the Liquidator may deem reasonably necessary for any contingent or unforeseen liabilities or obligations of the Partnership; and

(iii) third, to the Partners in the same manner as distributions are made under Section 8.01.

(d) When the Liquidator has complied with the foregoing liquidation plan, the termination of the Partnership shall be effective on the filing of, and the General Partner or Liquidator shall file, a certificate of cancellation of the Certificate of Limited Partnership (the "***Certificate of Cancellation***") with the Office of the Secretary of State of the State of Delaware in accordance with Section § 17-203 of the Delaware Act.

## ARTICLE XIII
## REPRESENTATIONS AND WARRANTIES OF THE GENERAL PARTNER

**Section 13.01 Representations and Warranties of the General Partner.** The General Partner represents, warrants and covenants to each Limited Partner that as of the date of the Initial Closing:

(a) The Partnership has been duly formed and is a validly existing limited partnership under the laws of the State of Delaware with full power and authority to conduct its business as described in this Agreement.

(b) The General Partner has been duly formed and is a validly existing limited liability company under the laws of the State of Delaware, with full power and authority to perform its obligations herein.

(c) All action required to be taken by the General Partner and the Partnership, as a condition to the issuance and sale of the Interests being purchased by the Limited Partners, has been taken.

(d) The Interest of each Limited Partner represents a duly and validly issued limited partnership interest in the Partnership and each Limited Partner is entitled to all the benefits of a Limited Partner under this Agreement and the Delaware Act.

(e) This Agreement has been duly authorized, executed and delivered by the General Partner and, assuming due authorization, execution and delivery by each Limited Partner, constitutes a valid and binding agreement of the General Partner enforceable in accordance with its terms against the General Partner, except as may be limited by bankruptcy, insolvency, reorganization, moratorium, and other similar laws of general applicability relating to or affecting creditors' rights or general equity principles (regardless of whether considered at law or in equity).

(f) The Private Placement Memorandum for the Fund did not contain any untrue statement of a material fact and did not omit to state a material fact necessary to make the statements made therein, in light of the circumstances in which they were made, not misleading, except that the description therein of this Agreement and the provisions hereof is superseded in its entirety by this Agreement.

(g) Assuming the accuracy of the representations and warranties made by each Limited Partner pursuant to the relevant Subscription Agreement, the Partnership is not required to register as an investment company under the Investment Company Act.

(h) Assuming the accuracy of the representations and warranties made by each Limited Partner pursuant to the relevant Subscription Agreement, the offer and sale of the Interests in accordance with the terms of the relevant Subscription Agreement does not require registration of the Interests under the Securities Act.

(i) The only fees payable to the General Partner or the Investment Manager by the Partnership or the Limited Partners are those contemplated or specified by this Agreement or the Investment Management Agreement.

## ARTICLE XIV
## ERISA CONSIDERATIONS

**Section 14.01 Status Under ERISA Plan Asset Rules.** The General Partner shall use its reasonable best efforts to conduct the affairs of the Partnership (a) as a "venture capital operating company" (VCOC) as defined in the Plan Asset Rules, or (b) to comply with such other exception as may be available under the Plan Asset Rules to prevent the assets of the Partnership from being treated as the assets of any ERISA Partner, including, if the General Partner so elects in its discretion, to limit investment in the Partnership so that investment by Benefit Plan Investors is not deemed to be "significant" under the Plan Asset Rules. The General Partner will promptly notify each ERISA Partner of any such election to limit participation by Benefit Plan Investors pursuant to Section 14.04(a).

**Section 14.02 VCOC Procedures.** If the General Partner conducts the affairs of the Partnership as a VCOC pursuant to Section 14.01(a), the General Partner shall deliver to each ERISA Partner an opinion of Partnership Counsel (or such other counsel as shall be reasonably acceptable to at least sixty-five percent (65%) of the Percentage Interests of the ERISA Partners), to the effect that the Partnership should qualify as a VCOC on the date of the Partnership's "first Investment." Thereafter, the General Partner shall deliver to each ERISA Partner a certificate with respect to each "annual valuation period," which certificate shall state whether it has concluded that the Partnership should qualify as a VCOC on at least one day during such "annual valuation period." The General Partner shall deliver such certificate within 60 days following the last day of each such annual valuation period.

**Section 14.03 Significant Participation and Plan Asset Procedures.** If the General Partner exercises its discretion to limit the participation of Benefit Plan Investors in the Partnership pursuant to Section 14.01(b), or if the General Partner determines in good faith that there is a reasonable likelihood that any or all of the assets of the Partnership would be deemed to be "plan assets" under the Plan Asset Rules:

(a) no transaction affecting the Interests shall be effective if the General Partner determines such transaction would cause or would present a material risk of causing the interests of Benefit Plan Investors to be "significant" under the Plan Asset Rules; and

(b) the General Partner may take any actions it deems appropriate in connection with assuring compliance with such exception, including, without limitation:

(i) precluding, limiting, liquidating or not otherwise giving effect to all or any portion of any purchase, acquisition, assignment or Transfer of any Interest, or withdrawal of any Limited Partner;

(ii) effecting pro rata withdrawals by Limited Partners who have represented that they are Benefit Plan Investors and by (unless otherwise agreed by a Limited Partner) Controlling Persons to reduce aggregate holdings of such Benefit Plan Investors so that investment by Benefit Plan Investors should not be deemed to be "significant" as determined under the Plan Asset Rules; or

(iii) offering to any Limited Partner who is not a Benefit Plan Investor or an ERISA Partner the opportunity to purchase, or purchase itself, at the Fair Value thereof, all or any portion of the Interest of an ERISA Partner.

**Section 14.04 Consequences of ERISA Plan Asset Status.** If the General Partner determines (including taking into account any relevant information provided by an ERISA Partner) that participation by Benefit Plan Investors in the Partnership is "significant" for purposes of the Plan Asset Rules or that no other exception from treatment as "plan assets" under the Plan Asset Rules applies, then the General Partner shall promptly notify the ERISA Partners of such determination. The General Partner is hereby authorized and empowered to take such actions as it determines in its discretion are appropriate to mitigate, prevent or cure any adverse consequences of such determination, which may include, without limitation, as appropriate:

(a) renegotiating the terms of any Portfolio Investment or otherwise modifying the manner in which the Partnership conducts its business;

(b) permitting or requiring the Transfer of all or a portion of the Interests of any or all of the ERISA Partners; and

(c) requiring each ERISA Partner that is a Benefit Plan Investor (on a pro rata basis unless otherwise consented to by an ERISA Partner) to do one or more of the following so as to comply with the significant participation exception under the Plan Asset Rules:

(i) transfer all or a portion of its Interest at a price not less than the Fair Value of such Interest or portion thereof, with such Fair Value being determined in good faith by the General Partner; or

(ii) completely or partially withdraw from the Partnership and receive in consideration therefor an amount equal to the Fair Value of such Interest or portion thereof being withdrawn, with such Fair Value being determined in good faith by the General Partner, and, in either case, with such amount being payable, in the discretion of the General Partner, either in cash or in the form of a promissory note (which may be prepaid by the Partnership at any time).

(d) Any distributions in kind made to a withdrawing ERISA Partner shall be made at the option of the General Partner after consultation with the withdrawing ERISA Partner, and shall be made in proportion to the withdrawing ERISA Partner's Percentage Interest; provided, that no distribution of property shall be made to the withdrawing ERISA Partner if the holding thereof would constitute or result in a violation of ERISA or other applicable law.

(e) If, within ninety (90) days after the General Partner's notification pursuant to the first sentence of Section 14.04, the General Partner has not delivered to each ERISA Partner an affirmative certificate to the effect that the assets of the Partnership should not then be deemed to constitute "plan assets," then from or after the expiration of such ninety (90)-day period each ERISA Partner may send notice to the General Partner that it is completely withdrawing from the Partnership; provided, that such right of withdrawal shall terminate if an affirmative certificate, or other such evidence as applicable, has been delivered to the withdrawing ERISA Partner prior to the effective date of withdrawal. Each withdrawing ERISA Partner shall be entitled to receive in consideration for its Interest an amount determined pursuant to Section 14.04(c)(ii).

(i) Notwithstanding the foregoing, if (A) fifty percent (50%) or more of the Percentage Interests of the ERISA Partners elect to withdraw from the Partnership or (B) fifty percent (50%) or more of the Percentage Interests of the Benefit Plan Investors in any Parallel Vehicle elect to withdraw from such Parallel Vehicle, then the General Partner, in its discretion, shall have the right to dissolve the Partnership and/or any or all of the Parallel Vehicles. Promissory notes issued to ERISA Partners pursuant to this Section 14.04(e)(i) shall be satisfied upon liquidation of the Fund, to the extent not satisfied earlier.

(ii) Unless otherwise determined by the General Partner, a complete or partial withdrawal of the ERISA Partners as provided in this Section 14.04(e) shall occur as of the date that is the earlier of:

(A) the last day of the Fiscal Year of the Partnership during which the decision to withdraw is made; or

(B) the last day of the fiscal quarter during which such decision to withdraw is made or of any subsequent fiscal quarter if such day is recommended by counsel.

## ARTICLE XV
## ADVISORY COMMITTEE

**Section 15.01 Advisory Committee.** Not later than the second (2nd) anniversary of the Initial Closing, the General Partner shall form an advisory committee (the "**Advisory Committee**") composed of up to five (5) individuals who shall be representatives of certain Fund Investors selected by the General Partner in its sole discretion. No voting member of the Advisory Committee shall be an Affiliate of the General Partner, *provided* that the General Partner may appoint one or more representatives as non-voting members of the Advisory Committee. The Advisory Committee shall (a) provide advice to the General Partner with respect to certain issues involving conflicts of interest in any transaction or relationship between the Fund and the General Partner or any of its employees or Affiliates that are presented to the Advisory Committee by the General Partner, (b) provide advice regarding certain investment transactions and investment valuations and (c) take other action, consent to or approve matters as provided in this Agreement; *provided* that no transaction that is specifically authorized in this Agreement shall require approval of the Advisory Committee. Each member of the Advisory Committee shall owe no fiduciary or other duties to the Partnership or the Partners and may act solely in the interest of the Fund Investor that it represents. Neither the Advisory Committee nor any member thereof shall have the power to bind or act for or on behalf of the Partnership in any manner. No Fund Investor who appoints a member of the Advisory Committee shall be deemed to be an Affiliate of the Fund, the Partnership, or the General Partner solely by reason of such appointment.

**Section 15.02 Meetings of and Action by the Advisory Committee.** The General Partner shall hold a meeting of the Advisory Committee at least annually with at least sixty (60) days' prior notice of the meeting. The General Partner may call special meetings of the Advisory Committee with at least five (5) Business Days' prior notice. The Advisory Committee shall act by at least a majority of its members (unless otherwise specified herein), which action may be taken by written consent in lieu of a meeting. A quorum for a meeting of the Advisory Committee shall be a majority of its members. Members may participate in a meeting of the Advisory Committee by telephone or similar communications by means of which all Persons participating in the meeting can hear and be heard. Any member who is unable to attend a meeting of the Advisory Committee may, by delivering a written notice to the General Partner, (a) grant another member of the Advisory Committee or another Person that is an Affiliate of the Fund Investor that appointed such member a proxy to vote on any matter upon which action is taken at such meeting or (b) designate a Person that is an Affiliate of the Fund Investor that

appointed such member to observe, but not vote on any matter acted upon at such meeting. The Advisory Committee shall conduct its business by such other procedures as a majority of its members consider appropriate.

**Section 15.03 Fees of Advisory Committee.** No fees shall be paid by the Fund to members of the Advisory Committee, but the members of the Advisory Committee shall be reimbursed by the Fund for all reasonable out-of-pocket expenses incurred in attending meetings of the Advisory Committee.

**Section 15.04 Member Removal or Resignation.** A member of the Advisory Committee may resign upon delivery of written notice from such member to the General Partner, and shall be deemed removed if (a) the Fund Investor that appointed such member (i) requests in writing to the General Partner that such member be removed, (ii) becomes a defaulting Fund Investor or (iii) Transfers all of its Interest (or its aggregate ownership interest in the Fund) or (b) the General Partner elects to remove such member with Advisory Committee Consent. If a member becomes unable to serve on the Advisory Committee, resigns or is removed, the Fund Investor that appointed such member may appoint a replacement member to serve on the Advisory Committee as long as (x) such Person is reasonably acceptable to the General Partner and (y) such Fund Investor is not in default under Section 6.05 of this Agreement or such similar provision in the operative documents of the Related Investment Vehicle or Alternative Investment Vehicle in which it is admitted (as applicable).

## ARTICLE XVI
## AMENDMENTS AND MEETINGS

**Section 16.01 Amendment Procedure.** This Agreement may be amended or modified only as follows:

(a) Amendments to this Agreement shall be proposed by the General Partner.

(b) A proposed amendment will be adopted and effective only if it receives the consent of the General Partner, which consent it may grant or withhold in its sole discretion, and consent of a Majority in Interest of the Limited Partners, except that (i) amendments may be adopted by the General Partner, without consent of a Majority in Interest of the Limited Partners, to (A) effect changes of an administrative or ministerial nature or to cure ambiguities or inconsistencies in the Agreement, (B) admit or withdraw one or more Partners in accordance with the terms of this Agreement, (C) make changes to this Agreement negotiated with Limited Partners admitted to the Partnership after the Initial Closing so long as such changes do not materially adversely affect the rights and obligations of any existing Limited Partner or (D) change the name of the Partnership, (ii) an amendment to any provision which by its express terms applies only to ERISA Partners (which shall include Section 3.02(n) and ARTICLE XIV) shall also require the consent of seventy-five percent (75%) of the Percentage Interests of the ERISA Partners, and (iii) Sections 2.01, 3.01, 3.02, 3.03, 3.05, 3.08, 4.01, 4.03, 4.04, 4.07, 4.09, 4.10, 6.03, 7.01, 7.02, 7.03, 7.04, 8.01, 8.02, 8.03, 9.02, and 10.02 and Articles XII, ARTICLE XV, and ARTICLE XVI may not be amended or modified without consent of the General Partner and consent of a Majority in Interest of the Limited Partners.

(c) In addition to any amendments otherwise authorized herein, and notwithstanding anything to the contrary in this Agreement, the General Partner may amend this Agreement, without consent of a Majority in Interest of the Limited Partners, in connection with the formation of any Alternative Investment Vehicle, as may be necessary or appropriate to facilitate the formation and operation of such Alternative Investment Vehicle, so long as any such changes do not adversely affect the rights and obligations of any existing Limited Partner.

(d) The General Partner shall furnish each Limited Partner with a copy of each amendment to this Agreement promptly after its adoption.

(e) The Partnership or the General Partner may, without any further act, approval, or vote of any Partner, enter into side letters or other agreements with one or more Limited Partners that have the effect of establishing rights under, or altering or supplementing, the terms of, this Agreement, and any rights established or any terms of this Agreement altered or supplemented in a side letter with a Limited Partner shall govern solely with respect to such Limited Partner notwithstanding any other provision of this Agreement.

**Section 16.02 Exceptions.** Notwithstanding the provisions of Section 16.01, no amendment shall be effective as to any Limited Partner without the consent of such Limited Partner that:

(a) increases the aggregate Capital Contributions required from such Limited Partner or decreases, except to the extent permitted pursuant to Section 16.01(c), the interests of such Limited Partner in the Net Income, Net Loss, fees, or Distributable Cash of the Partnership;

(b) adversely affects the limited liability of such Limited Partner under this Agreement or the Delaware Act; or

(c) directly or indirectly affects or jeopardizes the status of the Partnership as a partnership for federal income tax purposes.

(d) Notwithstanding anything herein to the contrary, this Agreement may be amended, and/or the Partnership may be reorganized or reconstituted, from time to time by the General Partner, without the consent of any Limited Partner, to address any change in regulatory or tax legislation, including any change in tax law related to the Carried Interest Distributions that materially and adversely affects the federal, state, or local tax treatment of the Carried Interest Distributions to the General Partner or to any of its direct or indirect members, provided that any such amendment, reorganization, or reconstitution would not add to the obligations (including any tax liabilities) of any Limited Partner or adversely alter any of the rights or benefits (including entitlements to distributions or any other economic rights) of any Limited Partner.

**Section 16.03 Meetings and Voting.**

(a) Meetings of the Partners may be called by the General Partner for any purpose permitted by this Agreement or the Delaware Act at a time and place reasonably selected by the General Partner. Except as otherwise specified herein, the General Partner shall give all Limited Partners not less than fifteen (15) nor more than sixty (60) days' notice of the

purpose of such proposed meeting and any votes to be conducted at such meeting. Partners may participate in a meeting by telephone or similar communications by means of which all Persons participating in the meeting can hear and be heard. The General Partner shall call a meeting of the Partners for informational purposes at least once every Fiscal Year with at least sixty (60) days' notice to discuss the Fund's investment activities.

(b) The General Partner shall, where feasible, solicit required consents of the Limited Partners under this Agreement by written ballot with at least fifteen (15) days' notice or, if a written ballot is not feasible, at a meeting held pursuant to Section 16.03(a).

## ARTICLE XVII
## MISCELLANEOUS

**Section 17.01 Severability.** Each provision of this Agreement shall be considered separable and if for any reason any provision or provisions herein are determined to be invalid, unenforceable, or illegal under any existing or future law in any jurisdiction, such invalidity, unenforceability, or illegality shall not impair the operation of or affect those portions of this Agreement which are valid, enforceable, and legal.

**Section 17.02 Governing Law.** All issues and questions concerning the application, construction, validity, interpretation, and enforcement of this Agreement shall be governed by and construed in accordance with the internal laws of the State of Delaware, without giving effect to any choice or conflict of law provision or rule (whether of the State of Delaware or any other jurisdiction) that would cause the application of laws of any jurisdiction other than those of the State of Delaware.

**Section 17.03 Submission to Jurisdiction.** The parties hereby agree that any suit, action, or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement or the transactions contemplated hereby, whether in contract, tort, or otherwise, shall be brought in the United States District Court for the District of Delaware or in the Court of Chancery of the State of Delaware (or, if such court lacks subject matter jurisdiction, in the Superior Court of the State of Delaware), so long as one of such courts shall have subject-matter jurisdiction over such suit, action or proceeding, and that any case of action arising out of this Agreement shall be deemed to have arisen from a transaction of business in the State of Delaware. Each of the parties hereby irrevocably consents to the jurisdiction of such courts (and of the appropriate appellate courts therefrom) in any such suit, action, or proceeding and irrevocably waives, to the fullest extent permitted by law, any objection that it may now or hereafter have to the laying of the venue of any such suit, action, or proceeding in any such court or that any such suit, action, or proceeding which is brought in any such court has been brought in an inconvenient forum. Service of process, summons, notice, or other document by registered mail to the address set forth in the books and records of the Partnership shall be effective service of process for any suit, action, or other proceeding brought in any such court.

**Section 17.04 Successors and Assigns.** Subject to the restrictions on Transfers set forth herein, this Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, executors, administrators, successors, and assigns.

**Section 17.05 Waiver of Jury Trial.** Each party hereto hereby acknowledges and agrees that any controversy which may arise under this Agreement is likely to involve complicated and difficult issues and, therefore, each such party irrevocably and unconditionally waives any right it may have to a trial by jury in respect of any legal action arising out of or relating to this Agreement or the transactions contemplated hereby.

**Section 17.06 Waiver of Action for Partition.** Each of the parties hereto irrevocably waives during the term of the Partnership any right that it may have to maintain any action for partition with respect to any property of the Partnership.

**Section 17.07 Record of Limited Partners.** The General Partner shall maintain at the office of the Partnership a record showing the names and addresses of all the Limited Partners. All Limited Partners and their duly authorized representatives shall have the right to inspect such record for a purpose reasonably related to such Limited Partner's Interest.

**Section 17.08 Headings.** The headings in this Agreement are inserted for convenience or reference only and are in no way intended to describe, interpret, define, or limit the scope, extent, or intent of this Agreement or any provision of this Agreement.

**Section 17.09 Counterparts.** This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by facsimile, e-mail, or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

**Section 17.10 Notices.** All notices, requests, consents, claims, demands, waivers, and other communications hereunder shall be in writing and shall be deemed to have been given: (a) when delivered by hand (with written confirmation of receipt); (b) when received by the addressee if sent by a nationally recognized overnight courier (receipt requested); (c) on the date sent by e-mail of a PDF document (with confirmation of transmission) if sent during normal business hours of the recipient, and on the next Business Day if sent after normal business hours of the recipient; or (d) on the third (3rd) day after the date mailed, by certified or registered mail, return receipt requested, postage prepaid. Such communications must be sent to the respective parties at the following addresses (or at such other address for a party as shall be specified in a notice given in accordance with this Section 17.10):

| | |
|---|---|
| If to the General Partner or Partnership: | c/o Swiftarc Beauty Fund GP, LLC<br>801 Brickell Avenue, Office 709<br>Miami, Florida 33131<br>E-mail: sid@swiftarcventures.com<br>Attention: Sid Jawahar |
| with a copy to: | DuBois Bryant & Campbell, LLP<br>303 Colorado Street, Suite 2300<br>Austin, Texas 78701<br>E-mail: wteten@dbcllp.com<br>Attention: William T. Teten |

**Section 17.11 Entire Agreement.** This Agreement (including any Schedules and Exhibits), the Subscription Agreements, any Side Letter Agreement and any other written agreements between the General Partner or the Partnership and the Limited Partners executed in connection with the subscription by the Limited Partners for the Interests, constitutes the sole and entire agreement of the parties to this Agreement.

**Section 17.12 No Third-party Beneficiaries.** Except as expressly provided to the contrary in this Agreement (including those provisions which are for the benefit of the Covered Persons), this Agreement is for the sole benefit of the parties hereto (and their respective heirs, executors, administrators, successors, and assigns) and nothing herein, express or implied, is intended to or shall confer upon any other Person any legal or equitable right, benefit, or remedy of any nature whatsoever under or by reason of this Agreement.

**Section 17.13 Counsel.** The General Partner, acting on behalf of the Partnership, has initially selected DuBois Bryant & Campbell, LLP ("***Partnership Counsel***") as legal counsel to the General Partner when acting on behalf of the Partnership. Each Limited Partner acknowledges that Partnership Counsel does not represent any Limited Partner (in its capacity as such) and shall owe no duties directly to any Limited Partner (in its capacity as such) whether or not Partnership Counsel has in the past represented or is currently representing such Limited Partner with respect to other matters. Counsel to the Partnership may also be counsel to the General Partner and its Affiliates. The General Partner may execute on behalf of the Partnership and the Partners any consent to the representation of the General Partner when acting on behalf of the Partnership or the General Partner that counsel may request pursuant to the applicable rules of professional conduct in any jurisdiction. In the event any dispute or controversy (including litigation) arises between any Limited Partner and the General Partner when acting on behalf of the Partnership or itself, or between any Limited Partner or the General Partner when acting on behalf of the Partnership, on the one hand, and the General Partner (or an Affiliate of the General Partner) that Partnership Counsel represents, on the other hand, then each Limited Partner agrees that Partnership Counsel may represent either the General Partner when acting on behalf of the Partnership, or the General Partner (or its Affiliate), or both, in any such dispute or controversy to the extent permitted by the applicable rules of professional conduct in any jurisdiction, and each Limited Partner hereby consents to such representation.

**Section 17.14 Side Letter Agreements.** Notwithstanding anything herein to the contrary, the Limited Partners hereby acknowledge and agree that the Partnership or the General Partner may, without the approval of the other Limited Partners, enter into a side letter or similar agreement with a Limited Partner that has the effect of establishing rights under, or altering or supplementing the terms of, this Agreement, and any rights established or any terms of this Agreement altered or supplemented in a side letter or similar agreement with a Limited Partner shall govern with respect to such Limited Partner (each, a "***Side Letter Agreement***"). A record shall be maintained by the General Partner of any side letter or similar agreement entered into by the Partnership or the General Partner with any of the Limited Partners.

**Section 17.15 Confidentiality.**

(a) Each Limited Partner shall maintain the confidentiality of (i) "Non-Public Information," (ii) any information subject to a confidentiality agreement binding upon the General Partner or the Partnership of which such Limited Partner has been provided written notice and (iii) the identity of other Limited Partners and their Affiliates so long as such information has not become otherwise publicly available unless, after reasonable notice to the Partnership by the Limited Partner, otherwise compelled by court order or other legal process or in response to other governmentally imposed reporting or disclosure obligations including, without limitation, any act regarding the freedom of information to which it may be subject; *provided*, that, for any *bona fide* business purpose reasonably related to its Interest in the Partnership, each Limited Partner may disclose "Non-Public Information" to its Affiliates, officers, employees, agents, professional consultants, and regulators upon notification to such Affiliates, officers, employees, agents, consultants, or regulators that such disclosure is made in confidence and shall be kept in confidence; *provided*, *further*, that each Limited Partner shall be liable for any subsequent disclosure of any such Non-Public Information disclosed by it to any such Person.

(b) As used in this Section 17.15, "***Non-Public Information***" means information regarding the Fund, the Partnership, the General Partner, the Investment Manager, their respective Affiliates, any Portfolio Investment or potential investment, any existing or potential Portfolio Company, or any existing or potential counterparty of the Partnership or source of existing or potential Portfolio Investments received by such Limited Partner pursuant to this Agreement, but does not include information that was publicly known when received by such Limited Partner, subsequently becomes publicly known through no act or omission by such Limited Partner or is disclosed to such Limited Partner by a third party not known to such Limited Partner to be bound by any confidentiality obligation. The General Partner may not disclose the identities of the Limited Partners, except on a confidential basis to prospective and other Limited Partners in the Partnership, or to lenders, third-party partners, or other financial sources. In the event a Limited Partner receives a request for the disclosure of information under freedom of information acts or similar statutes that is Non-Public Information, the Limited Partner shall (i) promptly notify the Partnership and the General Partner of the existence, terms, and circumstances surrounding such request, (ii) consult with the Partnership and the General Partner regarding taking steps to resist or narrow such request, (iii) if disclosure of such information is required, furnish only such portion of such information as such Limited Partner is advised by counsel is legally required to be disclosed, and (iv) cooperate with the Partnership and the General Partner in their efforts to obtain an order or other reliable assurance that confidential treatment will be accorded to such portion of the information that is required to be disclosed. Notwithstanding any provision of the Agreement to the contrary, the General Partner may withhold disclosure of any Non-Public Information (other than this Agreement or tax reports) to any Limited Partner if the General Partner reasonably determines that the disclosure of such Non-Public Information to such Limited Partner may result in the public disclosure of such Non-Public Information, and in such case the General Partner will use commercially reasonable efforts to make such information available to such Limited Partner through an alternate means; provided that such information will not thereby become subject to public disclosure.

*[Signature Pages Follow]*

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

**GENERAL PARTNER:**

Swiftarc Beauty Fund GP, LLC

DocuSigned by:

By: Sid Jawahar

BB217A15B3AF44B...

Name: Sid Jawahar
Title: Manager

**[Class I Limited Partner and Class II Limited Partner signature pages to be inserted from applicable Subscription Agreements.]**

# EXHIBIT A

## FORM OF SUBSCRIPTION AGREEMENT

*[See Attached]*

# EXHIBIT B

## FORM OF INVESTMENT MANAGEMENT AGREEMENT

*[See Attached]*

# INVESTMENT MANAGEMENT AGREEMENT

This Investment Management Agreement (this "***Agreement***"), is made and entered as of September ___, 2021 by and among Swiftarc Ventures, LLC, a Texas limited liability company (the "***Investment Manager***"), Swiftarc Beauty Fund, LP, a Delaware limited partnership (the "***Fund***"), and Swiftarc Beauty GP, LLC, a Delaware limited liability company (the "***General Partner***"). All capitalized terms not defined herein shall have the meanings set forth in the Partnership Agreement (defined below).

WHEREAS, the Fund has been formed to make one or more investments in certain Portfolio Companies, in accordance with the terms of the Partnership Agreement;

WHEREAS, the Investment Manager is controlled by individuals with substantial experience and expertise in transactions involving similar investments;

WHEREAS, the Amended and Restated Limited Partnership Agreement of the Fund, dated as of September ___, 2021, as amended from time to time (the "***Partnership Agreement***"), provides that the Fund shall appoint the Investment Manager to provide portfolio management and administrative services to and to act as the Investment Manager of the Fund; and

WHEREAS, the Investment Manager desires to render such services to the Fund on behalf of the General Partner as set forth in the Partnership Agreement.

NOW, THEREFORE, in consideration of the mutual covenants hereinafter contained, the Fund, the General Partner and the Investment Manager agree as follows:

1. **Services and Duties**.

(a) To the extent permitted under the Partnership Agreement, the Fund hereby engages and delegates certain powers of the General Partner under the Partnership Agreement to the Investment Manager, and the Investment Manager hereby agrees, as an independent contractor, to accept such delegation and to assist the General Partner in the performance of its duties under the Partnership Agreement. The duties of the Investment Manager, subject to the supervision of the General Partner and to the terms of the Partnership Agreement shall include, but shall not be limited to, the following: (i) maintaining the books and records of the Fund; (ii) providing office space to the Fund and the General Partner; (iii) assisting the General Partner in transactions related to Portfolio Investments; and (iv) monitoring the management and operations of the Portfolio Companies and their subsidiaries; and (v) preparing annual financial statements and tax returns for the Partnership (including K-1s for all Partners). The Investment Manager hereby agrees to comply with the investment restrictions and other provisions as set forth in the Partnership Agreement.

(b) It is expressly understood that the management and the conduct of the activities of the Fund shall remain the sole responsibility of the General Partner and that all decisions relating to the management and disposition of the Portfolio Investment shall be made exclusively by the General Partner.

(c) In discharging any of its duties under this Agreement, the Investment Manager may utilize the services of attorneys, accountants, investment bankers, brokers, appraisers and others.

(d) The Investment Manager agrees to be bound by, and will use its reasonable best efforts to cause its partners and professional employees to comply with, all terms and provisions the Partnership Agreement applicable to the Investment Manager, including Article IX thereof.

2. **Investment Management Fee, etc**. The Fund shall pay the Investment Manager an Investment Management Fee, in the amounts and at the times provided in Section 9.02 of the Partnership Agreement. The Investment Manager hereby represents that it is familiar with the Partnership Agreement and agrees to all arrangements stated therein regarding the Investment Management Fee.

3. **Expenses to be Paid by the Investment Manager**. The Investment Manager shall be responsible for all costs and expenses relating to the general operation of its business and the performance of services hereunder; provided, that the Fund shall reimburse the Investment Manager for expenditures that constitute Organizational Expenses and Operating Expenses made by the Investment Manager on behalf of the Fund or the General Partner.

4. **Indemnification and Exculpation**. The Investment Manager and its agents, partners, directors, officers, employees, controlling Persons and Affiliates (a) shall be and hereby are indemnified and held harmless by the Fund in accordance with the terms of Section 4.3 of the Partnership Agreement and (b) shall not be liable to the Fund except as provided in Section 4.3 of the Partnership Agreement.

5. **Duration and Termination**. This Agreement may be terminated (a) by the Fund at any time after sixty (60) days' written notice to the Investment Manager without the payment of any penalty by the General Partner or the Fund, (b) by the Investment Manager after sixty (60) days' written notice to the General Partner, without the payment of any penalty by the Investment Manager, or (c) by the Investment Manager or the Fund immediately upon notice to the other, without payment of penalty by the Investment Manager or the Fund, as the case may be, if the General Partner for any reason is no longer the general partner of the Fund. Upon termination of this Agreement, the Investment Manager shall repay to the Fund or to a replacement Investment Manager, as directed by the General Partner, the unearned portion (computed on the basis of the number of days elapsed), if any, of any Investment Management Fee previously paid to the Investment Manager.

6. **Miscellaneous**.

(a) ***Services Not Exclusive***. The services of the Investment Manager are not exclusive to the General Partner and the Fund. The Investment Manager and any partner, employee or agent of the Investment Manager may, to the extent not prohibited by the Partnership Agreement, render similar services to others and engage in additional activities so long as the Investment Manager performs its obligations hereunder.

(b) ***Applicable Law; Submission to Jurisdiction***. THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL BE GOVERNED BY AND CONSTRUED AND ENFORCED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE, EXCLUDING ANY CONFLICT-OF-LAWS RULE OR PRINCIPLE THAT MIGHT REFER THE GOVERNANCE OR THE CONSTRUCTION OF THIS AGREEMENT TO THE LAW OF ANOTHER JURISDICTION. THE PARTIES HEREBY AGREE THAT ANY SUIT, ACTION, OR PROCEEDING BASED ON ANY MATTER ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT SHALL BE BROUGHT IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE OR IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE (OR, IF SUCH COURT LACKS SUBJECT MATTER JURISDICTION, IN THE SUPERIOR COURT OF THE STATE OF DELAWARE). EACH OF THE PARTIES HEREBY IRREVOCABLY CONSENTS TO THE JURISDICTION OF SUCH COURTS (AND OF THE APPROPRIATE APPELLATE COURTS THEREFROM) IN ANY SUCH SUIT, ACTION, OR PROCEEDING.

(c) ***Successors and Assigns***. This Agreement shall inure to the benefit of the parties hereto and the Covered Persons, and shall be binding upon the parties, and their respective successors, permitted assigns and, in the case of individual Covered Persons, heirs and legal representatives.

(d) ***Severability***. Every term and provision of this Agreement is intended to be severable. If any term or provision hereof is illegal or invalid for any reason whatsoever, such term or provision will be enforced to the maximum extent permitted by law and, in any event, such illegality or invalidity shall not affect the validity of the remainder of this Agreement.

(e) ***Entire Agreement***. This Agreement constitutes the entire agreement among the parties with respect to the subject matter hereof and supersedes any prior agreement or understanding among them with respect to such subject matter.

(f) ***Headings***. The headings of the sections of this Agreement are inserted for convenience only and shall not be deemed to constitute a part hereof or affect the interpretation thereof.

(g) ***Counterparts***. This Agreement may be executed in any number of counterparts, each of which shall be deemed an original and all of which taken together shall constitute a single agreement.

(h) ***Survival of Certain Provisions***. The provisions of Section 4 of this Agreement shall survive any termination or expiration of this Agreement and the dissolution, termination and winding up of the Fund.

(i) ***Waiver***. No waiver of the provisions of this Agreement shall be valid unless in writing and signed by the party to be bound. No failure or delay by any party in exercising any right or remedy hereunder shall operate as a waiver thereof and a waiver of a particular right or remedy on one occasion shall not be deemed a waiver of any other right or remedy or a waiver on any subsequent occasion.

(j) ***Intent***. This Agreement is intended to confirm the arrangements provided for in the Partnership Agreement for the services and duties of the Investment Manager to the Fund. Accordingly, the Partnership Agreement shall govern in the event of any conflict, ambiguity or inconsistency between this Agreement and the Partnership Agreement.

*[Signature Page Follows]*

IN WITNESS WHEREOF, the parties hereto have executed this Investment Management Agreement on the date first written above.

**INVESTMENT MANAGER**:

Swiftarc Ventures, LLC

By: ______________________________
Name: Sid Jawahar
Title:

**FUND**:

Swiftarc Beauty Fund, LP

By: Swiftarc Beauty Fund GP, LLC,
its general partner

By: ______________________________
Name: Sid Jawahar
Title: Manager

**GENERAL PARTNER**:

Swiftarc Beauty Fund GP, LLC

By: ______________________________
Name: Sid Jawahar
Title: Manager

# SCHEDULE A

List of Partners as of [DATE]

**General Partner**

| General Partner: | Capital Contribution |
| --- | --- |
| Swiftarc Beauty Fund GP, LLC | $[AMOUNT] |

**Limited Partners**

| Class I Limited Partners: | Capital Contribution |
| --- | --- |
| [NAME]<br>[ADDRESS] | $[AMOUNT] |
| [NAME]<br>[ADDRESS] | $[AMOUNT] |
| Total Class I Limited Partner Contributions: | $[AMOUNT] |

| Class II Limited Partners: | Capital Contribution |
| --- | --- |
| [NAME]<br>[ADDRESS] | $[AMOUNT] |
| [NAME]<br>[ADDRESS] | $[AMOUNT] |
| Total Class II Limited Partner Contributions: | $[AMOUNT] |

| | |
| --- | --- |
| Total Limited Partner Contributions: | $[AMOUNT] |
| Total Partner Contributions: | $[AMOUNT] |